UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| INGA DOW, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| KELLER WILLIAMS REALTY, INC. | § | CIVIL ACTION NO. |
| JOHN DAVIS, GO MANAGEMENT, LLC, | § | |
| DAVID OSBORN, SMOKEY GARRETT, | § | |
| AND GARY KELLER, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW Inga Dow, Plaintiff in the above-styled and numbered cause ("Plaintiff"), and files this, her Original Complaint against Keller Williams Realty Inc. ("KWRI"), John Davis ("Davis"), GO Management, LLC ("GOM"), David Osborn ("Osborn"), Smokey Garrett ("Garrett"), and Gary Keller ("Keller") (KWRI, Davis, GOM, Osborn, Garrett, and Keller are collectively referred to herein as "Defendants"), and in support thereof would respectfully show the Court the following:

## I.
## THE PARTIES

1.1     Plaintiff is an individual residing in Tarrant County, Texas.

1.2     Defendant, KWRI, is a Texas for-profit corporation with a principal place of business located at: 1221 South Mopac Expressway, Suite 400, Austin, Texas 78746.  KWRI may be served through its registered agent, Valerie Volger-Stipe, located at: 1221 South Mopac Expressway, Suite 400, Austin, Texas 78746.

1.3     Defendant, Davis, is an individual residing and doing business in the State of Texas, and he may be served with process at: (a) 2815 Ridgecrest Drive, Southlake, Texas 76092; or (b) wherever he may be found.

1.4     Defendant, GOM, is a Texas limited liability company, which owns the DFW Region for Keller Williams, with a principal place of business located at: 1011 San Jacinto Blvd., Suite 303, Austin, Texas 78701.  GOM may be served through its registered agent, Corporate Creations Network, Inc., located at: 5444 Westheimer, #1000, Houston, Texas 77056.

1.5     Defendant, Osborn, is an individual residing and doing business in the State of Texas, and he may be served with process at: (a) 3112 Point O Woods, Austin, Texas 78735; (b) 2904 Popano CV, Austin, Texas 78746; or (c) wherever he may be found.

1.6     Defendant, Garrett, is an individual residing and doing business in the State of Texas, and he may be served with process at: (a) 1812 Nora Drive, Pantego, Texas 76013; (b) 700 Highlander Blvd., Arlington, Texas 76015; or (c) wherever he may be found.

1.7     Defendant, Gary Keller, is an individual residing and doing business in the State of Texas, and he may be served with process at: (a) 105 Riley Road, Austin, Texas 78746; or (b) wherever he may be found.

## II.
## JURISDICTION AND VENUE

2.1     This Court has jurisdiction over this matter pursuant to federal statutory law, particularly Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*., The Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*., as well as The Federal Declaratory Judgment Act.[1]

---

[1] 28 U.S.C. § 2201.

2.2     This Court is vested with original and supplemental jurisdiction over these claims by operation of 28 U.S.C. §§ 1331 and 1367.

2.3     Venue lies in this judicial district, pursuant to 28 U.S.C. § 1391, because it is the judicial district in which Plaintiff and Defendants (one or more) reside, where KWRI does business, and in which a substantial part of the events or omissions giving rise to the claim occurred.

2.4     Additionally, an actual controversy exists between the parties hereto within the meaning of 28 U.S.C. § 2201, and this Court is, therefore, vested with the power in the instant case to declare and adjudicate the legality of the actions and/or conduct by Defendants against Plaintiff.

2.5     Plaintiff timely filed charges of discrimination, retaliation, and hostile work environment with the Equal Employment Opportunity Commission (the "EEOC").  Plaintiff received her Right to Sue Letter from the EEOC on or about August 4, 2021 (the "EEOC Right to Sue Letter").  This Complaint has been filed within ninety (90) days of Plaintiff's receipt of the EEOC Right to Sue Letter.

2.6     Additionally, Plaintiff received her Notice of Complainant's Right to File Civil Action Letter from the Texas Workforce Commission, on or about September 13, 2021, permitting her to pursue her state law claims under Chapter 21 of the Texas Labor Code (the "FWHRC Right to Sue Notice").

### III.
### FACTUAL BACKGROUND

*A.     Overview of KWRI's Structure*

3.1     KWRI is a real estate franchise company with offices throughout the United States and Canada.  For those wishing to franchise a location, KWRI operates through a Market Center License Agreement (the "Franchise Agreement") with a "licensee" (the "Franchisee").  The

Franchisee is an individual that typically operates through an entity to own and operate a "market center," in exchange for access to the "Keller Williams brand," which includes operating and financial software, as well as business training and support (the "Market Center").[2]

3.2    Each Market Center operates largely through real estate agents engaged as "independent contractors," but also, each one employs staff who support the agents and basic business operations.  Yet, importantly, despite being its own entity and employer, each Market Center is subject to extensive oversight and control by both KWRI and Regional Office staff ("Regional Staff" and/or the "Region"), through the terms of the Franchise Agreement and KWRI's rules and procedures.[3]   This system supports what Keller Williams refers to as its "ecosystem."

3.3    In fact, this ecosystem is a complex and incestuous system of business and employment relationships.  For example, it is very common for a person to "own a region" through an entity, but also be employed by that, or another, regional entity in some capacity.  Simultaneously, that same person may own a Market Center, again through a separate entity, but also be an employee of that, or another, Market Center, all while also serving as an employee of KWRI.[4]

---

[2] A "Market Center" is an "approved facility" (i.e., by KWRI) from which a licensee (or the Franchisee) conducts the business of brokering the sale and purchase of real estate, as well as offering of any other approved services under the KWRI System.

[3] A "Regional Representative means the independent representative of Company who is authorized to perform certain duties on Company's behalf. . . ."  There are currently over 50 Regions throughout the United States and Canada.

[4] For example, John Davis, who will be discussed below, was employed by, and served as the CEO of KWRI until in or around December 2018.  During that time, he was also a partner in several market centers, an operating partner of multiple market centers, and a regional owner.  Gary Keller, while serving as CEO, was also an owner of a Market Center.

4

3.4     As a result of these complex, intertwined employment and ownership relationships, or perhaps because of it, KWRI maintains a significant, top-down, homogenized approach to the how real estate is sold under the Keller Williams brand by exercising an enormous degree of control over the day-to-day operations of the Market Centers through the Franchise Agreement and other policies.[5]

3.5     To that end, each Market Center is required to operate subject to a broad set of operating policies, procedures, and standards, all created and maintained by KWRI and pushed down to Franchisees through the Franchise Agreement and the Region.

3.6     Pursuant to the Franchise Agreement, KWRI retains the right to "adjust the boundaries of the Awarded Area at any time," in the sole "business judgment" of the Company, and a Franchisee may not relocate without express consent from KWRI.  In addition, a Franchisee must obtain approval from Regional Directors, Regional Owners, and/or KWRI itself before finalizing various operational decisions, such as expansion, sales, and budgeting.[6]

3.7     More importantly, for purposes of Plaintiff's claims, KWRI acts as an "employer" by providing manuals, software, and programs, which each franchisee is expected to use for business operations and employee relations.  In fact, with respect to employment at each Market Center, KWRI issues and maintains a mandatory 116-page *Policies and Guidelines Manual* containing detailed guidance on everything from how regions and Market Centers are structured, to employee pay issues (the "KWRI Manual").

---

[5] In fact, in 2020, KWx, a holding company, was created to "create alignment, scale and efficiencies across the Keller Williams ecosystem."  *See New KWx Holding Company to Manage Keller Williams Subsidiaries and Affiliates, Gary Keller Steps Down as CEO*, found at https://www.rismedia.com/2020/10/09/new-kwx-holding-company-to-manage-keller-williams-subsidiaries-and-affiliates-gary-keller-steps-down-as-ceo/.

[6] For example, Market Centers must seek approval from KWRI for budgets and expenses, which also must be submitted to the Regional Office for approval.

3.8     The KWRI Manual states, "Keller Williams is led by associates . . ." and "[e]very policy and guideline in this manual has been created and reviewed by our Associate Leadership Councils (Local, City, Regional, and International)."

3.9     Pursuant to the KWRI Manual, Associate Leadership Councils, or "ALC's," are the "highest honor that can be bestowed to an agent."  The "agents" comprising each ALC are the top 20% of the producing agents within a Market Center, and they are required to meet once per month. Those agents are also involved in the updating of the KWRI Manual.

3.10    As set forth in the KWRI Manual, KWRI attempts to present itself as a "training and coaching company that also happens to be in the business of real estate."  KWRI lives up to that promise and more with an extremely hands-on model of control over any person or entity associated with the Keller Williams brand.

3.11    In fact, pursuant to Appendix F of the KWRI Manual, associates must live by the "Real Estate Professional's Creed," which is thirteen (13) affirmative statements of what it takes to be a "Keller Williams" real estate professional.  KWRI attempts to maintain the notion that "associates" are not employees of KWRI, but instead, employees or "independent contractors" of a Market Center; however, KWRI expects that their very specific methods and principles be adhered to by all.

3.12    Moreover, the KWRI Manual goes on to detail what "associates" must do to be successful.  For example, "attend orientation and completely read this manual," and "take part each week in the many educational, support and leadership opportunities available to you" demonstrate some, of the many, requirements set forth in the KWRI Manual for "associates."

