UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| INGA DOW, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| KELLER WILLIAMS REALTY, INC. | § | CIVIL ACTION NO. 4:21-CV-01209-P |
| JOHN DAVIS, GO MANAGEMENT, LLC, | § | |
| DAVID OSBORN, SMOKEY GARRETT, | § | |
| AND GARY KELLER, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW Inga Dow, Plaintiff in the above-styled and numbered cause ("Plaintiff"), and files this, her First Amended Complaint against Keller Williams Realty Inc. ("KWRI"), John Davis ("Davis"), GO Management, LLC ("GOM"), David Osborn ("Osborn"), Smokey Garrett ("Garrett"), and Gary Keller ("Keller") (KWRI, Davis, GOM, Osborn, Garrett, and Keller are collectively referred to herein as "Defendants"), and in support thereof would respectfully show the Court the following:

## I.
## THE PARTIES

1.1     Plaintiff is an individual residing in Tarrant County, Texas.

1.2     Defendant, KWRI, is a Texas for-profit corporation with a principal place of business located at 1221 South Mopac Expressway, Suite 400, Austin, Texas 78746.  KWRI has made its appearance in this matter.

1.3     Defendant, Davis, is an individual residing and doing business in the State of Texas, and he has made his appearance in this matter.

1.4     Defendant, GOM, is a Texas limited liability company, which owns, manages, and/or operates the DFW Regional Office for Keller Williams, with a principal place of business located at 1011 San Jacinto Blvd., Suite 303, Austin, Texas 78701.  GOM has made its appearance in this matter.

1.5     Defendant, Osborn, is an individual residing and doing business in the State of Texas, and he has made his appearance in this matter.

1.6     Defendant, Garrett, is an individual residing and doing business in the State of Texas, and he has made his appearance in this matter.

1.7     Defendant, Keller, is an individual residing and doing business in the State of Texas, and he has made his appearance in this matter.

## II.
## JURISDICTION AND VENUE

2.1     This Court has jurisdiction over this matter pursuant to federal statutory law, particularly Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), The Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. (the "ADA"), as well as The Federal Declaratory Judgment Act.[1]

2.2     This Court is vested with original and supplemental jurisdiction over these claims by operation of 28 U.S.C. §§ 1331 and 1367.

2.3     Venue lies in this judicial district, pursuant to 28 U.S.C. § 1391, because it is the judicial district in which Plaintiff and Defendants (one or more) reside, where KWRI does

---

[1] 28 U.S.C. § 2201.

business, and in which a substantial part of the events or omissions giving rise to the claim(s) occurred.

2.4     Additionally, an actual controversy exists between the parties hereto within the meaning of 28 U.S.C. § 2201, and this Court is, therefore, vested with the power in the instant case to declare and adjudicate the legality of the actions and/or conduct by Defendants, jointly and severally, against Plaintiff.

2.5     Plaintiff timely filed charges of discrimination, retaliation, and hostile work environment with the Equal Employment Opportunity Commission (the "EEOC").  Plaintiff received her Right to Sue Letter from the EEOC, on or about August 4, 2021 (the "EEOC Right to Sue Letter").  This Complaint has been filed within ninety (90) days of Plaintiff's receipt of the EEOC Right to Sue Letter.

2.6     Additionally, Plaintiff received her Notice of Complainant's Right to File Civil Action Letter from the Texas Workforce Commission, on or about September 13, 2021, permitting her to pursue her state law claims under Chapter 21 of the Texas Labor Code (the "FWHRC Right to Sue Notice").

### III.
### FACTUAL BACKGROUND

*A.     Overview of KWRI's Structure, Control, and Oversight*

3.1     KWRI is a real estate company with offices throughout the United States and Canada.  For those wishing to manage and/or operate a location, KWRI requires such location(s) to operate through a Market Center License Agreement (the "Franchise Agreement") with a "licensee" (each, a "Franchisee").  The Franchisee is an individual, which typically operates a location or "market center" through an entity that is the named party to the Franchise Agreement, and in return, KWRI provides access to, and use of, the "Keller Williams" brand, including but

not limited to operating and financial software, as well as business training and support (each, a "Market Center").[2]

3.2    Each Market Center operates largely through real estate agents engaged as "independent contractors," but also, each entity (operating a Market Center) employs staff, who support the agents and basic business operations.  Yet, importantly, despite being its own entity and employer, each Market Center is subject to extensive oversight and control by KWRI and a KWRI Regional Office ("Regional Staff," a "Region," and/or a "Regional Office"), through the terms of the Franchise Agreement and KWRI's rules and procedures.[3]  This system supports what Keller Williams refers to as its "ecosystem."

3.3    In fact, this ecosystem is a complex and incestuous structure of business and employment relationships.  For example, it is very common for a person to "own a region" through an entity, but also be employed by that, or another, regional entity in some capacity.  Simultaneously, that same person may own a Market Center, again through a separate entity, but also be an employee of that, or another, Market Center, all while also serving as an employee of KWRI.[4]

3.4    As a result of these complex, intertwined employment and ownership relationships, or perhaps because of it, KWRI maintains a significant, top-down, homogenized approach on how

---

[2] A "Market Center" is an "approved facility" (i.e., approved by KWRI) from which a licensee (or the Franchisee) conducts the business of brokering the sale and purchase of real estate, as well as offering of any other approved services under the KWRI System.

[3] A "Regional Representative means the independent representative of Company who is authorized to perform certain duties on Company's behalf. . . ."  There are currently over 50 Regions for KWRI  throughout the United States and Canada.

[4] For example, John Davis, who will be discussed below, was employed by, and eventually served as the CEO of KWRI until at least December 2018, when he allegedly "stepped down" from his CEO position.  During that time, and subsequently, Davis also acted as a partner in several Market Centers, an operating partner of multiple Market Centers, as well as an owner of a Regional Office, and he continues to maintain such connections and/or ownership. Additionally, Gary Keller, while serving as CEO, was also an owner of a Market Center.

real estate is sold under the "Keller Williams" brand by exercising an enormous degree of control over the day-to-day operations of the Market Centers, including employee relations, through the Franchise Agreement and other policies.[5]

3.5     To that end, each Market Center is <u>required to operate</u> subject to a broad set of operating policies, procedures, and standards, all created and maintained by KWRI and pushed down to the Franchisees through the Franchise Agreement and each Region overseeing those Market Centers.

3.6     Pursuant to the Franchise Agreement, KWRI retains the right to "adjust the boundaries of the Awarded Area at any time," in the sole "business judgment" of KWRI, and a Franchisee may not relocate without express consent from KWRI.  In addition, a Franchisee must obtain approval from the directors and/or owners of a Region and/or from KWRI before finalizing various operational decisions, such as expansion, sales, and budgeting.[6]

3.7     More importantly, for purposes of Plaintiff's claims, KWRI acts as an "employer" by providing manuals, software, and programs, which each Franchisee is <u>expected to use</u> for business operations and employee relations.  In fact, with respect to employment at each Market Center, KWRI issues and maintains a mandatory 116-page *Policies and Guidelines Manual*, containing detailed guidance on everything from how Regions and Market Centers are structured, to employee pay issues (the "KWRI Manual").

---

[5] In fact, in 2020, KWx, a holding company, was created to "create alignment, scale and efficiencies across the Keller Williams ecosystem."  *See New KWx Holding Company to Manage Keller Williams Subsidiaries and Affiliates, Gary Keller Steps Down as CEO*, found at https://www.rismedia.com/2020/10/09/new-kwx-holding-company-to-manage-keller-williams-subsidiaries-and-affiliates-gary-keller-steps-down-as-ceo/.

[6] For example, the Market Centers must seek approval from KWRI for budgets and expenses, which also must be submitted to a Regional Office for approval.

3.8      The KWRI Manual states, "Keller Williams is led by associates . . ." and "[e]very policy and guideline in this manual has been created and reviewed by our Associate Leadership Councils (Local, City, Regional, and International)."

3.9      Pursuant to the KWRI Manual, Associate Leadership Councils, or "ALC's," are the "highest honor that can be bestowed to an agent."  The "agents" comprising each ALC are the top 20% of the producing agents within a Market Center, and they are required to meet once per month. Those agents are also involved with updating the KWRI Manual.

3.10     As set forth in the KWRI Manual, KWRI attempts to present itself as a "training and coaching company that also happens to be in the business of real estate."  KWRI lives up to that promise (and more) with an extremely hands-on model of control over any person or entity associated with the "Keller Williams" brand.

3.11     In fact, pursuant to Appendix F of the KWRI Manual, associates must live by the "Real Estate Professional's Creed," which is thirteen (13) affirmative statements of what it takes to be a "Keller Williams" real estate professional.  KWRI attempts to maintain the notion that "associates" are not employees of KWRI, but instead, employees or "independent contractors" of a Market Center; however, KWRI expects that its very specific methods and principles be adhered to by all.

3.12     Moreover, the KWRI Manual goes on to detail what "associates" must do to be successful.  For example, "attend orientation and completely read this manual," as well as "take part each week in the many educational, support and leadership opportunities available to you" and demonstrate some, of the many, requirements set forth in the KWRI Manual for "associates."

3.13     Section 4 of the KWRI Manual outlines the KWRI structure, which is designed to "guarantee our associates a vehicle for giving direct input on the operation of Keller Williams

Realty."  As part of this "guarantee," KWRI <u>orders</u> associates to "assist in setting annual Market Center goals and plans, and <u>take an active part in implementing those plans</u>," which KWRI claims is to "[h]elp the Market Centers achieve these goals."

3.14    Finally, each Market Center <u>is required to use</u> an employment application developed and maintained by KWRI, and require each applicant to complete the Keller Personality Assessment developed and maintained by KWRI.[7]  Additionally, each Market Center must also use KWRI's onboarding documents and deliver various trainings covering the tools that KWRI wants each associate to use in all Market Center staff positions.[8]  Finally, a Market Center owner must also seek approval from its Regional Office and KWRI in order to hire a Team Leader, Market Center Administrator, and Operating Partner ("OP"), even though each of those individuals will allegedly be employed by entity operating the Market Center (and not KWRI or the Region).[9]

3.15    The result is one large integrated entity whereby KWRI is, or acts as, the employer that pushes mandates down to each Market Center through the Region.  As such, both KWRI and the Region possess joint control over the terms and conditions of employment of Plaintiff and others.

---

[7] This assessment is a 40-minute written question and answer test that allegedly determines an applicant's behavioral strengths and operating style, but based on information and belief, it has not been vetted for discriminatory disparate impact risks, and in fact, it requires applicants to answer extremely difficult questions on things such as vocabulary.

[8] Such mandatory training includes, but is not limited to: OP Boot Camp, Team Leader Boot Camp, Market Center financial reporting, the KWRI Family Reunion (annual convention), biannual "mastermind meetings," MAPS coaching weekly, weekly call with the CEO of KWRI for Regional Directors, OPs, Team Leaders, and Market Center Administrators, quarterly regional meetings, weekly "regional" calls, biannual regional education, and each Market Center must purchase a copy of Gary Keller's book entitled, "*Millionaire Real Estate Agent*," as well as products offered by Keller Mortgage.

[9] The Franchise Agreement defines OP as "as Controlling Principal who has been designated by Licensee **and approved by the Company** as Licensee's primary officer assigned and empowered to act on Licensee's' behalf and the Team Leader's direct supervisor."  OPs, Team Leaders, and Market Center Administrators must also be approved by both the ALC and the Region.  In fact, the Region must interview the OP and Team Leader before those applicants are forwarded to KWRI for final approval.

3.16    In short, Defendants are jointly and severally liable for the failure to prevent and/or remediate the sexual harassment, sexual misconduct, hostile work environment, and retaliation suffered to date by Plaintiff at the hands of KWRI's employees and agents, because they are all in effect "employers" of Plaintiff.

B.    *Sexual Harassment, Sexual Misconduct, and Hostile Work Environment*

3.17    Plaintiff has been employed as an award-winning, top performing employee and/or Franchisee in Texas under the KWRI umbrella since 1992.  In fact, in 1996, she became a Team Leader in a Market Center owned by Keller, Founder and CEO of KWRI, himself.  During her entire tenure, she has performed her functions under the "Keller Williams" brand within the Keller Williams ecosystem (as described above).