3.13    Section 4 of the KWRI Manual outlines the KWRI structure, which is designed to "guarantee our associates a vehicle for giving direct input on the operation of Keller Williams

Realty."  As part of this "guarantee," KWRI <u>orders</u> associates to "assist in setting annual Market Center goals and plans, and <u>take an active part in implementing those plans</u>."  Which KWRI claims is to "[h]elp the Market Centers achieve these goals."  *Id.*

3.14    Finally, each Market Center <u>is required to use</u> an employment application developed and maintained by KWRI, and require each applicant to complete the Keller Personality Assessment developed and maintained by KWRI.[7]  Additionally, each Market Center must also use KWRI's onboarding documents and deliver various trainings covering the tools that KWRI wants each associate to use in all Market Center staff positions.[8]  Finally, a Market Center owner must also seek regional and KWRI approval to hire a Team Leader, Market Center Administrator, and Operating Partner ("OP"), even though they will allegedly be employed by the Market Center entity, and not KWRI or the region.[9]

3.15    The result is one large integrated entity whereby KWRI is, or acts as, the employer that pushes mandates down to each Market Center through the Region.  As such, both KWRI and Region possess joint control over the terms and conditions of employment of Plaintiff and others.

---

[7] This assessment is a 40-minute assessment that allegedly determines an applicant's behavioral strengths and operating style, but based on information and belief, it has not been vetted for discriminatory disparate impact risks, and in fact, it requires applicants to answer extremely difficult questions on things such as vocabulary.

[8] Such mandatory training includes, but is not limited to: OP Boot Camp, Team Leader Boot Camp, Market Center financial reporting, the KWRI Family Reunion (annual convention), biannual "mastermind meetings," MAPS coaching weekly, weekly call with the CEO of KWRI for Regional Directors, OPs, Team Leaders, and Market Center Administrators, quarterly regional meetings, weekly "regional" calls, biannual regional education, and each Market Center must purchase a copy of Gary Keller's book entitled *Millionaire Real Estate Agent*, as well as products offered by Keller Mortgage.

[9] The Franchise Agreement defines OP as "as Controlling Principal who has been designated by Licensee **and approved by the Company** as Licensee's primary officer assigned and empowered to act on Licensee's' behalf and the Team Leader's direct supervisor."  OPs, Team Leaders, and Market Center Administrator must also be approved by both the ALC and the Region.  In fact, the Region must interview the OP and Team Leader before those applicants are forwarded to KWRI for final approval.

3.16     In short, Defendants are jointly and severally liable for the failure to prevent and/or remediate the sexual harassment, sexual abuse, and retaliation suffered to date by Plaintiff at the hands of KWRI's employees and agents.

B.      _Plaintiff's Association with KWRI_

3.17     Plaintiff has been employed as an award-winning, top performing employee and/or Franchisee in Texas under the KWRI umbrella since 1992.  In fact, in 1996, she became a Team Leader in a Market Center owned by Keller, Founder and CEO, himself.  During her entire tenure, she has performed her functions under the Keller Williams brand within the Keller Williams ecosystem, as explained above.

3.18     Until only recently, the company culture was to encourage employees, especially women, to do whatever it took to make sales and "get along" with top performers and keep them happy.  "Getting along" included performing sexual favors with male counterparts and/or top clients.[10]

3.19     This mentality emboldened those associated with KWRI, either as employees or agents, to require, encourage, and/or turn a blind eye to ongoing sexual harassment and a sexually charged and permissible environment.[11]

3.20     Plaintiff, while witnessing sexual and sex-based harassment, was initially able to navigate through the sexually charged environment with integrity and still move up within the KWRI ecosystem, but that began to change in or around July 1996, when Plaintiff met Davis, who

---

[10] In or around late 2020, a few weeks after Plaintiff called Matt Green, Garrett's boss, KWRI launched a formal mandatory sexual harassment course for the Market Centers.  This is the first time Plaintiff has encountered any interest in sexual harassment training from KWRI and/or the Region since the time her employment began.

[11] For example, it was not uncommon for management to ask Plaintiff "why don't you just sleep with _____ to recruit them," "why don't you want to get in the hot tub with _____," or "why don't you go out with _____ (who was married)? It's harmless."

was hired as a mortgage loan officer for Keller Mortgage in Austin, Texas.[12]   In fact, Davis reported directly to Keller, who was also Plaintiff's boss and owner of the office she worked for at the time.

3.21    Davis is the nephew of Mary Tennant, a well-connected co-worker, and he moved into her house upon accepting the position of loan officer.   At that time, Mary Tennant had been Plaintiff's best friend since 1992, when they started together at Keller Williams.

3.22    In hindsight, from July 1996 until April 1998, Davis was using his aunt's close relationship with Plaintiff to gain her trust by being kind and "going to bat for her" within KWRI's executive structure, all to groom her for sexual favors.

3.23    In or around April 1998, the "payment became due."  Plaintiff was attending a party that month hosted by Mary Tennant, when Davis asked Plaintiff if he could come to her home after "to talk."  Plaintiff, having gotten to know Davis over the past few years, thought nothing of this request and said yes.

3.24    This was a mistake.   At one point in the evening, upon exiting the bathroom, Plaintiff entered her living room to find Davis masturbating.  Despite her shock, Plaintiff asked Davis to leave and walked him to the door.  However, before his exit, Davis, a large man, grabbed Plaintiff, and with both hands, digitally raped her.

3.25    Thereafter, nearly every time that he called Plaintiff, Davis demanded phone sex or that Plaintiff meet him at his house for sex.  Moreover, on one occasion at the end of May 1998, as Plaintiff cried out in pain and demanded that he stop, Davis did not stop and proceeded to anally rape Plaintiff.

---

[12] Keller Mortgage, LLC is another entity owned by Gary Keller, and part of the Keller Williams ecosystem.

3.26     The abuse and harassment continued, and Plaintiff had no choice but to acquiesce, as Davis was backed and supported by Keller, CEO and Founder, which gave Davis a high degree of power within KWRI.  In fact, Keller compelled Plaintiff, who was operating one of the most profitable offices of KWRI, to use his mortgage company, which Davis worked for, and which contained an office for Davis within Plaintiff's market center.  Additionally, Davis' aunt was very powerful within the Keller Williams ecosystem.  Importantly, when Plaintiff confided to Mary Tennant in or around August of 1998 what Davis was subjecting her to, Ms. Tennant told Plaintiff that she "was lying," that "it was disgusting," as Davis "would do no such thing" and hung up on Plaintiff.  Plaintiff never spoke to Mary Tennant, as a friend, again.  Plaintiff was left hopeless because she had reported sexual harassment and assault to not only her best friend, but a member of the KWRI "inner circle," and in return, she was hung up on and called a liar.[13]

3.27     Plaintiff knew any further complaints would fall on deaf ears within KWRI or the Region, and based on society at the time, with the authorities.  So, in or around September 1998 Plaintiff moved to Wichita Falls, Texas to live with her sister in an attempt to escape Davis' torment and demands for sex.  Importantly, the harassment had gotten so pervasive Plaintiff was willing to give up her career to escape it.  However, Osborn[14] sought after Plaintiff to bring her back to KWRI, and convinced her to move to Dallas to help him open some market centers in the DFW region. Plaintiff began working with Osborn in or around January 1999.  Unbeknownst to Plaintiff, in or around February 1999, Osborn brought Davis on board.

---

[13] At the time, Mary Tennant was the Team Leader in a Market Center owned by Keller, CEO and also in the chain of command to Mark Willis, the then-President of KWRI.  Plaintiff also wrote a letter to Mary Tennant in September 1998 reiterating the issue.  Mary Tennant never responded.

[14] The Osborn family, of which David Osborn was a member, owned the DFW Region.  Althea Osborn was the Regional Operating Partner.  In 1998, Althea Osborn hired David Osborn to be the Regional Director.  Osborn was in the Regional Director position until 2004, when he became Regional Operating Principal.

3.28     Plaintiff's own professional relationships with Osborn made it impossible to avoid Davis, or refuse to talk to and interact with him, especially considering Osborn hired Davis as a Team Leader,[15] for Osborn's Southlake Market Center, also part of the North Texas Region, so Plaintiff was forced to interact with Davis based on the intricate cross-relationships explained above, which required constant interaction.  In fact, Plaintiff was forced to attend regularly scheduled meetings which even required her to be face-to-face with Davis.

3.29     As a result, over the next three (3) years, Plaintiff, along with Osborn and Davis, worked very closely and the three eventually became partners in, and launched, three (3) separate market centers (the "Three Market Center Partnership"), which included the Fort Worth Market Center.  At this time, Plaintiff also ran two other successful market centers as the OP.

3.30     Plaintiff served as the OP,[16] for the Fort Worth Market Center from April to August 2002.  Plaintiff was also the Team Leader for the Fort Worth Market Center and, therefore, an employee of that Market Center.

3.31     Based on Plaintiff's status as an employee of the Fort Worth Market Center, the harassment from Davis became even worse in August 2002 when Osborn appointed Davis as the OP for the Fort Worth Market Center.  This appointment made Davis the supervisor of Plaintiff, as she remained in the position of Team Leader.  In short, Davis now held actual, legal authority to hire, discipline, and/or terminate Plaintiff even though she was also one of the Fort Worth Market Center Owners.  Such forced Plaintiff to endure his constant harassment and verbal berating.

---

[15] The Franchise Agreement defines "team leader" as "the individual who Licensee has designated **and Company has approved** as the individual who is responsible for serving as the Market Center's chief executive officer and managing the Market Center's Associate recruiting, training and consulting activities."