3.18    Until only recently, Plaintiff observed a company culture within KWRI (and its Regions) that encouraged employees, especially women, to do whatever it took to make sales and "get along" with top performers to keep them happy.  From Plaintiff's experience, "getting along" included having to perform sexual favors or acts for male counterparts and/or top clients.[10]

3.19    Plaintiff observed this mentality embolden those associated with KWRI, either as employees or agents, to require, encourage, and/or turn a blind eye to ongoing sexual harassment and a hostile work environment.[11]

3.20    Plaintiff, while witnessing sexual and/or sex-based harassment around her, initially navigated around the hostile work environment and still managed to move up within the KWRI

---

[10] In or around late 2020, a few weeks after Plaintiff called Matt Green, Garrett's boss, KWRI launched a formal mandatory sexual harassment course for the Market Centers.  This is the first time that Plaintiff encountered any interest in sexual harassment training from KWRI and/or the Regional Office since the time her employment began.

[11] For example, it was not uncommon for management to ask Plaintiff "why don't you just sleep with ____ to recruit them," "why don't you want to get in the hot tub with ____," or "why don't you go out with ____ (who was married)? It's harmless."

ecosystem.  However, this began to change in or around July 1996, when Plaintiff met Davis, who was hired as a mortgage loan officer for Keller Mortgage in Austin, Texas.[12]  In fact, at this time, Davis reported directly to Keller, who was also Plaintiff's boss, as well as the owner of the office where she worked.

3.21    Additionally, Davis is the nephew of Mary Tennant, a well-connected co-worker within KWRI.  In fact, Davis was living in his aunt's house.  At that time, Tennant had been Plaintiff's best friend, when they both started together at KWRI.

3.22    In hindsight, it became clear to Plaintiff that from approximately July 1996 until April 1998, Davis was using his aunt's close relationship with Plaintiff to gain her trust by being kind and "going to bat for her" within KWRI's executive structure.

3.23    Beginning in or around April 1998, Plaintiff began to experience things she had only witnessed and/or heard about in the KWRI ecosystem.  On one evening in or around April 1998, Plaintiff attended a party hosted by Tennant.  At that party, Plaintiff recalls Davis asking her if he could come to her home once it concluded "to talk."  Plaintiff, having gotten to know Davis over the past few years, thought nothing suspicious of this request and said yes.

3.24    Unfortunately, this became the evening that changed the course of Plaintiff's life, and the night that she began to endure sexual harassment and misconduct from Davis, and eventually from other supervisors, directors, and/or superiors within KWRI and the Region.  On this evening, while at her home, upon exiting the bathroom, Plaintiff entered her living room to find Davis masturbating.  Despite her astonishment, Plaintiff asked Davis to leave and walked him to the door.  However, before he left, Davis, who is a much larger person than Plaintiff, grabbed Plaintiff and proceeded to engage in sexual misconduct that violated her body.

---

[12] Keller Mortgage, LLC is another entity owned by Gary Keller, and part of the Keller Williams ecosystem.

3.25    Thereafter, it is Plaintiff's recollection that nearly every time that Davis called Plaintiff, Davis made sexual demands.  Plaintiff also recalls events where she did not capitulate and/or submit to Davis' sexual demands, and for example, in or around the end of May 1998, Plaintiff recalls an incident of sexual misconduct where she cried out in pain and asked Davis to stop, but instead, Davis proceeded to have anal sexual intercourse with Plaintiff, despite her objection.

3.26    As the sexual harassment, sexual misconduct, and hostile work environment continued, Plaintiff felt that she had no choice but to acquiesce, because Davis was backed and supported by Keller, CEO and Founder of KWRI, which gave Davis a high degree of power within KWRI.  In fact, Keller compelled Plaintiff, who was operating one of the most profitable Market Centers of KWRI, to use Keller's mortgage company, which Davis worked for, and resulted in providing an office for Davis within Plaintiff's Market Center.  Additionally, Davis' aunt was very powerful within the KWRI ecosystem.  Importantly, after several months of being subjected to Davis' sexual misconduct, Plaintiff decided to confide in Tennant, as a friend and leader within KWRI, for advice and to bring it to her attention that this was happening in the KWRI ecosystem. As such, in or around August of 1998, Plaintiff detailed the sexual harassment, sexual misconduct, and hostile work environment to Tennant, and in response, Tennant told Plaintiff that she "was lying," "it was disgusting," and Davis "would do no such thing," and she then hung up on Plaintiff. Plaintiff never spoke to Tennant, whom Plaintiff had considered a friend, ever again.  Plaintiff was left hopeless because she had reported the sexual harassment, sexual misconduct, and hostile work

environment, to not only the person who she considered to be her best friend, but also to a member of the KWRI "inner circle," and in return, she was hung up on and called a liar.[13]

3.27    Based upon this interaction with Tennent, and her observations throughout her time at KWRI, Plaintiff believed any further complaints would fall on deaf ears within KWRI and the Regional Office, and further, based upon society at the time, she felt the same was true with regard to the authorities.  So, in or around September 1998, Plaintiff moved to Wichita Falls, Texas to live with her sister in an attempt to escape the sexual harassment, sexual misconduct, and hostile work environment.  Importantly, the sexual harassment, sexual misconduct, and hostile work environment had gotten so pervasive that Plaintiff considered giving up her career to escape it. However, Osborn[14] pursued Plaintiff, and he eventually convinced her to move to Dallas to help him open some Market Centers in the DFW Region.  Accordingly, Plaintiff began working with Osborn in or around January 1999.  At the time Plaintiff began working with Osborn, it was unbeknownst to her that Osborn would later be bringing Davis onboard.

3.28    Plaintiff's professional relationships with Osborn made it impossible to avoid Davis, or refuse to talk to and interact with him, especially considering Osborn hired Davis as a Team Leader,[15] for Osborn's Southlake Market Center, also part of the DFW Region, so Plaintiff was forced to constantly interact with Davis based on the intricate cross-relationships within

---

[13] At the time, Mary Tennant was the Team Leader in a Market Center owned by Keller, and she was also in the chain of command to Mark Willis, then-President of KWRI.  Plaintiff also wrote a letter to Tennant in September 1998 reiterating the issue.  To Plaintiff's knowledge, Tennant never responded.

[14] The Osborn family, of which David Osborn was a member, owned the DFW Regional Office.  Althea Osborn was the Regional Operating Partner.  In 1998, Althea Osborn hired David Osborn to be the Regional Director.  Osborn held the Regional Director position until 2004, when he became Regional Operating Principal.  By this time, Osborn had also become a close and personal friend of Plaintiff.

[15] The Franchise Agreement defines "team leader" as "the individual who Licensee has designated **and Company has approved** as the individual who is responsible for serving as the Market Center's chief executive officer and managing the Market Center's Associate recruiting, training and consulting activities."

KWRI.  In fact, Plaintiff was forced to attend regularly scheduled meetings that required her to be face-to-face with Davis.

3.29    As a result, over the next three years, Plaintiff, along with Osborn and Davis, worked very closely and the three eventually became partners in, and launched, three separate Market Centers (the "Three Market Center Partnership"), which included the Fort Worth Market Center.  At this time, Plaintiff also ran two other successful Market Centers as the OP.[16]

3.30    Plaintiff served as the OP for the Fort Worth Market Center from April to August 2002.  Plaintiff was also the Team Leader for the Fort Worth Market Center and, therefore, an employee of that Market Center.

3.31    Based on Plaintiff's status as an employee of the Fort Worth Market Center, the sexual harassment, sexual misconduct, and hostile work environment due to Davis became even worse in August 2002 when Osborn appointed Davis as the new OP for the Fort Worth Market Center.  This appointment made Davis the supervisor of Plaintiff, as she remained in the position of Team Leader.  In short, in addition to his connections and influence in the ecosystem of KWRI, Davis also now held actual, legal authority to hire, discipline, and/or terminate Plaintiff even though she was also one of the "owners" of the Fort Worth Market Center.  Accordingly, this dynamic forced Plaintiff to endure his constant harassment and verbal berating for fear of losing everything she had helped build and having her reputation damaged.

---

[16] The Franchise Agreement defines "operating principal" as a "Controlling Principal who has been designated by Licensee **and approved by the Company** as Licensee's primary officer assigned and empowered to act on Licensee's behalf and the Team Leader's direct supervisor."  An OP must be approved by both the ALC and KWRI.  Importantly, as a condition precedent to being issued the Franchise Agreement, an applicant and/or its principal must agree by way of an implied oral contract to act as the OP for the Market Center, prior to the approval of the Franchise Agreement. In this regard, with respect to each of Plaintiff's Market Centers, she was forced to enter into an implied contract with KWRI that she would act as the OP, prior to being issued the Franchise Agreement for each Market Center, and such agreements included the expectation of renewals, so long as Plaintiff continued to fulfill her obligation to act as OP for those Market Centers.

C.      *Continuous and Ongoing Sexual Harassment, Sexual Misconduct, and Hostile Work Environment*

3.32    As Plaintiff's supervisor, Davis continued to engage in the same type of sexual harassment, sexual misconduct, and hostile work environment, as she was previously subjected to by him, but at this time, he also began to intensify his verbal harassment (collectively, the "Abuse and Harassment").

3.33    Until at least 2004, Davis persistently and continuously carried out the Abuse and Harassment through severe emotional and psychological manipulation of Plaintiff.  For example, Plaintiff recalls Davis consistently requesting that she speak to him about work, but instead of discussing work, Davis used these opportunities to make inappropriate and degrading demands of Plaintiff that constituted further sexual harassment and intensified the already existent hostile work environment.  Plaintiff recalls Davis making these demands in many different locations, including but not limited to the office, on the way to meetings, and over the phone.  In other words, Davis' behavior toward Plaintiff was constant, severe, and pervasive.

3.34    During this time, Plaintiff also remembers Davis regularly threatening to report Plaintiff's work performance as substandard, as well as threatening disciplinary action for alleged wrongdoings, up to and including termination of her employment, if she did not acquiesce to his sexual advances and demands.  Plaintiff now understands that Davis threatened her in this manner, in an effort to silence her and conceal his behavior.  Plaintiff reasonably feared retribution if she refused or once again attempted to report the sexual harassment, sexual misconduct, and hostile work environment, as now Davis was not only well-connected in the DFW Region and with KWRI's staff and leadership, but also, he was her direct supervisor.  In short, Plaintiff reasonably believed that one comment from Davis would crater not only the career she had worked so hard to build, but also, it would block her from future financial opportunities and ruin her reputation within

KWRI.  Plaintiff felt that she was left with no choice but to submit to Davis' sexual demands and endure his incessant harassment.[17]

3.35    As such, Plaintiff suffered through the sexual harassment, sexual misconduct, and hostile work environment, which included, among other things, repeated directives to pleasure him orally or face consequences. Plaintiff continued to endure the Abuse and Harassment until approximately 2004, when she found the courage to say that she would no longer engage in any sexual act with Davis and refused from an unwanted advance from Davis one evening.

3.36    However, as Plaintiff had feared, subsequently in 2004, while at the KWRI annual convention, Plaintiff recalls Davis her and making another unwanted demand for sex.  At that time, Davis was still Plaintiff's partner in the Three Market Center Partnership, as well as her supervisor in the Fort Worth Market Center; yet, she once again found the courage to stand her ground and refused to submit to Davis.

3.37    Subsequently, Plaintiff learned that almost immediately thereafter, Davis complained to Osborn that Plaintiff was being "difficult to deal with."  In order to defend herself, Plaintiff revealed to Osborn that Davis had been sexually, verbally, and emotionally abusing her for years and that she had recently told Davis that she would no longer acquiesce to his demands and threats.  Plaintiff explained to Osborn that her refusal to acquiesce to the Abuse and Harassment was why Davis was complaining to Osborn that she was "difficult."