[16] The Franchise Agreement defines "operating principal" as "as Controlling Principal who has been designated by Licensee **and approved by the Company** as Licensee's primary officer assigned and empowered to act on Licensee's' behalf and the Team Leader's direct supervisor."  An OP must be approved by both the ALC and KWRI.

C.    *Davis' Continuing Sexual Abuse and Harassment of Plaintiff*

3.32    As Plaintiff's supervisor, Davis continued to force Plaintiff to engage in sexual relations and acts, and also subjected her to verbal harassment (the "Sexual Abuse and Harassment").

3.33    Throughout 2002, 2003, and 2004, Davis relentlessly and continuously carried out the Sexual Abuse and Harassment through severe emotional and psychological manipulation by constantly requesting that she speak to him about work, but then, turning the opportunity into a demand for sexual gratification.  This occurred in the office, on the way to meetings, over the phone, etc.  It was constant, severe, and pervasive.

3.34    To silence her during this timeframe, he regularly threatened to report Plaintiff's work performance as substandard, and he threatened disciplinary action for alleged wrongdoings, up to and including termination of employment, if she did not appease his requests for sex.

3.35    Additionally, during this same time frame, even though Plaintiff continued to receive awards and praise for her work, she knew that Davis was (1) her supervisor and (2) extremely well-connected within the DFW Region and KWRI staff and leadership.  In short, Plaintiff was fully aware that one comment from Davis could crater not only the career she had built, but also block her from future financial opportunities.

3.36    In fact, Davis constantly reminded Plaintiff of his status and power.  As such, Plaintiff was left with no choice but to acquiesce to Davis' sexual demands out of fear and threat of losing all that she had built over the past decade.[17]

---

[17] Additionally, as stated above, the culture fostered by KWRI was that women were expected to have sex with colleagues and managers to be successful as an agent and/or franchisee.  Based upon such information, in addition to the fact that Plaintiff had told Osborn that she was being sexually harassed and assaulted, Plaintiff believes management, including various others at KWRI, knew of Davis' harassment and abuse, but did nothing to address this culture, stop such treatment, or rectify such behavior.

3.37    Plaintiff suffered through Davis' incessant demands to "pleasure him orally or else" until in or around January 2004 when she found the courage to say that she would <u>no longer engage in any sexual act with him</u> and walked away from his advance that night.

3.38    However, as feared, in or around February of 2004, while at the KWRI annual convention, Plaintiff was approached for sex by Davis.  At that time, Davis was still Plaintiff's partner in the Three Market Center Partnership, as well as her supervisor in the Fort Worth Market Center; yet, <u>she stood her ground and would not submit to Davis' demand for sex</u>.

3.39    Almost immediately thereafter, in or around February 2004, Osborn informed Plaintiff that Davis had complained to him that Plaintiff was being "difficult to deal with."  To defend herself, Plaintiff <u>revealed to Osborn that Davis had been sexually, verbally, and emotionally abusing her for years</u>, that she had told Davis that she would no longer acquiesce to his demands and threats, and actually said no the next time he asked.  This, Plaintiff told Osborn, was why Davis was inferring she was "difficult."

3.40    Instead, without expressing any concern or empathy, Osborn informed Plaintiff that she would "have to do whatever it takes to get along," implying that he either condoned the pattern of abusive and harassing behavior against Plaintiff or acquiesced to the workplace sex culture of KWRI.[18]

3.41    Osborn, as an OP for the Three Market Center Partnership, a Regional OP for the DFW Region, and an agent acting on behalf of KWRI as its local/regional representative, was Davis' boss.  He had the power to stop the abusive and harassing behavior of his employee and subordinate, Davis.  He did nothing.

---

[18] In or around February 2004, over dinner with Plaintiff and her husband, Osborn confided to Plaintiff that he could not believe Plaintiff had not sued him over Davis' behavior and Osborn's failure to address it.

3.42    Within hours of being told by her harasser's boss that she should accept the harassment and assault, Davis approached Plaintiff and demanded sex.  Plaintiff was horrified that Osborn failed to instruct Davis to cease the Sexual Abuse and Harassment.  Instead of receiving protection from the abusive behavior, Plaintiff continued to face sexual, emotional, and verbal harassment from Davis, an agent of KWRI.

3.43    Unfortunately, it got worse.  In or around March 2004, Davis began a campaign of retaliation against Plaintiff for denying Davis' advances and Osborn did nothing to stop him.  Specifically, without any prior indication or any cause, other than Plaintiff's refusal to submit to the sexual demands of Davis, Davis and Osborn initiated a "business divorce" for the Three Market Center Partnership because Davis "would not accept the Regional Director position if Plaintiff remained a partner."  Accordingly, the two forced Plaintiff out of her own businesses.

3.44    Over the next five (5) months, Davis continued to verbally abuse and threaten Plaintiff by screaming and cussing at her, as well as belittling her.  Plaintiff felt harassed, afraid, and alone as it was clear that no one from KWRI or the DFW Region intended to provide her with any support, remedy, or protection from such reprehensible treatment.

3.45    As further retaliation, which lead to significant financial harm, Plaintiff was offered ownership in **one** of the three (3) offices, the Fort Worth Market Center, and was forced to tender approximately $100,000.00, plus interest, to buy the ownership interest from Davis and Osborn.

3.46    Instead of being compensated for the value of the businesses that she had devoted years developing, and despite the duress and abuse of her superiors on behalf of KWRI, she was left with an underperforming office and debt.  However, because Davis and Osborn held the power to remove Plaintiff from any KWRI affiliation, which would result in a complete loss of income and opportunity, she was left voiceless and powerless.  By August 2004, Osborn and Davis'

continued threats, harassment, and denigration had worn Plaintiff down and she accepted the terms that she was offered, in order to maintain some vestige of the career that she had built.

3.47    Throughout the remainder of 2004, Davis continued his emotional and psychological abuse, as well as sexual harassment, by constantly asking Plaintiff for sex. He would also make comments such as "you know you want it" and "no one can satisfy you like me," which made Plaintiff severely uncomfortable and fearful of continued and increased retaliation by him, the Region (because Davis was the DFW Regional Director), and by KWRI. As Regional Director, Davis held the authority to affect not only the performance of the Fort Worth Market Center, but also Plaintiff's career.

3.48    Additionally, based on KWRI's heavy-handed approach to franchising, Plaintiff was <u>required to attend</u> various regional and national meetings and interact with Davis, which presented him with numerous opportunities to continue his harassment. He would make some sort of sexual comment <u>every time he spoke with Plaintiff</u>, and he constantly tried to physically corner her alone to solicit sex and intimidate her throughout the remainder of 2004 and into 2005.

3.49    In May of 2005, Plaintiff began attempting to expand her territory by applying to launch a new market center for Johnson County, Texas. Her application required Davis' approval, as DFW Regional Director (the "Johnson County Market Center").

3.50    Based on Plaintiff's experience with approvals, new market center applications were approved in four (4) to six (6) months. However, Davis, without reason, "slow walked" the approval for Plaintiff's application. Not only did he delay approval, but he used the outstanding application as an excuse to contact Plaintiff and continue his verbal harassment and threaten Plaintiff by stating that her performance was "too poor to approve the application," despite the fact that she had been continuously recognized as a high performing team leader and OP.

3.51    In the end, it took twenty-one (21) months before Davis approved the Johnson County Market Center.  Not the four (4) to six (6) other applicants experienced.

3.52    At least monthly, from May 2005 to the final approval in late 2006, Davis continued his harassment through mandatory calls and meetings.  Even after Plaintiff married in March 2006, the harassment, retaliation, and hostile work environment continued.  Moreover, it expanded to now include Plaintiff's husband.  Davis began making comments about Plaintiff's husband such as "he's not as big as me," "you know you want me," "don't you miss me?" "your husband does not keep you satisfied," and "you will always want me."  In fact, on the day that Davis found out Plaintiff had married, he immediately called Plaintiff, who was at a lodge with her new husband, to inform her that "he will never satisfy you like I do."

3.53    Davis was crafty in that his calls usually began with business, but Davis regularly turned those calls into an opportunity to make sexually suggestive comments, as well as solicit and pressure Plaintiff to have sex with him.  Plaintiff continued to refuse his advances, and she began bringing her husband to meetings where possible, sitting in the back of the room at mandatory in-person meetings and leaving early to avoid Davis, etc.  These actions in self-preservation worked to limit her ability to freely engage with others, in an industry where interaction and personal relationships equate to success and financial gain.

3.54    By 2007, Davis extended his retaliation to public ridicule.  As Regional Director, he began shaming Plaintiff at regional meetings and during regional group phone calls.  For example, in or around January 2007, when Davis presented the numbers from the Fort Worth Market Center, he purposely excluded an explanation for a large group of agents moving to another Market Center (i.e., the agents had transferred to the newly approved Johnson County Market

Center), which made it appear that Plaintiff was hemorrhaging agents, and he manipulated the data to suggest that the Fort Worth Market Center was failing.

3.55    Davis' monthly actions of portraying the Fort Worth Market Center in a terrible light were so retaliatory that Plaintiff's Team Leader, Sarah Steen, noticed and expressed that she felt attacked and humiliated because she was part of the Fort Worth Market Center's leadership. Moreover, agents became aware of the reports and thought that they were failing as an office. Plaintiff was forced to constantly do "damage control" to create an alternative narrative to Davis' retaliation and defamation to keep her agents and attract more.

3.56    This hostile work environment was relentless, severe, and pervasive, and it caused Plaintiff to begin skipping national meetings and ceremonies to avoid Davis.