3.38    Shockingly, instead of expressing any concern or empathy, Osborn informed Plaintiff that she would "have to do whatever it takes to get along," and as such, he implied to her

---

[17] Additionally, as stated above, based upon Plaintiff's observations and knowledge, the culture fostered by KWRI was that women were expected to have sex with colleagues and managers to be successful as an agent and/or franchisee.

that he either condoned the sexual harassment, sexual misconduct, and hostile work environment, or that he had conceded to the toxic culture of KWRI.[18]

3.39    Osborn, as an OP for the Three Market Center Partnership, a Regional OP for the DFW Region, and an agent acting on behalf of KWRI as its local/regional representative, was Davis' boss.  Thus, Osborn had the power to stop the sexual harassment, sexual misconduct, and hostile work environment, but instead, he did nothing.

3.40    In fact, within hours of her conversation with Osborn, and being told to "do whatever it takes," Davis approached Plaintiff, and once again, demanded sex.  Plaintiff was horrified, as it became readily apparent that Osborn had failed to instruct Davis to cease the Abuse and Harassment.  Instead of receiving protection, Plaintiff continued to face the sexual harassment, sexual misconduct, and hostile work environment stemming from Davis (and now Osborn).

3.41    Unfortunately, the situation subsequently became worse, as Davis began (what Plaintiff perceived as) a campaign of retaliation against Plaintiff.  Osborn did nothing to stop it. Moreover, Davis and Osborn initiated a "business divorce" from Plaintiff relating to the Three Market Center Partnership.  Plaintiff learned that this "business divorce" was the result of Davis' refusal to accept the Regional Director position in the DFW Region "if Plaintiff remained a partner."  The effect being that Davis and Osborn forced Plaintiff out of her own businesses for standing her ground against the Abuse and Harassment.

3.42    Accordingly, over the next five months, Davis continued to verbally abuse and threaten Plaintiff by screaming and cussing at her, as well as belittling her.  Plaintiff felt harassed, afraid, and alone, as it had become clear to her that no one from KWRI or the DFW Region

---

[18] Of note, years after this conversation, Plaintiff recalls Osborn, over dinner with Plaintiff and her husband, confiding to Plaintiff that he could not believe Plaintiff had not sued him over Davis' behavior and his failure to address it.

intended to provide her with any support, remedy, or protection from the reprehensible treatment that she had endured, and which she was continuing to endure.

3.43    As further retaliation, which lead to significant financial harm, Plaintiff was only offered ownership in **<u>one</u>** of the three offices, the Fort Worth Market Center (which she had already been an owner of), and she was forced to tender approximately $100,000.00, plus interest, <u>to buy the ownership interest from Davis and Osborn</u>, despite the fact that they were keeping the other two Market Centers, in which she had been a partner, for themselves.  In essence, Plaintiff was left with the least valuable office and debt, and Osborn and Davis capitalized on an opportunity to take advantage of Plaintiff in another manner, by keeping the profitable Market Centers.  In this regard, Plaintiff felt voiceless and powerless to stand up for herself and fight for what she believed she had rightfully earned, because Davis and Osborn held the power to remove Plaintiff from any KWRI affiliation, which would result in a complete loss of income and opportunity.

3.44    Towards the latter part of 2004, Osborn and Davis' continued threats, harassment, and denigration had worn Plaintiff down to where she decided to accept their terms in order to maintain some vestige of the career that she had built.

3.45    Throughout the remainder of 2004, Davis continued his emotional and psychological abuse, as well as sexual harassment, by constantly making demands for sex to Plaintiff.  Plaintiff recalls Davis specifically making comments, such as "you know you want it" and "no one can satisfy you like me," which made Plaintiff extremely uncomfortable and fearful of continued and increased retaliation by him, the Region (because Davis was the DFW Regional Director), and by KWRI, based upon the influence of Davis and Osborn.  Importantly, as Regional Director, Davis held the authority to affect not only the performance of the Fort Worth Market Center, but also, he had the power and influence to cause harm to Plaintiff's career, as the regional

entity and/or leadership is vital to the top-down and integrated approach of KWRI's ecosystem of operations.

3.46    Additionally, based on KWRI's heavy-handed approach to approving and permitting the continued operations of a Market Center, Plaintiff was <u>required to attend</u> various regional and national meetings (thus, requiring her to interact with Davis), which presented him with numerous opportunities to continue the sexual harassment, sexual misconduct, and hostile work environment.  Plaintiff recalls Davis making some sort of inappropriate sexual comment <u>every time that he spoke with Plaintiff</u>, as well as constantly trying to physically corner her alone to solicit sex and intimidate her through at least 2005.

3.47    During the middle part of 2005, Plaintiff began attempting to expand her territory by applying to launch a new Market Center for Johnson County, Texas.  Unfortunately, her application required Davis' approval, as DFW Regional Director (the "Johnson County Market Center").

3.48    Based upon Plaintiff's prior experience with approvals, an application for a new Market Center was generally approved within four to six months.  However, Davis, without justification, "slow walked" the approval for Plaintiff's application for the Johnson County Market Center.  Not only did he delay approval, but also, he used the pending application as an excuse to contact Plaintiff and continue his verbal harassment by threatening that Plaintiff's performance was "too poor to approve the application," despite the fact that she had been continuously recognized as a high performing team leader and OP.

3.49    In the end, rather than four to six months, it took twenty-one months before Davis and the DFW Regional Office approved the Johnson County Market Center.

3.50   At least monthly, until the final approval in late 2006, Davis continued his harassment of Plaintiff through "mandatory" calls and meetings.  Even after Plaintiff married in 2006, the harassment, retaliation, and hostile work environment continued.  Plaintiff recalls constant interactions with Davis wherein he would make sexual and inappropriate comments about Plaintiff's husband to her, such as "he's not as big as me," "you know you want me," "don't you miss me," "your husband does not keep you satisfied," and "you will always want me."  In fact, on the day that Davis learned Plaintiff had married, he called Plaintiff and told her that "he will never satisfy you like I do."

3.51   Plaintiff recalls how Davis would use the "mandatory" regular telephone calls as an opportunity to make sexually suggestive comments to Plaintiff.  He also used these calls as an opportunity to continue to solicit and harass Plaintiff to have sex with him.  Plaintiff continued to refuse his inappropriate advances, and she even began bringing her husband to meetings, when possible, in an attempt to shield herself from this ongoing torment.  Plaintiff also recalls attempting to sit in the back of the room at "mandatory" in-person meetings and leaving early, in an effort to escape Davis' harassing behavior.  However, these actions of self-preservation worked to limit her ability to freely engage with others, in an industry where interaction and personal relationships equate to success and financial gain.

3.52   By 2007, Davis extended his retaliation to public ridicule.  As Regional Director, Plaintiff recalls Davis shaming her at regional meetings and during regional group phone calls.  For example, in or around January 2007, Plaintiff remembers an incident of ridicule and humiliation, wherein Davis manipulated data  about the Fort Worth Market Center that he reported publicly to suggest that Plaintiff's Market Center was failing.  In reality, the numbers had simply

changed, as many of Plaintiff's agents had transferred to Plaintiff's newly approved Johnson County Market Center.

3.53    Davis' monthly actions of portraying the Fort Worth Market Center in a terrible light were so retaliatory that Plaintiff's Team Leader, Sarah Steen, noticed and expressed that she felt attacked and humiliated because she was part of the Fort Worth Market Center's leadership. Moreover, agents became aware of the reports and thought that they were failing as an office. Plaintiff was forced to constantly do "damage control" in order to create an alternative narrative to Davis' retaliation and to retain and attract her agents.

3.54    This hostile work environment was relentless, severe, and pervasive, and it caused Plaintiff to begin skipping national meetings and ceremonies in order to avoid any contact or interaction with Davis.

3.55    Moreover, from approximately 2005 to date, the actions taken against Plaintiff have made it clear to Plaintiff that Davis and Osborn joined forces to thwart Plaintiff's plans for expansion (or torpedo her career).  Osborn, who became an employee of KWRI in 2007, as President of Core Services, continued to turn a blind eye to the ongoing harassment and retaliation of Plaintiff by Davis.

3.56    Beginning in or around 2005, and continuing therefrom, Osborn and Davis took business opportunities for themselves, which Plaintiff had presented to them on her behalf for their required approval.  Plaintiff has observed many instances wherein together, Osborn and Davis, would fail to approve Plaintiff's expansion applications, and then they take the idea for themselves and expand their own territory, or they would go behind her back to her potential investors and

make it clear that the applications would not be approved, thus, intentionally interfering with the growth of her business and intimidating her potential investors.[19]

3.57    In or around 2008, Davis was promoted to President of Growth for KWRI.  To Plaintiff's knowledge, the President of Growth for KWRI is essentially the President, and this position is one step down from the CEO of KWRI.  Additionally, Davis remained the Regional Director and OP for three Market Centers.

3.58    Throughout 2008, despite his promotion, Davis maintained close, hands-on control and authority over regional directors, OPs, and team leaders, including Plaintiff.  In this regard, he remained in Plaintiff's chain of authority and control, and he used that position to continue to impugn her reputation, from both the regional and national levels.  Plaintiff recalls constant comments from Davis accusing her of being "difficult," "not a team player," "not a good performer," "not a good owner/broker," and "near bankruptcy," none of which was true.  Davis made these types of comments regularly to Market Center, Regional, and KWRI staff.

3.59    Plaintiff understands that Davis' actions were carried out in this manner in order to continue to intimidate, threaten, punish, and harass Plaintiff for her refusal to acquiesce to Davis' continuing sexual demands and propositions.

3.60    In addition, from 2007 to at least 2009, Davis, who now held even more power than before to approve and/or disapprove Plaintiff's expansion applications, continued his harassment

---

[19] In fact, in or around 2018, one potential investor specifically told Plaintiff that it backed out of a business deal because it did not want to anger Davis or Osborn and feared retaliation from them.

and retaliation by delaying every application Plaintiff made, as well as continually creating obstacles for Plaintiff to hinder her success and growth of her business.[20]

3.61    During the time that Davis remained the President of Growth for KWRI, he continued to require Plaintiff to participate in weekly calls, and the harassment and demeaning behavior during these meetings continued for years on end.

3.62    In or around May 2011, Plaintiff met with Alexandra Christman, Plaintiff's MAPS Coach and an employee of KWRI, who worked directly for the KWRI President of Education, Diane Kokoszka.  During this mandatory meeting, Plaintiff shared that she "needed help" and disclosed the Sexual Abuse and Harassment, which turned into additional sexual harassment, intimidation, and retaliation by Davis due to her refusals to his unwanted advances and demands. Plaintiff recalls Christman telling her that she would relay the message but that she "did not think that KWRI would do anything about it because [Davis] was too powerful."

3.63    Plaintiff was never contacted by KWRI, or anyone at the national level, concerning her disclosure of the sexual harassment, sexual misconduct, hostile work environment, and retaliation.  As a result, Davis continued to harass Plaintiff in some way, at least monthly, on calls, or by disparaging her to other powerful individuals, leaders, and agents throughout KWRI, which Plaintiff subsequently discovered.

3.64    Plaintiff perceived this "campaign" of Davis, attempting to impugn Plaintiff, as so pervasive that in or around September 2015, DeeDee Trosclair, Regional Director of the DFW Region at that time, advised Plaintiff to submit her application to expand to West Fort Worth before

---

[20] For example, Plaintiff experienced difficulty when she applied to launch a business office in Cleburne, Texas, which was permitted under the Franchise Agreement for the Johnson County Market Center.  Under Osborn's direction, Davis permitted an investor from Houston to pursue a territory in West Fort Worth, which was in direct competition with Plaintiff's Market Center in Fort Worth.  This action forced Plaintiff to compete with this investor during the three years that it took to obtain approval from Davis and Osborn for this territory.

December.  Plaintiff recalls Trosclair advising her that by November 2015, Davis "would be CEO" and "he doesn't like you," "he disses you all the time," and will "do anything he can to deny your application."

3.65    In addition to the continuous and non-stop reputational attacks and retaliation against Plaintiff by hindering her business growth and prospects, in or around November 2015, at the KW MAPS Coaching-Recharge Exclusive, an event where only 100 top leaders were invited, Plaintiff remembers Davis making a point to physically intimidate her.  Davis approached Plaintiff's table, stood behind her while she was seated, and placed his hand on Plaintiff's shoulder while he talked with the other individuals at Plaintiff's table (but not Plaintiff herself).  Such intimidating behavior made Plaintiff physically uncomfortable because of the Abuse and Harassment that she had already endured.  Also, this incident brought back traumatizing memories of the prior and ongoing sexual harassment, sexual misconduct, hostile work environment, and retaliation.  Plaintiff perceived this behavior as meant to make her feel intimidated and uncomfortable, as Plaintiff had been denying Davis for years, and as a result, she had been on the receiving end of incessant hostility and harassment.