3.57    Moreover, now that Plaintiff was "on her own," from 2005 until Davis left Keller Williams in or around December 2018, Davis and Osborn joined forces to thwart Plaintiff's plans for expansion.  Osborn, who became an employee of KWRI in 2007, as President of Core Services, continued to turn a blind eye to the harassment of Plaintiff by Davis.

3.58    To this end, beginning in 2005, Osborn and Davis began to take business opportunities that Plaintiff presented for approval for themselves.  Together, Osborn and Davis, either failed to approve Plaintiff's expansion applications while swooping in and taking them for themselves, or went behind her back to her potential investors and made it clear that the applications would not be approved, intentionally interfering with the growth of her business, and intimidating potential investors.[19]

---

[19] In fact, in or around 2018, one potential investor specifically told Plaintiff that it backed out of a business deal because it did not want to anger Davis or Osborn and feared retaliation from them.

3.59    In 2008, Davis was promoted to President of Growth and became an employee of KWRI.  The President of Growth for KWRI is essentially the President, and one step down from the CEO.  Additionally, he remained the Regional Director and OP for three (3) Market Centers.

3.60    Throughout 2008, even though an employee of KWRI, Davis maintained close, hands-on control and authority over regional directors, OPs, and team leaders, including Plaintiff.  In this regard, he remained in Plaintiff's chain of authority and control, and he used that position to continue to impugn her reputation, now also from the "KWRI" level, by regularly stating that she was "difficult," "not a team player," "not a good performer," "not a good owner/broker," and "near bankruptcy," none of which was true, to Market Center, Regional, and KWRI staff.

3.61    It is Plaintiff's belief that Davis' actions were carried out to continue to intimidate, threaten, punish, and harass Plaintiff for her refusal to acquiesce to Davis' continuing sexual demands and propositions.

3.62    In addition, from 2007 to 2009, Davis, who still held the power to approve Plaintiff's expansion applications, continued his harassment and retaliation by delaying every application Plaintiff made, and continually creating obstacles for Plaintiff to hinder her success and growth of her business.[20]

3.63    Plaintiff thought things would change for the better in 2009, when Davis sold the shares in his partnerships with Osborn and focused in regions outside DFW, but she was wrong.[21]

---

[20] For example, Plaintiff applied to launch a business office in Cleburne, which was permitted under her Johnson County, Texas franchise agreement.  Under Osborn's direction, Davis permitted an investor from Houston to pursue a territory in West Fort Worth, in direct competition with Plaintiff's office in Fort Worth.  This action forced Plaintiff to compete with this investor during the three (3) years that it took to obtain approval from Davis and Osborn for this territory.

[21] In May 2009, Osborn informed Plaintiff that Davis sold his shares because Osborn "doesn't want to be entangled in Davis' lawsuits for bullying others."

He remained the President of Growth for KWRI, and he still required Plaintiff to participate in weekly calls, and the harassment and demeaning during these meetings continued for years on end.

3.64    In or around May 2011, Plaintiff met with Alexandra Christman, Plaintiff's MAPS Coach and an employee of KWRI, who worked directly for the KWRI President of Education, Diane Kokoszka.  During this <u>mandatory</u> meeting, Plaintiff shared that she "needed help," and she disclosed that Davis had sexually abused her, and because she now refused to have sex with him, he had turned to sexual harassment, intimidation, and retaliation.  Alexandra Christman stated that she would relay the message, but "did not think that KWRI would do anything about it because [Davis] was too powerful."

3.65    Plaintiff was never contacted concerning the allegations, and Davis continued to harass Plaintiff in some way at least monthly on calls, or through rumors that she would hear of later.

3.66    Davis' campaign to impugn Plaintiff was so pervasive that in or around September 2015, DeeDee Trosclair, Regional Director of the DFW Region at the time, advised Plaintiff to submit her application to expand to West Fort Worth before December.  By November 2015, DeeDee Trosclair advised Plaintiff again to submit her application because Davis "would be CEO" and "he doesn't like you," "he disses you all the time," and will "do anything he can to deny your application."

3.67    In addition to the continuous and non-stop reputational attacks and retaliation against Plaintiff by hindering her business growth and prospects, in or around November 2015, at the KW MAPS Coaching-Recharge Exclusive, an event where only 100 top leaders were invited, Davis made a point to physically intimidate Plaintiff.  Davis approached Plaintiff's table, stood behind her while she was seated, and placed his hand on Plaintiff's shoulder while he talked with

the other individuals at Plaintiff's table (but not Plaintiff herself).  Such intimidating behavior not only made Plaintiff physically uncomfortable, but it also brought back traumatizing memories of the ongoing sexual harassment, abuse, assault, and intimidation of Plaintiff.

3.68    Meanwhile, back in the DFW Region, Garrett, a close friend of Davis who had joined Keller Williams in 2004, was working his way up the Keller Williams ecosystem ladder. In or around 2016, he became the DFW Regional Director, and as such, he assumed a position of authority over Plaintiff.

3.69    While Davis continued to disparage Plaintiff in his monthly meetings with Garrett and other regional and KWRI leadership, which on occasion included Osborn, Garrett took up Davis' campaign of disparagement, harassment, and hostility toward Plaintiff through the region. Accordingly, Garrett continued the pattern of constant harassment with unwarranted delays of applications, bad-mouthing Plaintiff, and withholding of expansion opportunities from Plaintiff, behavior that was not exhibited toward other employees, franchisees, or agents in the DFW Region.  In short, Plaintiff was being attacked from the national and regional levels.[22]

3.70    Simultaneously, Osborn, still employed as the Regional OP and Garrett's supervisor, allowed Garrett to continue the hostile and harassing practices of Davis, doing nothing to offer protection despite his knowledge of such behavior and requests for help from Plaintiff.

3.71    In or around January 2016, Plaintiff learned that negative comments about Plaintiff were being made to peers and agents in both the DFW Region and at the national level, which included lies such as she was not a team player, her performance was sub-par, and she was not

---

[22] By way of example, despite being extremely well-qualified, Garrett refused to approve the mega-agent location application of one of Plaintiff's agents in the summer of 2016.  Yet, also in 2016, Garrett violated a KWRI/Regional rule of obtaining the Franchisee's written consent before approving a mega-agent location in their territory when he allowed two of his friends to open mega-agent locations in, not one, but two of Plaintiff's territories.

financially solvent.  None of the statements were true and only served to continue the pattern of constant harassment and hostility toward Plaintiff, which had been going on for years.[23]

3.72    Throughout 2016, Plaintiff was constantly disturbed because Garrett would use the same words Davis used, and even mimicked Davis' voice when he spoke to Plaintiff.  It is Plaintiff's belief that this behavior was meant to telegraph that Davis' pattern of retaliation for denying him sex would continue with Garrett, and the two discussed her and how to retaliate against her.

3.73    Throughout this time, Davis remained powerful, and in or around February 2017, he was named co-CEO of Keller Williams.  By April 2017, he was the sole CEO.  Even after becoming the CEO of KWRI, an international force in the real estate industry, he still held mandatory weekly calls for OPs, of which Plaintiff was one, to dictate actions, approve decisions, and remain involved in the day-to-day operations of the Market Centers.  Davis continued to use these weekly calls to disparage, harass, exhibit hostility toward, and retaliate against Plaintiff.

3.74    In or around 2017, the ten-year renewal of the Fort Worth Market Center, Plaintiff's most profitable market center, was due.  Osborn and Garrett refused to renew the license based on alleged non-compliance; and to date, they continue to force Plaintiff to operate on a month-to-month extension.  Such has caused Plaintiff to never know when, or if, her license will be approved, which perfectly depicts the continual and never-ending environment of harassment and retaliation that Plaintiff continues to endure, to this very day.

---

[23] For example, in January 2016, Plaintiff learned that Shelley Gonzales, Executive Assistant to Davis, informed an agent not to join Plaintiff's Fort Worth Market Center, but instead, to join Garrett's Market Center in Arlington, Texas.  The agent was advised that Garrett "gets opportunities" and "Inga doesn't get business opportunities."  The agent was informed the same thing upon interviewing with the Arlington Market Center, which was then relayed back to Plaintiff.  Plaintiff then had to reassure the agent that the Fort Worth Market Center did perform well and that what she had been told was a lie.  In essence, Garrett emulated Davis, and continued the same pattern and practice of harassing Plaintiff which had been ongoing for many years.

3.75    Plaintiff met the KWRI standards for approval, but Garrett either refused to acknowledge or failed to report her successful performance to KWRI.   As a result, Plaintiff received multiple correspondences from KWRI concerning "non-performance" and lack of approval of her application.   Moreover, Garrett's refusal and/or failure to report Plaintiff's successful performance to corporate caused, and continues to cause, corporate not to approve Plaintiff's application. Corporate also refused to consider any contact from Plaintiff directly, would ignore any direct complaints from Plaintiff, and instead outright rejected any attempts from Plaintiff to advance her application, and instead kicked it back to the Region, where Plaintiff was being constantly threatened, harassed, and treated with great hostility.

3.76    Additionally, by in or around February 2017, the ongoing, relentlessly hostile work environment created by Davis and Osborn, and perpetuated and continued by Osborn and Garrett, had taken a great toll on Plaintiff's emotional and physical well-being. Moreover, Plaintiff developed a stress-induced medical condition, Bell's Palsy, from which she continues to suffer to date and has affected her ability to work in the same manner as she had worked before its onset.