3.66    Meanwhile, back in the DFW Region, Garrett, a close friend of Davis that joined KWRI in 2004, was working his way up the Keller Williams ecosystem ladder.  In or around 2016, he became the DFW Regional Director and assumed a position of authority over Plaintiff that Davis previously held in the Region.

3.67    Plaintiff has learned that during this timeframe, Davis continued to disparage her in his monthly meetings with Garrett and other regional and KWRI leadership, which also included Osborn, on occasion.  At this point, Garrett took up Davis' campaign of disparagement, harassment, and hostility toward Plaintiff in the Region, through his position as the Regional

Director.  In essence, Garrett continued the pattern of constant harassment and retaliation with unwarranted delays of applications, bad-mouthing and disparagement of Plaintiff, and withholding expansion opportunities from Plaintiff.  Similar behavior that was not exhibited toward other employees, Franchisees, or agents within in the DFW Region by Davis, Osborn, Garrett, or the Regional Office.  In summary, based upon the relationships, business and personal, between Davis, Osborn, Garrett, and their intertwined business entities, Plaintiff was being harassed and scorned from both the national and regional levels.[21]

3.68    Simultaneously, Osborn, who was still employed as the Regional OP and Garrett's supervisor, allowed Garrett to continue the hostile and harassing practices of Davis towards Plaintiff by doing nothing to prevent or derail the harassment, hostile work environment, and retaliation directed at her.

3.69    In or around January 2016, Plaintiff learned that negative comments about her were being made to peers and agents in both the DFW Region and at the national level, which included lies such as she was not a team player, her performance was sub-par, and she was not financially solvent.  None of the statements were true and only served to continue the pattern of constant harassment and hostility toward Plaintiff, which had been ongoing for years despite the knowledge of the DFW Regional Office and KWRI.[22]

---

[21] By way of example, despite being extremely well-qualified, Garrett refused to approve the mega-agent location application of one of Plaintiff's agents in the summer of 2016.  Yet, also in 2016, Garrett violated a KWRI/Regional rule requiring him to obtain the Franchisee's written consent before approving a mega-agent location in their territory, when he allowed two of his friends to open mega-agent locations in, not one, but two of Plaintiff's territories.

[22] For example, in or around January 2016, Plaintiff learned that Shelley Gonzales, the Executive Assistant to Davis and at the behest of Davis, informed an agent not to join Plaintiff's Fort Worth Market Center, and instead, she told the agent to join Garrett's Market Center in Arlington, Texas.  The agent was advised that Garrett "gets opportunities" and "Inga doesn't get business opportunities," which further demonstrated the lack of support and harassment that Plaintiff continued to endure all the way from the CEO down through the Regional level.  Again, when this agent interviewed at the Arlington Market Center, the agent was informed the same thing, which was then relayed back to Plaintiff.  Plaintiff was forced to reassure the agent that the Fort Worth Market Center did perform well and that what she had been told was a lie.  This is simply another example of the collaboration between Davis and Garrett to continue the same pattern and practice of harassment that Davis had begun, which was now being emulated through Garrett.

3.70    Throughout at least 2016, Plaintiff was constantly disturbed because Garrett would use the same words that Davis previously used when speaking with Plaintiff, and he would even go as far as to mimic Davis' voice when he spoke to Plaintiff.  Plaintiff perceived this behavior as a means to telegraph that Davis' pattern of retaliation and harassment was going to continue, which stemmed back to her denial of Davis' sexual advances after capitulating to them for years for fear of her professional and financial well-being.  Plaintiff also perceived that Garrett continued this treatment of Plaintiff at the behest of Davis, as they were friends and partners in business, and that Osborn continued to do nothing to protect or speak out for his alleged friend, Plaintiff, because of his ongoing business relationship and partnerships with Davis.

3.71    Throughout at least this time, Davis remained in powerful positions at the national level of KWRI (with great influence over the DFW Regional Office), and in or around February 2017, he was named co-CEO of KWRI.  By approximately April 2017, he was the sole CEO of KWRI.  Even after becoming the CEO, an international force in the real estate industry, Davis still held mandatory weekly calls for OPs, which required Plaintiff's participation.  It was Plaintiff's interpretation that Davis continued to do so in order to dictate actions, approve decisions, and remain involved in the day-to-day operations of the Market Centers, including the ones in which Plaintiff had any financial interest.  Plaintiff recalls that Davis continued to use these weekly calls to disparage, harass, exhibit hostility toward, and retaliate against Plaintiff.

D.    *Continued Harassment and Failure to Accommodate Plaintiff*

3.72    In or around 2017, the ten-year renewal of the Fort Worth Market Center, which Plaintiff had built up to become her most profitable Market Center, was due.  However, Osborn, Garrett, and/or GOM (i.e., those that comprise the DFW Regional Office) refused to renew the license (which should have been renewed without issue) and alleged that their rationale for this

refusal was "non-compliance," which Plaintiff disputed and continues to dispute to this very day. Instead, the improper denial simply represents further retaliation and hostility towards Plaintiff, upon the behest of Davis (and/or in furtherance of the sexual harassment, sexual misconduct, hostile work environment, and retaliation initially stemming from Davis). In fact, to date, the DFW Regional Office (with the knowledge of KWRI) continues to force Plaintiff to operate her Fort Worth Market Center on a month-to-month basis and have yet to renew Plaintiff's license, despite the fact that Plaintiff continues to hold the title and act as the OP of this Market Center, in accordance with her implied contract and/or agreement with KWRI. In other words, Plaintiff has abided by the terms of her agreement with KWRI, as well as the terms of her license agreement, but KWRI has breached or repudiated its contractual obligations, and/or Davis, Osborn, Garrett, and GOM (i.e., Davis and/or those that comprise the DFW Regional Office) have knowingly participated in (or caused through actual or apparent authority) such breach and/or interfered. This wrongful behavior interferes with Plaintiff's ability to know when, or if, her license will be approved, and it serves as a perfect depiction of the continual and never-ending harassment, hostile work environment, and retaliation that Plaintiff continues to endure, to this very day.

       3.73    Plaintiff met the KWRI standards for approval, but Osborn, Garrett, and/or GOM (i.e., those that comprise the DFW Regional Office) either refused to acknowledge or failed to report her successful performance to KWRI. As a result, Plaintiff received multiple correspondences from KWRI, of whom Davis was CEO, concerning "non-performance" and lack of approval of her application. Moreover, refusal and/or failure to report Plaintiff's successful performance by Osborn, Garrett, and/or GOM (i.e., those that comprise the DFW Regional Office) to corporate (i.e., Davis) caused, and continues to cause, KWRI not to approve Plaintiff's application. KWRI also refused to consider any direct contact from Plaintiff, ignored direct

complaints from Plaintiff, and outright rejected any attempts by Plaintiff to advance her application; instead, KWRI kicked it back to the Regional Office, despite KWRI's knowledge of the prior and ongoing sexual harassment, sexual misconduct, hostile work environment, and retaliation by Davis, Osborn, Garrett, and GOM (i.e., Davis and/or those that comprise the DFW Regional Office).

      3.74    By the earlier part of 2017, the ongoing, relentlessly hostile work environment created by Davis and Osborn, and perpetuated and continued by Davis, Osborn, Garrett, and GOM (i.e., Davis and/or those that comprise the DFW Regional Office), as well as KWRI, had taken a great toll on Plaintiff's emotional and physical well-being.  Plaintiff developed a stress-induced medical condition, Bell's Palsy, which has affected her ability to work in the same manner as she had worked before its onset and from which she continues to suffer to date.  During this time, Davis was CEO of KWRI, and he was aware of Plaintiff's condition.  Despite this knowledge, Davis, KWRI, and the DFW Regional Office comprised of Osborn, Garrett, and GOM, failed to, and continue to fail to, provide Plaintiff with reasonable accommodations in light of this disability.

      3.75    With Bell's Palsy, it was visibly obvious from Plaintiff's face that she had become disabled.  Also, KWRI and the Regional Office became aware of Plaintiff's disability because she was forced to communicate via text messages and/or e-mail correspondence due to her inability to effectively communicate verbally, as a result of her disability.  Beginning around the spring of 2017, Plaintiff was unable to go into her office, as her medical condition and disability caused her face to droop and caused her to drool, which further exacerbated her ability to communicate verbally.  Since the stress from the constant and continuous harassment, hostile work environment, and retaliation continued, Plaintiff's recovery was very slow, and by approximately June 2018, she was forced to ask her husband for assistance in the daily operation of her businesses.  Plaintiff's

husband is not, nor ever has been, an owner or an employee if Plaintiff's businesses, and Plaintiff remains the OP for her Market Center portfolio and is apprised of its daily operations.

3.76    Beginning in or around May 2018, Plaintiff has made several attempts to sell her three Market Centers, in order to break away from the constant and continuous harassment, hostile work environment, and retaliation, which now includes the complete failure to make any attempts to accommodate her disability by KWRI or any of those (now or previously) associated with the DFW Regional Office.

3.77    Upon learning of her interest in selling in 2018, Garrett indicated to Plaintiff that he and Osborn (presumably through their regional entity, GOM) would purchase her Market Centers and asked her to hold off on publicizing her Market Centers as "for sale."  Plaintiff chose to proceed with marketing the offices nationally, for fear that the offer she would receive from those associated with the DFW Regional Office would not be a fair and reasonable offer, considering the value of her business, in conjunction with the way she had been constantly treated over years by the Region (by and through Davis, Osborn, Garrett, and/or GOM), as well as by KWRI, for whom Davis was CEO.

3.78    During this same time frame, as another option to accommodate her disability, in or after September 2018, Plaintiff proposed stepping down as OP under a newly created Legacy Program launched by Keller himself.  Plaintiff learned that Keller announced the launch of this program at a Mega Agent Bootcamp, at which Plaintiff's MAPS coach and various employees of Plaintiff were in attendance.[23]   Plaintiff also learned that Keller represented that under this program, Plaintiff (and others seeking to retire, suffering from health issues, etc.) would be

---

[23] In or around November 2020, during a conversation with a purported corporate attorney for KWRI, this attorney confirmed the existence of the Legacy Program to Plaintiff.

permitted to remain as an owner of a Market Center but turn over the OP duties to someone else. As Plaintiff believed this to be a solution to the ongoing harassment, hostile work environment, and retaliation, as it would allow Plaintiff to retain a passive income stream without having to deal with Defendants on a day-to-day basis. Plaintiff sought this reasonable accommodation to avoid the worsening of her medical condition, and in furtherance thereof, she applied for the program; however, to date, Plaintiff has not been permitted to enter the program or to step down from and/or re-appoint another to fill the position of OP for each of her Market Centers. At the time of Plaintiff's application for this program, Davis was still the CEO of KWRI, but Keller personally announced the program before stepping back in as CEO. Further, at this time, Osborn, Garrett, and GOM continued to run the Regional Office and had great influence over the approval process for this program. To date, Defendants have denied Plaintiff, and continue to deny Plaintiff, approval to participate in the Legacy Program, as a reasonable accommodation for her disability.[24]

3.79    Upon learning of the Legacy Program, in or around October 2018, Plaintiff identified the perfect candidate to assume the OP role over her three Market Centers in Scott Tolar. Plaintiff eventually entered into an employment agreement with Mr. Tolar, whom she intended to appoint as OP, and her successor upon approval from the Region (i.e., Osborn, Garrett, and GOM) and KWRI (i.e., Davis and/or Keller). As such, in conjunction with her application to the Legacy Program, Plaintiff brought this plan to the Regional Office (Garrett, Osborn, and GOM) for approval. Davis was still CEO of KWRI at this time, and as the chief officer of KWRI's corporate

---

[24] As described in detail *infra*, based upon public filings, it appears Davis has continued to act in conjunction with KWRI, and the Regional Office, as a partner, owner, and/or agent, and as such, continues to contribute to this prohibited behavior.

office, was directly involved in whether Plaintiff's Legacy Program application was approved or denied, and was also involved in decisions to accommodate her disability.[25]

3.80    During the latter part of 2018, the DFW Regional Office, by and through Garrett, denied Plaintiff's request to enter the Legacy Program and refused to appoint Scott Tolar as OP of Plaintiff's Market Centers.   Osborn, Garrett, and/or GOM (i.e., those that comprise the DFW Regional Office) have neither offered an acceptable alternative, nor engaged in the interactive process with Plaintiff to find a way to provide a reasonable accommodation for her disability.