3.77    With Bell's Palsy, it was visibly obvious from Plaintiff's face that she was not well. Additionally, corporate and the Region were also aware of Plaintiff's disability as she was forced to text and/or e-mail communications based upon her inability to effectively communicate verbally as a result of her disability.  In this regard, beginning in or around February 2017, she was unable to go into her office, as the condition caused her face to droop, which caused her to drool.  Since the stress from the constant retaliation continued, her recovery was very slow, and by June 2018, she was forced to ask her husband to assist her in the operation of her business daily.  But, her husband is neither an owner nor an employee, and Plaintiff remains the ultimate authority for decisions pertaining to her Market Center portfolio.

3.78    Similarly, since in or around May 2018, Plaintiff has made several attempts to sell her three market centers, as a way to break away from this continuing hostile work environment, harassment, and retaliation, and accommodate her disability.

3.79    Immediately upon learning of her desire to sell in May 2018, Garrett indicated that he and Osborn would purchase her market centers and asked her to hold off marketing her Market Centers as "for sale."  Plaintiff chose to proceed with marketing the offices nationally, for fear that the offer she would receive from them would not be a fair and reasonable offer, considering the value of her business.

3.80    During this same time frame, as another option to accommodate her disability, in September 2018, Plaintiff proposed stepping down as OP under a newly created Legacy Program launched by Keller himself.  Under this program Plaintiff would be permitted to remain an owner of a market center but turn over the OP duties to someone else.  This was a perfect solution, as it would allow Plaintiff passive income, without having to deal with Defendants on a day-to-day basis.  Plaintiff sought this reasonable accommodation to avoid the worsening of her medical condition.

3.81    In or around October 2018, Plaintiff identified the perfect candidate to assume the OP role over her three Market Centers in Scott Tolar, and she brought this plan to Garrett and Osborn for approval.  Davis was still CEO of KWRI at this time, and based on information and belief, he was involved in whether the Legacy Program application was approved or denied.

3.82    In or around November 2018, Garrett denied Plaintiff's request to enter the Legacy Program and refused to appoint Scott Tolar as OP.  Garrett neither offered an acceptable alternative, nor engaged in the interactive process with Plaintiff to find a way to provide a reasonable accommodation for her disability.

3.83     During the first week of November 2018, Osborn and Garrett made an offer well below the appraised value of Plaintiff's business.   On or about November 10, 2018, Plaintiff received an offer from another buyer, whose offer was not only higher, but was a cash offer. Around this same time, Plaintiff also had other interested purchasers.   Plaintiff accepted the cash buyer's offer.   Such prompted Osborn to begin calling potential purchasers in an attempt to identify who the cash buyer was, and to disparage Plaintiff to impede the sale.   Based upon information and belief, Osborn identified and/or reached the cash buyer, and subsequently, in or around March 2019, the cash buyer backed out of the purchase.

3.84     In or around December 2018, after Plaintiff refused his offer to buy her Market Centers, Garrett solicited Plaintiff's top producing agent to his Market Center.

3.85     In or around January 2019, Plaintiff learned that Garrett was openly telling anyone who would listen that he will "force her out" and "not renew" her Franchise Agreements.

3.86     By February 2019, Garrett had solicited the Team Leader from the Fort Worth Market Center, Trish Moore, and he began using her to recruit agents away from the Fort Worth Market Center in violation of a KWRI rule.

3.87     During the summer of 2019, Garrett continued to poach agents from Plaintiff's Market Centers by continuing to spread rumors that Plaintiff was going to sell, her renewal applications would not be approved, etc.   In fact, during the summer of 2019, three of Plaintiff's agents left Keller Williams altogether for other real estate companies due to Garrett's behavior towards Plaintiff.

3.88     Garrett also reported Plaintiff to KWRI compliance for operating an "unapproved" office in the summer of 2019.   Plaintiff learned of this allegation upon receiving a letter of non-compliance from KWRI.   However, the allegations were <u>completely fabricated</u> by Garrett, and the

address that he had reported as "Plaintiff's location" was in fact the work address of the ex-husband of one of Plaintiff's agents.  As these allegations were completely fabricated, such operated only as another pretextual way for Garrett and KWRI to deny Plaintiff's application, and demonstrated the ongoing harassment and hostility that Plaintiff had been forced to endure for years at the hand of Davis and Garrett.

3.89     In or around December 2018, Davis stepped down as CEO of KWRI.  Based upon information and belief, Davis was asked to step down in lieu of termination for inappropriate sexual behavior, verbal abuse, and bullying.  It is now widespread knowledge by those associated with KWRI that Davis' inappropriate sexual conduct resulted in numerous confidential settlements with females in the Keller Williams ecosystem.

3.90     In or around November 2020, Plaintiff reported the entirety of her issue to Matt Green who worked directly with Keller, who was transitioning from CEO of KWRI to KWx.  Matt Green reported the issue, and KWRI Legal finally reached out to Plaintiff, but nothing more has been done to address the situation.

3.91     As a result, to date, Plaintiff continues to be retaliated against, harassed, and treated with hostility by Defendants through the continued denial of her participation in the Legacy Program, amongst other things.  All for refusing to submit to Davis' sexual advances, demands, and threats, and for refusing to take part in the culture at KWRI that female employees should do whatever it takes, which may include sexual favors and suffering sexual advances, to become successful and generate income for KWRI.

3.92     To date, despite knowing that the hostile work environment, harassment, and retaliation that Plaintiff has been subjected to and that she continues to endure, which affects not

only Plaintiff but also her staff and agents, Defendants have not taken any action or even affirmatively acknowledged Plaintiff's issues and complaints.[24]

3.93    Conversely, in or around <u>July 2020</u>, KWRI released a statement that Seth Campbell, an extremely successful franchisee, Regional Director, and all-around leader within the Keller Williams ecosystem, was being <u>removed from all affiliation</u> with Keller Williams after an extensive investigation into multiple allegations of sexual harassment that goes back to 2015.[25]

3.94    According to the Inman article, during his career with KWRI, Seth Campbell served as a Regional Director for the Maryland and Washington D.C. area from 2011 to 2017, an OP, a Market Center owner, a coach within the KWRI Mastery Program, and as a member of Keller's private expansion group which met monthly.  He has been described as a KWRI "God."

3.95    However, Seth Campbell's success hid a story strikingly similar to Plaintiff.  In or around 2015, Mr. Campbell developed a business relationship with a female agent.  Over a period of two (2) years, Mr. Campbell "repeatedly pushed the boundaries of the business relationship" by sending sexually explicit text messages and asking for inappropriate pictures of her, and he even made an advance on her in a hotel room (the female had agreed to meet in the room because Mr. Campbell convinced her that he "could not be seen with females in public because people get the wrong impression.").

---

[24] In this regard, in or around 2020, Scott Tolar reported to Matt Green, Garrett's boss, that he was being harmed by not being approved as OP by Garrett due to Garrett's continuing harassment of Plaintiff.  During the meeting with Matt Green, Scott Tolar was told that the reason he was not approved as OP was because "people in the region don't like him."  When pressed, Matt Green admitted that that information was relayed to him by Garrett.  It was a lie.  In fact, on a call with Plaintiff's husband, in front of regional staff, Garrett stated that the reason Scott Tolar was not being approved as OP was because he did not attend all required calls or meetings.  This was also untrue, and it exemplifies the extensive oversight of Market Center operations by both KWRI and the regional office.

[25] The July 1, 2020 was titled, *Keller Williams is removing Seth Campbell over sexual harassment allegations*, and was found on Inman, a real estate industry publication found at <u>www.inman.com</u>.

3.96    In 2016, this female agent approached KWRI, specifically Mo Anderson and Mary Tennant (the same Mary Tennant as above), who were and remain members of the Board of Directors for KWRI.  Mo Anderson promised to report this behavior and ask someone to follow up with the female agent.  It appears, according to the article, that no one has followed up with the female agent.

3.97    Other former agents and employees described Seth Campbell, as creating an environment of "gaslighting, harassment, fear, and blackmail if someone spoke out about Campbell's behavior," and were too afraid to give their names for fear of retaliation.

3.98    The Campbell situation shows that: (1) the "have sex to get ahead" mentality is endemic throughout the Keller Williams ecosystem; (2) it was allowed, either actually or tacitly, by various levels of local, regional, and corporate staff because "everyone knew about it" but did nothing because he was "too powerful; and (3) it is clear that employees throughout the Keller Williams ecosystem believe that KWRI is the employer, or at least the appropriate place to report the behavior for redress.

3.99    In short, while it is laudable that KWRI addressed the Campbell situation, it should have come as no surprise when Plaintiff approached KWRI with a very similar situation less than six (6) months later.

3.100   Plaintiff was not believed, however. Instead, she is being accused of being "a wealthy" woman bringing "salacious allegations" in an attempt to use the "EEOC Charge process to exert pressure on KWRI to compromise on business ownership matters that Ms. Dow is unhappy about - not because she was discriminated against and harassed by KWRI in violation of Title VII."[26]

---

[26] Such represents the position taken in the Position Statement sent on behalf of KWRI, dated July 13, 2021.