3.81    In conjunction with the aforementioned conduct, during the first part of November 2018, Osborn and Garrett made an offer well below the appraised value of Plaintiff's business. During that same month, Plaintiff received an offer from another buyer, whose offer was not only higher but also was a cash offer.   Plaintiff also had other interested purchasers around this time, but Plaintiff decided to accept the cash buyer's offer, which prompted Osborn, Garrett, and/or GOM (i.e., those that comprise the DFW Regional Office) to begin calling potential purchasers in an attempt to identify who the cash buyer was and to impede the sale.  It is Plaintiff's understanding that Osborn, Garrett, and/or GOM (i.e., those that comprise the DFW Regional Office) identified and/or reached out to the cash buyer, and subsequently, during 2019, the cash buyer backed out of the purchase.[26]

3.82    Also, in or around December 2018, after Plaintiff refused the offer to buy her Market Centers from Osborn, Garrett, and/or GOM (i.e., those that comprise the DFW Regional Office), and in furtherance of the constant and continuous harassment, hostile work environment,

---

[25] Importantly, as Plaintiff continues to seek approval for this program and/or other reasonable accommodations for her disability, Keller, who subsequently took over the role of CEO of KWRI, has also been directly involved in the continual denial of Plaintiff's application and failure to accommodate her disability.

[26] Of note, during this time, Davis remained CEO of KWRI, and as set forth below, he appeared to still be involved in the Regional Office(s) and/or entities.

and retaliation being suffered by Plaintiff, the DFW Regional Office, by and through Garrett, solicited Plaintiff's top producing agent away from Market Center and to his Market Center, in violation with KWRI's policies and/or ethics.

3.83    Additionally, in or around February 2019, the DFW Regional Office, by and through Garrett, solicited the Team Leader from the Fort Worth Market Center, Trish Moore, and began using her to recruit agents away from the Fort Worth Market Center, in violation with KWRI's policies and/or ethics.

3.84    Further, subsequently during 2019, the DFW Regional Office, by and through Garrett, continued to poach agents from Plaintiff's Market Centers by continuing to spread rumors that Plaintiff was going to sell, her renewal applications would not be approved, etc.  In fact, as a result of this improper and unwarranted behavior, three of Plaintiff's agents left Keller Williams altogether for other real estate companies.

3.85    Moreover, during the latter part of 2019, Plaintiff learned that the DFW Regional Office, by and through Garrett, was openly telling anyone who would listen, in or around the earlier part of 2019, that the DFW Regional Office will "force her out" and "not renew" her Franchise Agreements,[27] which once again continued the harassment, hostile work environment, and retaliation against Plaintiff.

E.    *Further Harassment, Corporate's Failure to Act, and Cultural Environment*

3.86    During 2019, Garrett (and the DFW Regional Office) reported Plaintiff to KWRI compliance for operating an "unapproved" office.  Plaintiff learned of this allegation during the

---

[27] In or around the end of December 2018 and/or the beginning of January 2019, Davis stepped down from his role as CEO of KWRI.  It is Plaintiff's understanding that Davis was asked to step down in lieu of termination for inappropriate sexual behavior, verbal abuse, and bullying.  To Plaintiff's knowledge, it is widespread knowledge by those associated with KWRI that Davis' inappropriate sexual conduct resulted in numerous confidential settlements with females in the Keller Williams ecosystem.  Despite Davis' exit from the position of CEO of KWRI, it is Plaintiff's understanding that Davis is still associated with, owner/partner, manager, and/or an executive in several KWRI entities, including the Region.

latter part of 2019, and she received a letter of non-compliance from KWRI.  However, the allegations were <u>completely fabricated</u> by Garrett (and the DFW Regional Office), and the address that he had reported as "Plaintiff's location" was in fact the work address of the ex-husband of one of Plaintiff's agents.  As these allegations were completely fabricated, such operated only as another pretextual way for Garrett, the DFW Regional Office, and KWRI to deny Plaintiff's application and demonstrated the ongoing harassment and hostility that Plaintiff had been forced to endure for years at the hand of Davis, Garrett, Osborn, and/or GOM.[28]

3.87    Subsequently, during the latter part of 2020, Plaintiff reported the entirety of her issues to Matt Green, who worked directly with Keller, who was transitioning from CEO of KWRI to KWx.  Matt Green reported the issues, and KWRI's legal department finally reached out to Plaintiff, but to date, nothing more has been done to address the situation, rectify the behavior and/or harassment, or accommodate Plaintiff's disability.

3.88    To date, Plaintiff continues to be retaliated against, harassed, and treated with hostility by Defendants through the continued denials of her renewal(s) and participation in the Legacy Program, as well as the unrelenting interference with her businesses, amongst other things. All for refusing to submit to Davis' sexual advances, demands, and threats and for refusing to take part in the culture at KWRI, which demonstrated that female employees should do whatever it takes (including sexual favors and suffering from sexual advances) to become successful and generate income for KWRI.

---

[28] Plaintiff contacted corporate (KWRI and/or Keller, who was CEO) to contest the false allegations of non-compliance, and Plaintiff specifically learned that it was Garrett that was making such allegations and that such had happened on more than one occasion.  Furthermore, corporate (KWRI and/or Keller, who was CEO) did nothing and refused to look into such behavior or investigate whether Plaintiff was truly in non-compliance.

3.89    Despite knowledge of the prior and ongoing sexual harassment, sexual misconduct, hostile work environment, and retaliation by Davis, Osborn, Garrett, and GOM (i.e., Davis and/or those that comprise the DFW Regional Office) that Plaintiff has been subjected to, and continues to endure, which affects not only Plaintiff but also her staff and agents, Defendants have not taken any action or even affirmatively acknowledged Plaintiff's issues and complaints.[29]

3.90    Conversely, in or around <u>July 2020</u>, KWRI released a statement that Seth Campbell, an extremely successful Franchisee, Regional Director, and all-around leader within the Keller Williams ecosystem, was being <u>removed from all affiliation</u> with Keller Williams after an extensive investigation into multiple allegations of sexual harassment that went back to 2015.[30]

3.91    According to the Inman article, during his career with KWRI, Campbell served as a Regional Director for the Maryland and Washington D.C. area from 2011 to 2017, as well as an OP, a Market Center owner, a coach within the KWRI Mastery Program, and a member of Keller's private expansion group which met monthly.  He has been described as a KWRI "God."

3.92    However, Campbell's success hid a story strikingly similar to Plaintiff.  In or around 2015, Campbell developed a business relationship with a female agent.  Over a period of two years, Campbell "repeatedly pushed the boundaries of the business relationship" by sending sexually explicit text messages and asking for inappropriate pictures of her, and he even made an

---

[29] In this regard, during 2020, Scott Tolar, an employee and potential OP of Plaintiff's Market Centers, reported to Matt Green, Garrett's boss, that he was being harmed by not being approved as OP by Garrett due to Garrett's continuing harassment of Plaintiff.  During the meeting with Matt Green, Scott Tolar was told that the reason he was not approved as OP was because "people in the region don't like him."  When pressed, Matt Green admitted that that information was relayed to him by Garrett.  Despite such contention, prior to seeking approval to appoint Scott Tolar as OP, Plaintiff received numerous recommendations regarding Scott Tolar from high level KWRI executives.  In fact, on a call with Plaintiff's husband, in front of regional staff, Garrett stated that the reason Scott Tolar was not being approved as OP was because he did not attend all required calls or meetings.  This was also untrue, and it exemplifies the extensive oversight of the Market Center operations by both KWRI and the DFW Regional Office.

[30] The July 1, 2020 article was titled, "*Keller Williams is removing Seth Campbell over sexual harassment allegations*," and was found on Inman, a real estate industry publication found at <u>www.inman.com</u>.

advance on her in a hotel room (the female had agreed to meet in the room because Campbell convinced her that he "could not be seen with females in public because people get the wrong impression.").

3.93    In or around 2016, this female agent approached KWRI, specifically Mo Anderson and Mary Tennant, who were and remain members of the Board of Directors for KWRI.  Anderson promised to report this behavior and ask someone to follow up with the female agent.  It appears, according to the article, that no one has followed up with the female agent.

3.94    Other former agents and employees described Campbell, as creating an environment of "gaslighting, harassment, fear, and blackmail if someone spoke out about Campbell's behavior," and they were too afraid to give their names for fear of retaliation.

3.95    The Campbell situation shows that: (1) the "have sex to get ahead" mentality is endemic throughout the Keller Williams ecosystem; (2) it was allowed, either actually or tacitly, by various levels of local, regional, and corporate staff because "everyone knew about it" but did nothing because he was "too powerful; and (3) it is clear that employees throughout the Keller Williams ecosystem believe that KWRI is the employer, or at least the appropriate place to report the this type of behavior for redress.

3.96    In short, while it is laudable that KWRI addressed the Campbell situation, it should have come as no surprise when Plaintiff approached KWRI with a very similar situation subsequently.

3.97    However, KWRI failed to address Plaintiff's situation in any substantial way. Instead, she is being accused of being "a wealthy" woman bringing "salacious allegations" in an attempt to use the "EEOC Charge process to exert pressure on KWRI to compromise on business

ownership matters that Ms. Dow is unhappy about - not because she was discriminated against and harassed by KWRI in violation of Title VII."[31]

F.    *Davis' Continued Involvement in KWRI and Regional Office*

3.98    Based upon recent filings with the Texas Secretary of State, it appears that not only is Davis still involved on a corporate level with KWRI, but also, he remains involved with the Region, as an owner, partner, director, and/or executive. [32]

3.99    As of March 21, 2022, Davis is still identified on the Texas Secretary of State's website as management of KWRI.  Moreover, according to the Texas Secretary of State, Davis is also listed in a management and/or executive position in the following companies representing KWRI and corporate in Texas: KW Mid-American Management LLC (which is also the limited partner of KW Mid-American Region, Ltd.) and KW Worldwide Management, LLC.  Also, with regard to regional involvement, at a minimum Davis is also associated with the with a company named JRDSSGBW, LLC.  Interestingly, Davis' full name is John Robert Davis, which comprises the first three letters in this entity's name.  The Texas Secretary of State's management tab relating to JRDSSGBW, LLC, whose certificate of formation was signed by Davis and lists Davis as the organizer and a governing member, still shows Davis' executive assistant (who worked for Davis at a minimum through his tenure as CEO of KWRI) as a manager, and it also identifies GOM as a manager.  Additionally, Davis' assistant is also listed as the filer in recently filings of the public information reports for such entity.   Further, as recently as August 2020, JRDSSGBW, LLC filed

---

[31] Such represents the position taken in the Position Statement sent on behalf of KWRI, dated July 13, 2021, and the position being taken in this litigation, despite the fact that Plaintiff has been dealing with this environment for years, and she has reported it numerous times to higher ups at KWRI in an attempt to see its end, to no avail.  Additionally, Plaintiff has even attempted to sell her business to escape this harassment and hostility; however, even those attempts have been thwarted and used to take further advantage of, and continue to harass, Plaintiff.

[32] Federal courts have taken judicial notice of matters of public record. *See Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007); *see also Cinel v. Connick*, 15 F.3d 1338, 1343 n. 6 (5th Cir.1994) (both holding that a court may take judicial notice of matters of public record).

an assumed name certificate indicating its business was to be conducted as "Keller Williams Realty." As such, it appears that Davis is still very much involved in this entity, whose purpose according to its certificate of formation was to operate Keller Williams Realty Market Centers.[33]

3.100    More importantly, GO LFRO LLC, whose manager is GOM (owned and managed by Osborn and Garrett), was the sponsoring broker for Davis' original broker's license back in 1998 (when the Abuse and Harassment began), and again, it recently sponsored Davis' license in September 2021, after the filing of the EEOC Charge and closely preceding the filing of this lawsuit. Interestingly, GO LFRO LLC was formed shortly after Davis' exit from the position of CEO for KWRI. As previously set forth, to Plaintiff's knowledge, Davis, Osborn, and Garrett all maintained a close, personal and business friendship with one another, which to Plaintiff's knowledge continues.