3.101   KWRI has "hung up on her" again and the retaliation and harassment continues.

3.102   As a direct and continuing result of Davis' sexual, emotional, and psychological abuse, sexual harassment, and continuous retaliation and hostile treatment by <u>all</u> Defendants, Plaintiff has lost hundreds of thousands of dollars, and Plaintiff has also been forced to seek psychiatric counseling for over fourteen (14) years in an effort to address the trauma she has suffered and continues to suffer to this day.[27]

3.103   Moreover, as a result of the continued harassment and hostility aimed at Plaintiff, and the denial of her application to operate under the Legacy Program, the individual Plaintiff sought to appoint as OP, Scott Tolar, resigned effective November 1, 2021.  Mr. Tolar resigned due to the ongoing harassment and hostility of Plaintiff, which was in turn directed toward Mr. Tolar as Garrett refused to acknowledge, and in fact completely ignored, Mr. Tolar at meetings and/or on calls, together with the ongoing refusal to approve Plaintiff's application.   More specifically, Mr. Tolar could no longer commute from Austin and spend substantial amount of time away from his family and risk their overall financial well-being when he was being harassed and treated in such a hostile manner, which in turn caused him to fear the longevity of the position he was supposed to take one.  A position for which was supposed to begin in or around November 2019.

### IV.
### <u>CAUSES OF ACTION</u>

4.1   ***Alternative Pleadings***.  To the extent necessary, each of the claims set forth below is pleaded in the alternative.

---

[27] It has taken over fourteen (14) years to unpack the emotional trauma Plaintiff has been subjected to since 2002, and to date, she remains unable to recall some details of Davis' actions due to her brain's attempt to shield her from the trauma.  Moreover, recently, as a result of pursing her rights, she has begun experiencing disturbing and terrifying nightmares about Davis and the treatment that he subjected her to under the KWRI umbrella.

A.     **Count One:**

**Violation of Title VII of the Civil Rights Act of 1964:**
**Sex Discrimination – Sexual Harassment and Hostile Work Environment**
**(Against KWRI and GOM)**

4.2      To the extent necessary, Paragraphs 1.1 through 4.1 of this Complaint are hereby referenced and fully incorporated herein by this specific reference, as though fully set forth herein.

4.3      As set forth above, KWRI and GOM violated Title VII by subjecting Plaintiff to severe and pervasive sexual abuse, assault, and harassment, including continuous sex-based harassment, which altered the terms and conditions of Plaintiff's working environment.

4.4      KWRI and GOM also violated Title VII by creating and fostering a hostile work environment which, to date, continues to affect the terms and conditions of her employment and her accessibility to financial opportunities within the KWRI structure.

4.5      KWRI and GOM engaged in a systemic practice of sexual harassment and/or sex-based harassment by tolerating, condoning, and/or allowing the sexual harassment and hostile work environment to continue for Plaintiff without repercussions to the offenders.

4.6      Moreover, neither KWRI nor GOM addressed the issues, implemented and/or enforced policies and practices that, on their face, could reasonably be perceived to prohibit sexual harassment and the creation of a hostile work environment.

4.7      Despite having actual and constructive knowledge of the sexual harassment and hostile work environment to which Plaintiff has been subjected, KWRI and GOM failed to take immediate and appropriate corrective action to stop it.  Despite having actual and/or constructive knowledge that the sexual harassment and hostile work environment rose to the level of a systemic, institutional issue, KWRI and GOM, failed to take steps to remedy the sexual harassment and hostile work environment.

4.8     KWRI and GOM knew, or should have known, that their actions constituted unlawful sex discrimination, including sexual harassment and hostile work environment, and showed willful and/or reckless disregard for Plaintiff's protected rights.

4.9     KWRI and GOM's actions amount to impermissible discrimination and harassment, which created an on-going hostile work environment and constitute violations of Title VII.

4.10    As a result of the foregoing, Plaintiff has been injured and/or damaged, and Plaintiff hereby seeks to recover any and all remedies afforded and/or available under law and/or in equity, including but not limited to her damages resulting from said conduct by KWRI and GOM, jointly and severally, in an amount to be proven and/or determined at the time of trial, equitable relief, and attorneys' fees and costs.

**B.     Count Two:**

**Violation of Title VII of the Civil Rights Act of 1964:**
**Retaliation for Reporting and Opposing Sexual Abuse, Discrimination and Harassment**
**(Against KWRI and GOM)**

4.11    To the extent necessary, Paragraphs 1.1 through 4.10 of this Complaint are hereby referenced and fully incorporated herein by this specific reference, as though fully set forth herein.

4.12    Plaintiff engaged in protected activity when she reported the sexual abuse to Mary Tennant in 1998, Osborn in 2004, and at various times thereafter to those employed by KWRI when she informed them of the treatment that she was being subjected to as a result of her denying Davis' sexual advances and demands for sexual favors.

4.13    KWRI and GOM violated Title VII when they engaged in adverse employment actions against Plaintiff for the purpose of retaliating against her because of report of sexual abuse

and harassment and opposition to same, including the hostile work environment to which she has been subjected.

4.14    KWRI and GOM knew or should have known that their actions constituted unlawful retaliation and showed willful and/or reckless disregard for Plaintiff's statutorily protected rights.

4.15    Additionally or alternatively, such conduct by KWRI and GOM is an impermissible form of retaliation against Plaintiff because it was based upon Plaintiff's exercise of her rights to engage in a protected activity, including but not limited to Plaintiff's opposition of KWRI and GOM's unlawful practices under Title VII and/or Plaintiff's charges, testimonies, assistance, or participation of any manner in the investigation, proceedings, and/or hearings under Title VII. Retaliation of this nature is prohibited by Title VII.

4.16    Plaintiff engaged in activity protected under Title VII, namely speaking and/or reporting to her supervisor, Osborn, the sexual abuse and harassment she experienced from Davis. As a result of Plaintiff's protected activity, KWRI and GOM have continued to deny Plaintiff's applications for Market Centers, for the Legacy Program, for the renewal of her Franchise Agreements, etc.

4.17    KWRI and GOM have not, and are unable to provide, any non-discriminatory reason for the adverse actions taken against Plaintiff.

4.18    This claim is timely because the retaliation has continued in an unbroken chain since 1998.  In Texas, an individual has 300 days from the date of the alleged harm to file a charge with the EEOC for discrimination and/or retaliation based on gender/sex under Title VII of the

Civil Rights Act of 1964.[28]  Plaintiff continues to be retaliated against to date, and as such, Plaintiff timely filed her Charge on December 28, 2020.

4.19    As a result of the foregoing, Plaintiff has been injured and/or damaged, and Plaintiff hereby seeks to recover any and all remedies afforded and/or available under law and/or in equity, including but not limited to his damages resulting from said conduct by KWRI and GOM, jointly and severally, in an amount to be proven and/or determined at the time of trial, equitable relief, and attorneys' fees and costs.

**C.      Count Three:**

**Violation of Chapter 21 of the Texas Labor Code:**
**Sexual Harassment**
**(Against KWRI, GOM, Osborn, and Garrett)**

4.20    To the extent necessary, Paragraphs 1.1 through 4.19 of this Complaint are hereby referenced and fully incorporated herein by this specific reference, as though fully set forth herein.

4.21    As set forth above, the actions of KWRI, GOM, Osborn, and Garrett amount to discrimination, specifically sexual harassment, and constitutes a violation of Section 21.142 of the Texas Labor Code.  KWRI, GOM, Osborn, and Garrett are prohibited from discriminating against and harassing Plaintiff based on her gender/sex under Chapter 21 of the Texas Labor Code.

4.22    Further, KWRI, GOM, Osborn, and Garrett are prohibited from retaliating against Plaintiff because she opposed such sexual harassment and abuse pursuant to Section 21.055 of the Texas Labor Code.  Additionally or alternatively, the manner and/or method by which KWRI, GOM, Osborn, and Garrett applied, or failed to apply, the policies and/or procedures resulted in a disparate and/or discriminatory impact upon Plaintiff, as stated above.

---

[28] *See Allen v. County of Galveston, Tex.*, 352 Fed. Appx. 937, 939 (5th Cir. 2009); *see also* 42 U.S.C. § 2000e–5(e)(1).

4.23    Additionally or alternatively, such conduct by KWRI, GOM, Osborn, and Garrett is an impermissible form of retaliation against Plaintiff because it was based upon Plaintiff's exercise of her rights to engage in protected activity, including but not limited to Plaintiff's opposition of KWRI, GOM, Osborn, and Garrett's unlawful practices under Chapter 21 of the Texas Labor Code.  Retaliation of this nature is prohibited by Chapter 21 of the Texas Labor Code.

4.24    Additionally or alternatively, GOM, as the owner of the DFW Region, and Osborn and Garrett, individually as regional managers of Plaintiff, are acting directly in the interests of an employer in relation to an employee, and they have engaged in retaliation and sexual harassment against Plaintiff after September 1, 2021 by continuing to deny her application for the Legacy Program, refusing to appoint Scott Tolar as OP, and continuing to fail to approve Plaintiff's ten-year renewal of the Fort Worth Market Center, in violation of Section 21.141 of the Texas Labor Code.

4.25    Additionally or alternatively, KWRI knew, or should have known, that Plaintiff continues to be sexually harassed, as defined by Section 21.141(2)(B) of the Texas Labor Code by GOM, Osborn, and Garrett in violation of Section 21.142 of the Texas Labor Code, as they have wholly failed to address the violation.

4.26    KWRI is subject to liability even as a franchisor, because it "exercised a type or degree of control over the franchisee or the franchisee's employees not customarily exercised by a franchisor for the purpose of protecting the franchisor's trademarks and brand." TEX. LAB. CODE § 21.0022.  In short, KWRI is Plaintiff's "employer" for purposes of liability.

4.27    As previously set forth herein, Plaintiff engaged in activity protected under Chapter 21 of the Texas Labor Code, namely speaking up and/or reporting to her supervisor, Osborn, and a member of KWRI's staff, regarding the sexual abuse harassment she experienced from Davis.