G.    *Plaintiff's Damages*

3.101    As a direct and continuing result of the prior and ongoing sexual harassment, sexual misconduct, hostile work environment, and retaliation, Plaintiff has lost hundreds of thousands of dollars, and Plaintiff has also been forced to seek psychiatric counseling for over fourteen years in an effort to address the trauma that she has suffered and continues to suffer to this day.[34]

3.102    Moreover, as a result of the continued harassment and hostility aimed at Plaintiff, the denial of her application to operate under the Legacy Program, and the refusal to approve and appoint Scott Tolar as OP, Tolar resigned effective November 1, 2021. Tolar resigned due to the

---

[33] Based upon review of Texas Secretary of State Documents, it appears Davis is likely associated with several other Regional entities; however, additional investigation and discovery is needed to inquire into such suspected involvement.

[34] It has taken over fourteen years to unpack the emotional trauma Plaintiff has been subjected to since 2002, and to date, she remains unable to recall some details of Davis' actions due to her brain's attempt to shield her from the trauma. Moreover, recently, as a result of pursing her rights, she has begun experiencing disturbing and terrifying nightmares about Davis and the treatment that he subjected her to under the KWRI umbrella.

ongoing harassment and hostility towards Plaintiff, which was in turn was directed toward Tolar, as Garrett refused to acknowledge, and in fact completely ignored, Tolar at meetings and/or on calls, together with the ongoing refusal to approve Plaintiff's application.  More specifically, Tolar could no longer commute from Austin and spend a substantial amount of time away from his family to risk their overall financial well-being when he was being harassed and treated in such a hostile manner, which in turn caused him to fear the longevity of the position that he intended to take over.  A position that he was supposed to begin in or around November 2019.

## IV.
## CAUSES OF ACTION

4.1    *__Alternative Pleadings__*.  To the extent necessary, each of the claims set forth below is pleaded in the alternative.

A.    **Count One:**

**Violation of Title VII of the Civil Rights Act of 1964:**
**Sex Discrimination – Sexual Harassment and Hostile Work Environment**
**(Against KWRI and GOM)**

4.2    To the extent necessary, Paragraphs 1.1 through 4.1 of this Complaint are hereby referenced and fully incorporated herein by this specific reference, as though fully set forth herein.

4.3    As set forth above, KWRI and GOM violated Title VII by subjecting Plaintiff to severe and pervasive sexual harassment, including continuous sex-based harassment, which altered the terms and conditions of Plaintiff's working environment.

4.4    KWRI and GOM also violated Title VII by creating and fostering a hostile work environment which, to date, continues to affect the terms and conditions of Plaintiff's employment and her accessibility to financial opportunities within the KWRI structure.

4.5    KWRI and GOM engaged in a systemic practice of sexual harassment and/or sex-based harassment by tolerating, condoning, and/or allowing the sexual harassment and hostile work environment to continue for Plaintiff without repercussions to the offenders.

4.6    Moreover, neither KWRI nor GOM addressed the issues or implemented and/or enforced policies and practices that, on their face, could have reasonably been perceived to prohibit sexual harassment and the creation of a hostile work environment.

4.7    Despite having actual and/or constructive knowledge of the sexual harassment and hostile work environment to which Plaintiff has been subjected, KWRI and GOM failed to take immediate and appropriate corrective action to stop it. Despite having actual and/or constructive knowledge that the sexual harassment and hostile work environment rose to the level of a systemic, institutional issue, KWRI and GOM, failed to take steps to remedy the sexual harassment and hostile work environment.

4.8    KWRI and GOM knew, or should have known, that their actions constituted unlawful sex discrimination, including sexual harassment and hostile work environment, and showed willful and/or reckless disregard for Plaintiff's protected rights.

4.9    KWRI and GOM's actions amount to impermissible discrimination and harassment, which created an on-going hostile work environment and constitute violations of Title VII.

4.10    As a result of the foregoing, Plaintiff has been injured and/or damaged, and Plaintiff hereby seeks to recover any and all remedies afforded and/or available under law and/or in equity, including but not limited to her damages resulting from said conduct by KWRI and GOM, jointly and severally, in an amount to be proven and/or determined at the time of trial, equitable relief, and attorneys' fees and costs.

**B.    Count Two:**

**Violation of Title VII of the Civil Rights Act of 1964:**
**Retaliation for Reporting and/or Opposing Sexual Abuse, Discrimination, and Harassment**
**(Against KWRI and GOM)**

4.11    To the extent necessary, Paragraphs 1.1 through 4.10 of this Complaint are hereby referenced and fully incorporated herein by this specific reference, as though fully set forth herein.

4.12    Plaintiff engaged in protected activity when she reported the prior and ongoing sexual harassment, sexual misconduct, hostile work environment, and retaliation, which includes her reports to Tennant in or around 1998, Osborn in or around 2004, and at various times thereafter (as recently as 2020) to those employed (or controlled) by KWRI when she informed them of the treatment that she was being subjected to as a result of her denying Davis' sexual advances and demands for sexual favors.

4.13    KWRI and GOM violated Title VII when they engaged in adverse employment actions against Plaintiff for the purpose of retaliating against her because of her reports about (and opposition to) prior and ongoing sexual harassment, sexual misconduct, hostile work environment, and retaliation to which she had been subjected.

4.14    KWRI and GOM knew or should have known that their actions constituted unlawfulretaliation, and KWRI and GOM showed willful and/or reckless disregard for Plaintiff's statutorily protected rights.

4.15    Additionally or alternatively, such conduct by KWRI and GOM is an impermissible form of retaliation against Plaintiff because it was based upon Plaintiff's exercise of her rights to engage in a protected activity, including but not limited to Plaintiff's opposition of KWRI and GOM's unlawful practices under Title VII and/or Plaintiff's charges, testimonies, assistance, or

participation of any manner in the investigation, proceedings, and/or hearings under Title VII. Retaliation of this nature is prohibited by Title VII.

4.16    Plaintiff engaged in activity protected under Title VII, namely speaking and/or reporting the prior and ongoing sexual harassment, sexual misconduct, hostile work environment, and retaliation to which she had been subjected, which includes reporting such prohibited conduct to her supervisor, Osborn.  As a result of Plaintiff's protected activity, KWRI and GOM have continued to deny Plaintiff's applications for Market Centers, for the Legacy Program, for the renewal of her Franchise Agreements, etc.

4.17    KWRI and GOM have not, and are unable to provide, any non-discriminatory reason for the adverse actions taken against Plaintiff.

4.18    This claim is timely because the retaliation has continued in an unbroken chain since 1998, and as such, Plaintiff timely filed her charge.  To date, Plaintiff continues to be retaliated against and harassed.

4.19    As a result of the foregoing, Plaintiff has been injured and/or damaged, and Plaintiff hereby seeks to recover any and all remedies afforded and/or available under law and/or in equity, including but not limited to her damages resulting from said conduct by KWRI and GOM, jointly and severally, in an amount to be proven and/or determined at the time of trial, equitable relief, and attorneys' fees and costs.

**C.    Count Three:**

**Violation of Chapter 21 of the Texas Labor Code:**
**Sexual Harassment and Retaliation**
**(Against KWRI, GOM, Osborn, and Garrett)**

4.20    To the extent necessary, Paragraphs 1.1 through 4.19 of this Complaint are hereby referenced and fully incorporated herein by this specific reference, as though fully set forth herein.

4.21    As set forth above, the actions of KWRI, GOM, Osborn, and Garrett amount to discrimination, specifically sexual harassment, and constitutes a violation of Section 21.142 of the Texas Labor Code.  KWRI, GOM, Osborn, and Garrett are prohibited from discriminating against and harassing Plaintiff based on her gender/sex under Chapter 21 of the Texas Labor Code.

4.22    Further, KWRI, GOM, Osborn, and Garrett are prohibited from retaliating against Plaintiff because she opposed such sexual harassment and abuse pursuant to Section 21.055 of the Texas Labor Code.  Additionally or alternatively, the manner and/or method by which KWRI, GOM, Osborn, and Garrett applied, or failed to apply, the policies and/or procedures resulted in a disparate and/or discriminatory impact upon Plaintiff, as stated above.

4.23    Additionally or alternatively, such conduct by KWRI, GOM, Osborn, and Garrett is an impermissible form of retaliation against Plaintiff because it was based upon Plaintiff's exercise of her rights to engage in protected activity, including but not limited to Plaintiff's opposition of KWRI, GOM, Osborn, and Garrett's unlawful practices under Chapter 21 of the Texas Labor Code.  Retaliation of this nature is prohibited by Chapter 21 of the Texas Labor Code.

4.24    Additionally or alternatively, GOM, as the owner of the DFW Regional Office, and Osborn and Garrett, individually as regional managers of Plaintiff, are acting directly in the interests of an employer in relation to an employee, and they have engaged in retaliation and sexual harassment against Plaintiff after September 1, 2021 by continuing to deny her application for the Legacy Program, refusing to appoint Scott Tolar as OP, continuing to fail to approve Plaintiff's ten-year renewal of the Fort Worth Market Center, reporting Plaintiff to corporate for false allegations of non-compliance, and working to de-value Plaintiff's business, all in violation of Section 21.141 of the Texas Labor Code.

4.25    Additionally or alternatively, KWRI knew, or should have known, that Plaintiff continues to be sexually harassed, as defined by Section 21.141(2)(B) of the Texas Labor Code by GOM, Osborn, and Garrett in violation of Section 21.142 of the Texas Labor Code, as they have wholly failed to address the violation.

4.26    KWRI is subject to liability even as a franchisor, because it "exercised a type or degree of control over the franchisee or the franchisee's employees not customarily exercised by a franchisor for the purpose of protecting the franchisor's trademarks and brand." TEX. LAB. CODE § 21.0022.  In short, KWRI is Plaintiff's "employer" for purposes of liability.

4.27    As previously set forth herein, Plaintiff engaged in activity protected under Chapter 21 of the Texas Labor Code, namely speaking up and/or reporting to her supervisor, Osborn, and members of KWRI's corporate staff, regarding the sexual abuse and harassment that she experienced from Davis.  Since that time, KWRI, GOM, Osborn, and Garrett have engaged in a pattern and practice of thwarting Plaintiff's financial opportunities.  Additionally, Plaintiff not only reported the harassment she endured at the direct hands of Davis, but also, she reported the harassment and retaliation by Osborn, Garrett, and GOM, and KWRI wholly failed to take action.

4.28    As a result of the foregoing, Plaintiff has been injured and/or damaged, and Plaintiff hereby seeks to recover any and all remedies afforded and/or available under law and/or in equity, including but not limited to her damages resulting from said conduct by KWRI, GOM, Osborn, and Garrett, jointly and severally, in an amount to be proven and/or determined at the time of trial, equitable relief, and attorneys' fees and costs.

**D.      Count Four:**

**Violation of Chapter 21 of the Texas Labor Code:**
**Hostile Work Environment**
**(Against KWRI and GOM)**

4.29     To the extent necessary, Paragraphs 1.1 through 4.28 of this Complaint are hereby

referenced and fully incorporated herein by this specific reference, as though fully set forth herein.

4.30     As set forth above, the actions of KWRI and GOM created a hostile work

environment in violation of Section 21.141(2)(D) of the Texas Labor Code.  Plaintiff belonged to

a protected group based on her gender/sex and disability.  She was subject to unwelcome sexual

harassment that was based on gender/sex.  The harassment affected a term, condition, or privilege

of Plaintiff's employment, including but not limited to the deprivation or diminution of the

financial opportunities that were available to Plaintiff.