Since that time, KWRI, GOM, Osborn, and Garrett have engaged in a pattern and practice of thwarting Plaintiff's financial opportunities.

4.28    As a result of the foregoing, Plaintiff has been injured and/or damaged, and Plaintiff hereby seeks to recover any and all remedies afforded and/or available under law and/or in equity, including but not limited to her damages resulting from said conduct by KWRI, GOM, Osborn, and Garrett, jointly and severally, in an amount to be proven and/or determined at the time of trial, equitable relief, and attorneys' fees and costs.

**D.     Count Four:**

**Violation of Chapter 21 of the Texas Labor Code:**
**Hostile Work Environment**
**(Against KWRI and GOM)**

4.29    To the extent necessary, Paragraphs 1.1 through 4.28 of this Complaint are hereby referenced and fully incorporated herein by this specific reference, as though fully set forth herein.

4.30    As set forth above, the actions of KWRI and GOM created a hostile work environment in violation of Section 21.141(2)(D) of the Texas Labor Code.  Plaintiff belonged to a protected group based on her gender/sex, and disability.  She was subject to unwelcome sexual harassment that was based on gender/sex.  The harassment affected a term, condition, or privilege of Plaintiff's employment, including but not limited to the deprivation or diminution of the financial opportunities that were available to Plaintiff.

4.31    KWRI and GOM were negligent in that they knew or reasonably should have known about the discriminatory and harassing conduct towards Plaintiff, and failed to take remedial action.  Under Texas law, where alleged harassment is perpetrated by a supervisor with immediate or successively higher authority, an employee asserting hostile work environment need

not establish that the employer knew or should have known of the harassment and failed to take remedial action.[29]

4.32     KWRI and GOM's conduct was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment.  KWRI and GOM unreasonably interfered with Plaintiff's work performance by: (1) failing to report and/or timely investigate the sexual harassment and abuse by Davis; (2) placing her sexual abuser over her in the chain of authority and supervision; (3) failing to report and/or timely investigate the retaliation Plaintiff was subjected to after denying Davis sexual favors; (4) treating males differently from females with respect to sexual harassment; (5) encouraging female employees to capitulate to male requests for sexual favor; and (6) subjecting Plaintiff to adverse actions as detailed above.

4.33     KWRI and GOM's repeated conduct of harassment set forth above humiliated Plaintiff to the point where Plaintiff felt completely unsafe working with Davis and physically unable to execute some of the functions of her business.

4.34     Additionally or alternatively, pursuant to the "continuing violation doctrine," Plaintiff can support a hostile work environment claim against KWRI and GOM, as the harassment occurring more than 300 days before she filed her charges and/or complaints with the EEOC has been carried out in a continuous pattern and practice of linking events.[30]

4.35     As a result of the foregoing, Plaintiff has been injured and/or damaged, and Plaintiff hereby seeks to recover any and all remedies afforded and/or available under law and/or in equity,

---

[29] *Wal-Mart Stores, Inc. v. Davis*, 979 S.W.2d 30, 40 (Tex. App.—Austin 1998, pet. denied) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).

[30] *See Hunicke v. Seafarers Intern. Union*, 2013 WL 2444634, at *7 (Tex. App.—Houston [14th Dist.] June 4, 2013, pet. denied) (mem. op).

including but not limited to her damages resulting from said conduct by KWRI and GOM, jointly and severally, in an amount to be proven and/or determined at the time of trial, equitable relief, and attorneys' fees and costs.

**E.      Count Five:**

**Violation of Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.:**
**Failure to Provide a Reasonable Accommodation**
**(Against KWRI and GOM)**

4.36    To the extent necessary, Paragraphs 1.1 through 4.35 of this Complaint are hereby referenced and fully incorporated herein by this specific reference, as though fully set forth herein.

4.37    In or around February 2017, Plaintiff was diagnosed with Bell's Palsy, making her a qualified individual with a disability within the meaning of 42 U.S.C. § 12111 of the Americans with Disabilities Act ("ADA").  Plaintiff is able to perform the essential functions of her job as an OP with or without a reasonable accommodation.

4.38    In or around September 2018, Plaintiff informed Garrett that she wanted to participate in the Legacy Program and replace herself as OP with Scott Tolar.  Plaintiff made this request as a way to accommodate her disability by reducing the amount of stress she was subjected to almost daily.

4.39    KWRI and GOM have not only continued to refuse her application, but also they never engaged in the interactive process or offered any reasonable alternative reasonable accommodation.

4.40    As a result of the foregoing, Plaintiff has been injured and/or damaged, and Plaintiff hereby seeks to recover of any and all remedies afforded and/or available under law and/or in equity, including but not limited to her damages resulting from said conduct by KWRI and GOM,

jointly and severally, in an amount to be proven and/or determined at the time of trial, equitable relief, and attorneys' fees and costs.

**F.     Count Six:**

**Violation of Chapter 21 of The Texas Labor Code**
**Failure to Provide a Reasonable Accommodation**
**(Against KWRI and GOM)**

4.41     To the extent necessary, Paragraphs 1.1 through 4.40 of this Complaint are hereby referenced and fully incorporated herein by this specific reference, as though fully set forth herein.

4.42     In or around February 2017, Plaintiff was diagnosed with Bell's Palsy, making her a qualified individual with a disability within the definition provided by Section 21.002(6) of the Texas Labor Code.  Plaintiff is able to perform the essential functions of her job as an OP with or without a reasonable accommodation.

4.43     In or around September 2018, Plaintiff informed Garrett that she wanted to participate in the Legacy Program and replace herself as OP with Scott Tolar.  Plaintiff made this request as a way to accommodate her disability by reducing the amount of stress she was subjected to almost daily.

4.44     KWRI and GOM have not only continued to refuse her application, but never engaged in the interactive process or offered any reasonable alternative reasonable accommodation.

4.45     As a result of the foregoing, Plaintiff has been injured and/or damaged, and Plaintiff hereby seeks to recover of any and all remedies afforded and/or available under law and/or in equity, including but not limited to her damages resulting from said conduct by KWRI and GOM, jointly and severally, in an amount to be proven and/or determined at the time of trial, equitable relief, and attorneys' fees and costs.

**G.      Count Seven:**

**Tortious Interference with Employment Relationship**
**(Against All Defendants)**

4.46    To the extent necessary, Paragraphs 1.1 through 4.45 of this Complaint are hereby referenced and fully incorporated herein by this specific reference, as though fully set forth herein.

4.47    In order to prove a claim of tortious interference with an employment contract under Texas law, a Plaintiff must "demonstrate that: (1) a contract subject to interference exists; (2) the alleged act of interference was willful and intentional; (3) the willful and intentional act proximately caused damage; and (4) actual damage or loss occurred.[31]

4.48    In this regard, as set forth above, Plaintiff was pursuing the application to make Scott Tolar OP.  Defendants continued to refuse to approve the application to make Mr. Tolar an OP, without good reason, and Garrett continually directed his harassment and hostility concerning Plaintiff toward Mr. Tolar, as well, which in turn caused Mr. Tolar to resign.  Specifically, Mr. Tolar could no longer risk the financial well-being of his family, and continue to commute from Austin and spend a substantial amount of time away from his family for a position he feared would continually be discredited and unapproved based upon Garrett's continued hostility toward Plaintiff.

4.49    Additionally or alternatively, Plaintiff employed various agents which were poached by Garrett in an attempt to harm her financially, and in fact, he used those agents to further induce other agents to leave their associations with Plaintiff.

4.50    As a result of the foregoing, Plaintiff has been injured and/or damaged, and Plaintiff hereby seeks to recover of any and all remedies afforded and/or available under law and/or in

---

[31] *Kadco Contract v. Dow Chemical Co.*, 198 F.3d 241 (5th Cir. 1999) (citing *Powell Indus. v. Allen*, 985 S.W.2d 455 (Tex. 1998).

equity, including but not limited to her damages resulting from said conduct by Defendants, jointly and severally, in an amount to be proven and/or determined at the time of trial, equitable relief, and attorneys' fees and costs.

**H.      Count Eight:**

**Tortious Interference with Prospective Relationship
(Against All Defendants)**

4.51    To the extent necessary, Paragraphs 1.1 through 4.50 of this Complaint are hereby referenced and fully incorporated herein by this specific reference, as though fully set forth herein.

4.52    In order to prove a claim of tortious interference with a prospective relationship under Texas law, a Plaintiff must "demonstrate that: (1) a reasonable probability that the plaintiff would have entered into a contractual relationship; (2) and intentional and malicious act by the defendant that prevented the relationship from occurring, with the purpose of harming plaintiff; and (3) actual harm or damage resulted from the defendant's interference."[32]

4.53    Plaintiff wanted to appoint Scott. Tolar as OP for her Market Centers and submitted the application for same.  Defendants have refused this application and continue to do so, without good reason, to date.  Mr. Tolar has resigned from employment with Plaintiff effective November 1, 2021.

4.54    Plaintiff also applied for, and wishes to pursue, the Legacy Program.  Defendants have refused her application, and continue to do so, without good reason, to date.

4.55    Plaintiff has suffered further harm to her health from dealing with the continued stress placed upon her by Defendants' failure to allow her to enter the Legacy Program.  Plaintiff has also suffered financial harm due to the inability to sell her Market Centers because of

---

[32] *T&T Geotechnical, Inc. v. Union Pacific Resources, Co.*, 944 F.Supp. 1317, 1324 (N.D. Tex. July 1996).