4.31     KWRI and GOM were negligent in that they knew or reasonably should have

known about the discriminatory and harassing conduct towards Plaintiff, and KWRI and GOM

failed to take remedial action.  Under Texas law, where alleged harassment is perpetrated by a

supervisor with immediate or successively higher authority, an employee asserting hostile work

environment need not establish that the employer knew or should have known of the harassment

and failed to take remedial action.[35]

4.32     KWRI and GOM's conduct was sufficiently severe or pervasive to alter the

conditions of Plaintiff's employment and create an abusive working environment.  KWRI and

GOM unreasonably interfered with Plaintiff's work performance by: (1) failing to report and/or

timely investigate the sexual harassment and abuse by Davis; (2) placing her sexual abuser over

---

[35] *Wal-Mart Stores, Inc. v. Davis*, 979 S.W.2d 30, 40 (Tex. App.—Austin 1998, pet. denied) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).

her in the chain of authority and supervision; (3) failing to report and/or timely investigate the retaliation Plaintiff was subjected to after denying Davis sexual favors; (4) treating males differently from females with respect to sexual harassment; (5) encouraging female employees to capitulate to male requests for sexual favor; and (6) subjecting Plaintiff to adverse actions, as detailed above.

4.33    KWRI and GOM's repeated conduct of harassment set forth above humiliated Plaintiff to the point where Plaintiff felt completely unsafe working with Davis and physically unable to execute some of the functions of her business.  Additionally, based upon the continued harassment of Plaintiff, taken over by Osborn, Garrett, and/or GOM, Plaintiff has been unable to, or prohibited from, performing the duties of her employment, and she suffers from extreme discomfort due to the precarious position she has been forced to endure.  Such has been so pervasive that she has sought, on more than one occasion, to sell her businesses in an effort to escape the harassment.

4.34    Additionally or alternatively, pursuant to the "continuing violation doctrine," Plaintiff can support a hostile work environment claim against KWRI and GOM, as the harassment occurring more than 300 days before she filed her charges and/or complaints with the EEOC has been carried out in a continuous pattern and practice of linking events.[36]

4.35    As a result of the foregoing, Plaintiff has been injured and/or damaged, and Plaintiff hereby seeks to recover any and all remedies afforded and/or available under law and/or in equity, including but not limited to her damages resulting from said conduct by KWRI and GOM, jointly and severally, in an amount to be proven and/or determined at the time of trial, equitable relief, and attorneys' fees and costs.

---

[36] *See Hunicke v. Seafarers Intern. Union*, 2013 WL 2444634, at *7 (Tex. App.—Houston [14th Dist.] June 4, 2013, pet. denied) (mem. op).

E.      **Count Five:**

**Violation of Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.:**
**Failure to Provide a Reasonable Accommodation**
**(Against KWRI and GOM)**

4.36    To the extent necessary, Paragraphs 1.1 through 4.35 of this Complaint are hereby referenced and fully incorporated herein by this specific reference, as though fully set forth herein.

4.37    Plaintiff has been diagnosed with Bell's Palsy, making her a qualified individual with a disability within the meaning of 42 U.S.C. § 12111 of the Americans with Disabilities Act ("ADA").  Plaintiff is able to perform the essential functions of her job as an OP, with or without a reasonable accommodation.  This disability was known to Davis, Osborn, Garrett, GOM, and/or KWRI.

4.38    Additionally, in or around September 2018, Plaintiff informed KWRI and the DFW Regional Office, by and through Garrett, that she wanted to participate in the Legacy Program and replace herself as OP with Scott Tolar.  Plaintiff made this request as a way to accommodate her disability by reducing the amount of stress she was subjected to almost daily.

4.39    KWRI and GOM have not only continued to refuse her application, but also, they never engaged in the interactive process or offered any reasonable alternative and/or reasonable accommodation.

4.40    As a result of the foregoing, Plaintiff has been injured and/or damaged, and Plaintiff hereby seeks to recover of any and all remedies afforded and/or available under law and/or in equity, including but not limited to her damages resulting from said conduct by KWRI and GOM, jointly and severally, in an amount to be proven and/or determined at the time of trial, equitable relief, and attorneys' fees and costs.

**F.     Count Six:**

### Violation of Chapter 21 of The Texas Labor Code:
### Failure to Provide a Reasonable Accommodation
### (Against KWRI and GOM)

4.41    To the extent necessary, Paragraphs 1.1 through 4.40 of this Complaint are hereby referenced and fully incorporated herein by this specific reference, as though fully set forth herein.

4.42    Plaintiff has been diagnosed with Bell's Palsy, making her a qualified individual with a disability within the definition provided by Section 21.002(6) of the Texas Labor Code. Plaintiff is able to perform the essential functions of her job as an OP, with or without a reasonable accommodation. This disability was known to Davis, Osborn, Garrett, GOM, and/or KWRI

4.43    In or around September 2018, Plaintiff informed KWRI and the DFW Regional Office, by and through Garrett, that she wanted to participate in the Legacy Program and replace herself as OP with Scott Tolar. Plaintiff made this request as a way to accommodate her disability by reducing the amount of stress she was subjected to almost daily.

4.44    KWRI and GOM have not only continued to refuse her application, but never engaged in the interactive process or offered any reasonable alternative reasonable accommodation.

4.45    As a result of the foregoing, Plaintiff has been injured and/or damaged, and Plaintiff hereby seeks to recover of any and all remedies afforded and/or available under law and/or in equity, including but not limited to her damages resulting from said conduct by KWRI and GOM, jointly and severally, in an amount to be proven and/or determined at the time of trial, equitable relief, and attorneys' fees and costs.

**G.    Count Seven:**

**Tortious Interference with an Existing Contractual Relationship**
**(Against All Defendants)**

4.46    To the extent necessary, Paragraphs 1.1 through 4.45 of this Complaint are hereby referenced and fully incorporated herein by this specific reference, as though fully set forth herein.

4.47    In order to prove a claim of tortious interference with an employment contract under Texas law, a Plaintiff must "demonstrate that: (1) a contract subject to interference exists; (2) the alleged act of interference was willful and intentional; (3) the willful and intentional act proximately caused damage; and (4) actual damage or loss occurred."[37]

4.48    As set forth above, Plaintiff pursued the application to make Scott Tolar the OP of her Market Centers through the Legacy Program.  Defendants continued to refuse to approve the application to make Tolar an OP, without good reason, and Osborn, Garrett, and/or GOM (i.e., those that comprise the DFW Regional Office) continually directed harassment and hostility concerning Plaintiff toward Tolar, which in turn caused Tolar to resign.  Specifically, Tolar could no longer risk the financial well-being of his family, and continue to commute from Austin and spend a substantial amount of time away from his family, for a position that he feared would continually be discredited and remain unapproved based upon the continued hostility toward Plaintiff.  During at least a portion of this time, Davis was CEO of KWRI, and based upon his continued involvement with KWRI, as well as the Region, Davis' relationship, ownership, and influence contributed to this continued hostility toward Plaintiff, as well as the interference with the success of her businesses.

---

[37] *Kadco Contract v. Dow Chemical Co*., 198 F.3d 241 (5th Cir. 1999) (citing *Powell Indus. v. Allen*, 985 S.W.2d 455 (Tex. 1998).

4.49    Additionally or alternatively, Osborn, Garrett, and/or GOM (i.e., those that comprise the DFW Regional Office), interfered with Plaintiff's business and employment relationships by poaching agents, top leaders/producers, and/or driving Plaintiff's employees away from KWRI altogether.  Garrett, Osborn, and/or GOM did so in an attempt to harm Plaintiff financially, drive down the value of her business, and also used those agents to further induce other agents to leave their associations with Plaintiff.

4.50    Additionally or alternatively, Defendants have all interfered with Plaintiff's employment relationship with KWRI through the implied contract she made with KWRI to act as the OP of her Market Centers and/or offices, as a condition precedent to being granted a franchise license.  Moreover, Defendants' actions in blocking, prohibiting, and/or failing to approve her license renewal and threatening closure of her Johnson County office interfered with her employment relationship, as well as the implied contract that she would be granted renewals so long as she continued to perform her duties under the implied contract, i.e., remain OP.

4.51    As a result of the foregoing, Plaintiff has been injured and/or damaged, and Plaintiff hereby seeks to recover of any and all remedies afforded and/or available under law and/or in equity, including but not limited to her damages resulting from said conduct by Defendants, jointly and severally, in an amount to be proven and/or determined at the time of trial, equitable relief, and attorneys' fees and costs.

## H.    Count Eight:

### Tortious Interference with Prospective Relationship
### (Against All Defendants)

4.52    To the extent necessary, Paragraphs 1.1 through 4.51 of this Complaint are hereby referenced and fully incorporated herein by this specific reference, as though fully set forth herein.

4.53    In order to prove a claim of tortious interference with a prospective relationship under Texas law, a Plaintiff must "demonstrate that: (1) a reasonable probability that the plaintiff would have entered into a contractual relationship; (2) and intentional and malicious act by the defendant that prevented the relationship from occurring, with the purpose of harming plaintiff; and (3) actual harm or damage resulted from the defendant's interference."[38]

4.54    Plaintiff sought to appoint Scott Tolar as OP for her Market Centers and submitted the requisite application.  Defendants have refused this application and continue to do so, without good reason, to date.  Such program was announced by Keller himself, was confirmed by Plaintiff's MAPS Coach and several of her employees, and its existence was further acknowledged by KWRI's legal department to Plaintiff.  As a result of Defendants' interference, Tolar has resigned from employment with Plaintiff effective November 1, 2021.

4.55    Plaintiff also applied for, and wishes to pursue, the Legacy Program.  Defendants have refused her application, and continue to do so, without good reason, to date.

4.56    Plaintiff has suffered further harm to her health from dealing with the continued stress placed upon her by Defendants' failure to allow her to enter the Legacy Program.  Plaintiff has also suffered financial harm due to the inability to sell her Market Centers because of Defendants continued efforts to interfere with the business operations, which reduces the value and appeal of her Market Centers.

4.57    As a result of the foregoing, Plaintiff has been injured and/or damaged, and Plaintiff hereby seeks to recover of any and all remedies afforded and/or available under law and/or in equity, including but not limited to her damages resulting from said conduct by Defendants, jointly

---

[38] *T&T Geotechnical, Inc. v. Union Pacific Resources, Co.*, 944 F.Supp. 1317, 1324 (N.D. Tex. July 1996).

and severally, in an amount to be proven and/or determined at the time of trial, equitable relief, and attorneys' fees and costs.

**I.      Count Nine:**

**Breach of Contract**
**(Against KWRI)**

4.58     To the extent necessary, Paragraphs 1.1 through 4.57 of this Complaint are hereby referenced and fully incorporated herein by this specific reference, as though fully set forth herein.

4.59     KWRI is also liable to Plaintiff for breach of a contract implied-in-fact.  A contract is implied-in-fact when its terms arise from the acts and conduct of the parties.  As set forth above, KWRI entered into an implied-in-fact contract with Plaintiff to provide her with a Franchise Agreement, under which she could operate her Market Centers, including renewals of such agreement, if Plaintiff fulfilled the condition precedent of acting as the OP for the Market Centers. Plaintiff acted, and continues to act to this day, as the OP of her Market Centers, yet, KWRI has failed to renew Plaintiff's Franchise Agreement.[39]  Further, Keller, who had the actual and/or apparent authority to act on behalf of KWRI, under the theory of vice-principal, altered and/or caused a novation to the franchise agreement when he announced the institution of the Legacy Program, which would allow for Plaintiff to appoint an OP to act on her behalf, while still maintaining ownership of her Market Centers.  Since this novation, in or around September 2018, KWRI has failed to approve Plaintiff's application to the Legacy Program.  During such time, Plaintiff has, and continues, to act as the OP for the Market Centers.  To date, KWRI has failed and/or refused to perform the obligations and duties owed to Plaintiff under an implied-in-fact contract with Plaintiff.

---

[39] In this regard, as KWRI is in breach of its agreement to renew Plaintiff's Franchise Agreement, despite her continuing to operate as OP, such cannot form the basis or support KWRI's request to compel arbitration under such an agreement to which it is in breach.

4.60    As a result of this breach, Plaintiff has been injured and/or damaged, and Plaintiff hereby seeks to recover any and all remedies afforded and/or available under law and/or in equity, including but not limited to her damages resulting from said conduct by KWRI, in an amount to be proven and/or determined at the time of trial, equitable relief, and attorneys' fees and costs.