Defendants continued efforts to interfere with the business operations, which reduces the value and appeal of her Market Centers.

4.56    As a result of the foregoing, Plaintiff has been injured and/or damaged, and Plaintiff hereby seeks to recover of any and all remedies afforded and/or available under law and/or in equity, including but not limited to her damages resulting from said conduct by Defendants, jointly and severally, in an amount to be proven and/or determined at the time of trial, equitable relief, and attorneys' fees and costs.

## I.      Count Nine:

### Intentional Infliction of Emotional Distress
### (Against Davis)

4.57    To the extent necessary, Paragraphs 1.1 through 4.56 of this Complaint are hereby referenced and fully incorporated herein by this specific reference, as though fully set forth herein.

4.58    As set forth above, Davis participated in an extreme campaign of harassment, intimidation, fear, and retaliation against Plaintiff for refusing his sexual advances.

4.59    In order to prove a claim of intentional infliction of emotional distress under Texas law, a Plaintiff must "demonstrate that the defendant intentional or recklessly engaged in extreme or outrageous conduct that resulted in severe emotional distress."[33]

4.60    Davis used his various positions of power and connections with the "power players" within KWRI, the regional offices, and other market centers to knowingly, continue the retaliation which began immediately after Plaintiff refused to submit to Davis' sexual demands.  Moreover, Davis, as CEO, recklessly disregarded the retaliation Plaintiff was subjected to by Osborn and Garrett.

---

[33] *Stelly v. Duriso*, 982 F.3d 403 (5th Cir. 2020) (citing *Standard Fruit & Veg. Co. v. Johnson*, 985 S.W.2d 62,22 (Tex. 1988).

4.61     As a result of the foregoing, Plaintiff has been injured and/or damaged, and Plaintiff hereby seeks to recover of any and all remedies afforded and/or available under law and/or in equity, including but not limited to her damages resulting from said conduct by Davis in an amount to be proven and/or determined at the time of trial, equitable relief, and attorneys' fees and costs.

**J.     Count Ten:**

**Negligent Supervision**
**(Against Davis and Keller)**

4.62     To the extent necessary, Paragraphs 1.1 through 4.61 of this Complaint are hereby referenced and fully incorporated herein by this specific reference, as though fully set forth herein.

4.63     As set forth above, Davis participated in an extreme campaign of harassment, intimidation, fear, and retaliation against Plaintiff for refusing his sexual advances.  This campaign was continued, and carried out by, the remaining Defendants through retaliation and a continuously hostile work environment.

4.64     Both Davis and Keller, while acting as CEO of KWRI, have refused to Plaintiff refused to submit to Davis' sexual demands.  Moreover, Davis, as CEO, recklessly disregarded the retaliation Plaintiff was subjected to by Osborn and Garrett.

4.65     As a result of the foregoing, Plaintiff has been injured and/or damaged, and Plaintiff hereby seeks to recover of any and all remedies afforded and/or available under law and/or in equity, including but not limited to her damages resulting from said conduct by Davis and Keller, jointly and severally, in an amount to be proven and/or determined at the time of trial, equitable relief, and attorneys' fees and costs.

**K.**     **Count Eleven:**

### Declaratory Judgment

4.66     To the extent necessary, Paragraphs 1.1 through 4.65 of this Complaint are hereby referenced and fully incorporated herein by this specific reference, as though fully set forth herein.

4.67     The franchisor-franchisee relationship laid out above, demonstrates a degree of control in excess of that required to protect KWRI's brand and trademarks.

4.68     As such, pursuant to 28 U.S.C. § 2201 and/or Texas Labor Code § 21.0022, Plaintiff seeks judgment declaring that Defendants KWRI, GOM, Keller, Osborn, and Garrett are "employers" for purposes of Plaintiff.

### V.
### REQUESTED RELIEF

5.1     As the direct and/or proximate result of the actions and/or conduct of Defendants complained of herein, Plaintiff has suffered, and continues to suffer, from intentional discrimination and/or discriminatory treatment and harassment, as well as adverse employment actions, unlawful employment practices, and retaliation, which have damaged and caused, and continue to damage and cause, Plaintiff damages, emotional distress, and mental anguish.

5.2     As such, Plaintiff seeks to recover from Defendants, jointly and severally, her actual and/or economic damages caused by the wrongful acts of Defendants, in amounts that are within the jurisdictional limits of this Court to be proven and/or determined at the time of trial.

5.3     As to Plaintiff's claims under Title VII, Plaintiff herein sues Defendants pursuant to 42 U.S.C. §§ 2000e *et seq.*  Accordingly, Plaintiff seeks recovery of the full measure of relief and damages provided by Title VII against Defendants, jointly and severally, including but not limited to damages for her lost earnings, past and future, the harm to her personal and professional reputation, out-of-pocket losses and/or expenses, emotional pain and suffering, inconvenience,

mental anguish, and other pecuniary and non-pecuniary losses in an amount within the jurisdictional limits of this Court to be proven at trial.

5.4     Plaintiff also seeks front pay damages from Defendants, jointly and severally, in the amount equal to the difference between the amounts actually received by Plaintiff and the amounts Plaintiff would have received had she not been harassed and retaliated against, together with an additional amount as compensatory damages, in addition to reasonable and necessary attorneys' fees and any and all other equitable and compensatory relief which may be available.

5.5     As to Plaintiff's claims under Chapter 21 of the Texas Labor Code, Plaintiff herein sues Defendants pursuant to Chapter 21 of the Texas Labor Code, including but not limited to Sections 21.051, 21.055, 21.254, 21.258, 21.2585, 21.259, and 21.2585 of the Texas Labor Code. Accordingly, Plaintiff seeks recovery of the full measure of relief and damages provided by Chapter 21 of the Texas Labor Code against Defendants, jointly and severally, including but not necessarily limited to damages for future pecuniary losses, emotional pain, suffering inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and non-pecuniary losses in an amount within the jurisdictional limits of this Court to be proven at trial.

5.6     Plaintiff also seeks front pay damages from Defendant, jointly and severally, in the amount equal to the difference between the profits actually received by Plaintiff and the profits Plaintiff would have received had she not been discriminated, harassed or retaliated against, together with an additional amount as compensatory damages, in addition to reasonable and necessary attorneys' fees and any and all other equitable and compensatory relief which may be available.

5.7     As to Plaintiff's claims under the Federal Declaratory Judgment Act, Plaintiff herein sues Defendants pursuant to 28 U.S.C. §2201, and as such, Plaintiff seeks a judgment

declaring that Defendants are an "employer" within the definition of 21.0022 of the Texas Labor Code, and as such violated Plaintiff's statutory rights, violated and/or breached Plaintiff's contracts and/or agreements, violated its own policies, procedures, guidelines, rules, and/or regulations, and/or violated state and/or federal law.

## VI.
## FEES, COSTS, AND INTEREST

6.1     Plaintiff has retained The Michael Kim Law Firm, PLLC to represent her in connection with this matter, and has agreed to pay for such reasonable and necessary services.  In addition to and without waiving and/or limiting any other relief requested in this Complaint, Plaintiff is entitled to and seeks to recover her reasonable and necessary attorneys' fees and costs incurred and to be incurred in bringing this suit and in all appeals of this suit, as permitted by law, in equity, and/or pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code, 42 U.S.C. §§ 2000e-5(k) and 12205, and/or Tex. Labor Code § 21.259.

6.2     Also, pursuant to 42 U.S.C. § 2000e-5(k) and/or Tex. Labor Code § 21.259, Plaintiff seeks to recover any and all expert fees, which she incurs and/or may incur in bringing this suit.

6.3     Additionally, Plaintiff seeks to recover costs of court, along with pre-judgment and post-judgment interest at the maximum rate permitted by law.

## VII.
## CONDITIONS PRECEDENT

7.1     All conditions precedent to the relief being sought by Plaintiff in this Complaint have been performed, have occurred, and/or have been waived.

## VIII.
## DEMAND FOR JURY TRIAL

8.1     Pursuant to the Rule 38 of the Federal Rules of Civil Procedure, Plaintiff requests

trial by jury and will tender the requisite fee.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that upon final hearing,

Plaintiff recover judgment against Defendant and be awarded:

(1)     any and all amounts recoverable and/or recognizable as damages under law and/or
        in equity, resulting and/or occasioned by the wrongful acts and/or conduct of
        Defendants (as set forth above more specifically);

(2)     equitable relief to the extent permitted by law and/or equity;

(3)     declaratory relief as requested herein;

(4)     her litigation expenses and costs, including but not limited to her reasonable and
        necessary attorneys' fees and costs and any applicable expert fees;

(5)     pre-judgment and post-judgment interest at the maximum rate permitted by law;

(6)     costs of court; and

(7)     such other and further relief, both general and special, at law and in equity, to which
        Plaintiff may show herself to be justly entitled.

Respectfully submitted,

/s/ *Michael Y. Kim*
Michael Y. Kim
State Bar No. 24039960
mkim@mkimlegal.com
Ericha Ramsey Brown
State Bar No. 24051952
erbrown@mkimlegal.com
Monica L. Narvaez
State Bar No. 24088113
mnarvaez@mkimlegal.com
Eduardo R. Garza
State Bar No. 24120843
egarza@mkimlegal.com

**THE MICHAEL KIM LAW FIRM, PLLC**
4236 W. Lovers Lane
Dallas, Texas 75209
(214) 357-7533
(214) 357-7531 Facsimile

ATTORNEYS FOR PLAINTIFF