4.61    Additionally or alternatively, KWRI is liable to Plaintiffs for breach of a contract implied-in-law or "quasi-contract."   A contract is implied-in-law when the law imposes an obligation between two parties to do justice even though it is clear that no promise was ever made or intended.  To the extent that the promise made by KWRI to Plaintiff to franchise to Plaintiff, and continue to renew such Franchise Agreement, so long as Plaintiff fulfilled the condition precedent of acting as the OP for the Market Centers is ultimately determined not to constitute an implied-in-fact contract, then its promise is a contract implied-in-law or "quasi-contract."  Further, to the extent that Keller's novation to the Franchise Agreement, by and through his announcement of the institution of the Legacy Program, which allows for Plaintiff to appoint an OP to act on her behalf, while still maintaining ownership of her Market Centers, is ultimately determined not to constitute an implied-in-fact contract, then its promise is a contract implied-in-law or "quasi-contract."  During such time, Plaintiff has, and continues, to act as the OP for the Market Centers. To date, KWRI has failed and/or refused to perform the obligations and duties owed to Plaintiff under an implied-in-law contract or "quasi-contract" with Plaintiff to pay.

4.62    As a result of this breach, Plaintiff has been injured and/or damaged, and Plaintiff hereby seeks to recover any and all remedies afforded and/or available under law and/or in equity, including but not limited to her damages resulting from said conduct by KWRI, in an amount to be proven and/or determined at the time of trial, equitable relief, and attorneys' fees and costs.

**J.      Count Ten:**

**Breach of Fiduciary Duties**
**(Against Davis and Osborn)**

4.63    To the extent necessary, Paragraphs 1.1 through 4.62 of this Complaint are hereby referenced and fully incorporated herein by this specific reference, as though fully set forth herein.

4.64    The acts and/or omissions of Davis and Osborn constitute a breach of fiduciary duties, and Plaintiff brings this breach of fiduciary duties claim, based upon informal fiduciary duties.  An informal fiduciary duty arises from a moral, social, domestic, or purely personal relationship of trust and confidence, which as set forth above, Plaintiff possessed.

4.65    Plaintiff had a special relationship of trust and confidence with Osborn and Davis based upon their dealings and/or relationship that existed prior to and apart from the many business ventures between them, and which Davis admitted in this litigation that such relationship continued through at least 2018.[40]  In this same regard, Plaintiff's close personal relationship with Osborn, as set forth above, dates back to at least the 1990's, and Plaintiff considered him to be a close, personal friend thereafter.  Based upon those confidential relationships, Davis and Osborn owed Plaintiff certain fiduciary duties, including but not limited to: (a) the duty of loyalty and utmost good faith; (b) the duty of candor; (c) the duty to refrain from self-dealing; (d) the duty to act with integrity of the strictest kind; (e) the duty of fair and honest dealing; and/or (f) the duty of full disclosure.  Davis and/or Osborn breached these fiduciary duties in the following ways, including but not limited to: (a) interfering with Plaintiff's businesses and success by poaching agents, leaders, and/or top producers; (b) failing to renew Plaintiff's Franchise Agreement; (c) failing to approve of Plaintiff's application to the Legacy Program; (d) participating in reports of alleged and untruthful non-compliance through the Regional Office; (e) acting to de-value Plaintiff's

---

[40] *See* Joint Status Report, p.3 [Doc. #20].

business; (f) making Plaintiff an offer to purchase her businesses at a rate well below its appraised value; (g) interfering with the potential sale of Plaintiff's business to third-parties; and/or (h) continuing to disparage Plaintiff and her businesses to others in the industry.[41]  Plaintiff justifiably relied upon and trusted Davis and/or Osborn, and Davis and/or Osborn used that trust and reliance to take advantage of Plaintiff to an unfair degree in breach of the fiduciary duties that Davis and Osborn owed to Plaintiff.  Davis and Osborn have benefited from their breach of fiduciary duties.

4.66    As a result of the foregoing, Plaintiff has been injured and/or damaged, and Plaintiff hereby seeks to recover any and all remedies afforded and/or available under law and/or in equity, including but not limited to her damages resulting from said conduct by Davis and Osborn, jointly and severally, in an amount to be proven and/or determined at the time of trial, equitable relief, exemplary damages, and costs.

**K.    Count Eleven:**

### Declaratory Judgment

4.67    To the extent necessary, Paragraphs 1.1 through 4.66 of this Complaint are hereby referenced and fully incorporated herein by this specific reference, as though fully set forth herein.

4.68    The franchisor-franchisee relationship laid out above, demonstrates a degree of control in excess of that required to protect KWRI's brand and trademarks.

4.69    As such, pursuant to 28 U.S.C. § 2201 and/or Texas Labor Code § 21.0022, Plaintiff seeks judgment declaring that KWRI, GOM, Keller, Osborn, and/or Garrett are "employers" for purposes of Plaintiff, and as such violated Plaintiff's statutory rights, violated and/or breached

---

[41] Importantly, as set forth above, Davis remained CEO of KWRI until in or around December 2018 and/or January 2019, and appears to still maintain an active role with KWRI and the Regional Office.  Osborn is still heavily involved in KWRI and owns and operates the Regional Office with Garrett and GOM.

Plaintiff's contracts and/or agreements, violated its own policies, procedures, guidelines, rules, and/or regulations, and/or violated state and/or federal law.

## V.
## REQUESTED RELIEF

5.1     As the direct and/or proximate result of the actions and/or conduct of Defendants complained of herein, Plaintiff has suffered, and continues to suffer, from intentional discrimination and/or discriminatory treatment and harassment, as well as adverse employment actions, unlawful employment practices, and retaliation, which have damaged and caused, and continue to damage and cause, Plaintiff damages, emotional distress, and mental anguish.

5.2     As such, Plaintiff seeks to recover from Defendants, jointly and severally, her actual and/or economic damages caused by the wrongful acts of Defendants, in amounts that are within the jurisdictional limits of this Court to be proven and/or determined at the time of trial.

5.3     As to Plaintiff's claims under Title VII, Plaintiff herein sues Defendants pursuant to 42 U.S.C. §§ 2000e *et seq*.  Accordingly, Plaintiff seeks recovery of the full measure of relief and damages provided by Title VII against Defendants (as applicable), jointly and severally, including but not limited to damages for her lost earnings, past and future, the harm to her personal and professional reputation, out-of-pocket losses and/or expenses, emotional pain and suffering, inconvenience, mental anguish, and other pecuniary and non-pecuniary losses in an amount within the jurisdictional limits of this Court to be proven at trial.

5.4     Plaintiff also seeks front pay damages from Defendants (as applicable), jointly and severally, in the amount equal to the difference between the amounts actually received by Plaintiff and the amounts Plaintiff would have received had she not been harassed and retaliated against, together with an additional amount as compensatory damages, in addition to reasonable and

necessary attorneys' fees and any and all other equitable and compensatory relief which may be available.

5.5    As to Plaintiff's claims under Chapter 21 of the Texas Labor Code, Plaintiff herein sues Defendants pursuant to Chapter 21 of the Texas Labor Code, including but not limited to Sections 21.051, 21.055, 21.254, 21.258, 21.2585, 21.259, and 21.2585 of the Texas Labor Code. Accordingly, Plaintiff seeks recovery of the full measure of relief and damages provided by Chapter 21 of the Texas Labor Code against Defendants (as applicable), jointly and severally, including but not necessarily limited to damages for future pecuniary losses, emotional pain, suffering inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and non-pecuniary losses in an amount within the jurisdictional limits of this Court to be proven at trial.

5.6    Plaintiff also seeks front pay damages from Defendants (as applicable), jointly and severally, in the amount equal to the difference between the profits actually received by Plaintiff and the profits Plaintiff would have received had she not been discriminated, harassed or retaliated against, together with an additional amount as compensatory damages, in addition to reasonable and necessary attorneys' fees and any and all other equitable and compensatory relief which may be available.

5.7    As to Plaintiff's claims under the Federal Declaratory Judgment Act, Plaintiff herein sues Defendants pursuant to 28 U.S.C. §2201, and as such, Plaintiff seeks a judgment declaring that Defendants are an "employer" within the definition of 21.0022 of the Texas Labor Code, and as such violated Plaintiff's statutory rights, violated and/or breached Plaintiff's contracts and/or agreements, violated its own policies, procedures, guidelines, rules, and/or regulations, and/or violated state and/or federal law.

## VI.
## FEES, COSTS, AND INTEREST

6.1     Plaintiff has retained The Michael Kim Law Firm, PLLC to represent her in connection with this matter, and has agreed to pay for such reasonable and necessary services.  In addition to and without waiving and/or limiting any other relief requested in this Complaint, Plaintiff is entitled to and seeks to recover her reasonable and necessary attorneys' fees and costs incurred and to be incurred in bringing this suit and in all appeals of this suit, as permitted by law, in equity, and/or pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code, 42 U.S.C. §§ 2000e-5(k) and 12205, and/or TEX. LABOR CODE § 21.259.

6.2     Also, pursuant to 42 U.S.C. § 2000e-5(k) and/or TEX. LABOR CODE § 21.259, Plaintiff seeks to recover any and all expert fees, which she incurs and/or may incur in bringing this suit.

6.3     Additionally, Plaintiff seeks to recover costs of court, along with pre-judgment and post-judgment interest at the maximum rate permitted by law.

## VII.
## CONDITIONS PRECEDENT

7.1     All conditions precedent to the relief being sought by Plaintiff in this Complaint have been performed, have occurred, and/or have been waived.

## VIII.
## DEMAND FOR JURY TRIAL

8.1     Pursuant to the Rule 38 of the Federal Rules of Civil Procedure, Plaintiff requests trial by jury and will tender the requisite fee.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that upon final hearing, Plaintiff recover judgment against Defendant and be awarded:

(1)     any and all amounts recoverable and/or recognizable as damages under law and/or in equity, resulting and/or occasioned by the wrongful acts and/or conduct of Defendants (as set forth above more specifically);

(2)     equitable relief to the extent permitted by law and/or equity;

(3)     declaratory relief as requested herein;

(4)     her litigation expenses and costs, including but not limited to her reasonable and necessary attorneys' fees and costs and any applicable expert fees;

(5)     pre-judgment and post-judgment interest at the maximum rate permitted by law;

(6)     costs of court; and

(7)     such other and further relief, both general and special, at law and in equity, to which Plaintiff may show herself to be justly entitled.

Respectfully submitted,

/s/ *Michael Y. Kim*
Michael Y. Kim
State Bar No. 24039960
mkim@mkimlegal.com
Ericha Ramsey Brown
State Bar No. 24051952
erbrown@mkimlegal.com
Monica L. Narvaez
State Bar No. 24088113
mnarvaez@mkimlegal.com
Eduardo R. Garza
State Bar No. 24120843
egarza@mkimlegal.com

**THE MICHAEL KIM LAW FIRM, PLLC**
4236 W. Lovers Lane
Dallas, Texas 75209
(214) 357-7533
(214) 357-7531 Facsimile

ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the foregoing instrument has been forwarded in accordance with the Federal Rules of Civil Procedure by electronic service and/or electronic mail on this 23rd day of March, 2022:

Kristin L. Bauer
Texas Bar No. 24006813
Kristin.Bauer@jacksonlewis.com
Claire L. Cook
Texas Bar No. 24086220
Clair.Cook@jacksonlewis.com
JACKSON LEWIS P.C.
500 N. Akard, Suite 2500
Dallas, Texas  75201
(214) 520-2400
(214) 520-2008 Facsimile

A. Boone Almanza
Texas Bar No. 01579001
balmanza@abdmlaw.com
ALMANZA, BLACKBURN, DICKIE
   & MITCHELL, LLP
2301 S. Capital of Texas Highway, Bldg. H
Austin, Texas 78746
(512) 474-9486
(512) 478-7151 Facsimile

James T. Drakeley
Texas Bar No. 06111600
jdrakeley@spencerfane.com
Laurie N. Patton
Texas Bar No. 24078158
lpatton@spencerfane.com
SPENCER FANE LLP
5700 Granite Parkway, Suite 650
Plano, Texas 75024
(972) 324-0300
(972) 324-0301 Facsimile.

/s/ *Michael Y. Kim*
Michael Y. Kim