IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| INGA DOW, | § | |
|---|---|---|
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:21-cv-01209-P |
| | § | |
| KELLER WILLIAMS REALTY, INC., | § | |
| JOHN DAVIS, GO MANAGEMENT, LLC, | § | |
| DAVID OSBORN, SMOKEY GARRETT, | § | |
| AND GARY KELLER, | § | |
| | § | |
| Defendants. | § | |

**<u>DEFENDANTS KELLER WILLIAMS REALTY, INC. AND GARY KELLER'S
APPENDIX IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S FIRST
AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(6), SUBJECT TO THEIR
MOTION TO COMPEL ARBITRATION</u>**

| <u>Exhibit</u> | <u>DESCRIPTION</u> | <u>APPENDIX PAGE</u> |
|---|---|---|
| A | Fort Worth #310 2007 License Agreement | APP. 1 - 102 |
| B | Johnson County #272 2011 License Agreement | APP. 103 - 202 |
| C | West Fort Worth #1055 2016 License Agreement | APP. 203 - 298 |
| D | *Domino's Pizza, L.L.C.* v. Reddy, LEXIS 2578 | APP. 299 - 307 |
| E | *Jackson v. Univ. of Tex. M.D. Anderson Cancer Ctr*, LEXIS 29400 | APP. 308 - 314 |
| F | *Powell v. Akin Gump Strauss Hauer Feld, LLP*, LEXIS 75153 | APP. 315 - 324 |
| G | *Stroup v. MRM Mgmt.*, LEXIS 8446 | APP. 325 - 330 |
| H. | *Monk v. Choice Hotels International Services, Corp.*, LEXIS 105806 | APP. 331 - 335 |
| I. | *Simmons v. Methodist Hosps. of Dallas*, LEXIS 58427 | APP. 336 - 342 |

Respectfully submitted,

By:   */s/ Kristin L. Bauer*
     Kristin L. Bauer
     Texas Bar No. 24006813
     Kristin.Bauer@jacksonlewis.com
     Claire L. Cook
     Texas Bar No. 24086220
     Clair.Cook@jacksonlewis.com
     JACKSON LEWIS P.C.
     500 N. Akard, Suite 2500
     Dallas, Texas 75201
     PH: (214) 520-2400
     FX: (214) 520-2008

     **ATTORNEYS FOR DEFENDANTS**
     **KELLER WILLIAMS REALTY, INC.**
     **AND GARY KELLER**

---

## CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of the foregoing document has been served on all counsel of record in accordance with the Federal Rules of Civil Procedure on April 12, 2022.

| | | |
|---|---|---|
| Michael Y. Kim<br>Ericha Ramsey Brown<br>Monica L. Narvaez<br>Eduardo R. Garza<br>THE MICHAEL KIM LAW FIRM, PLLC<br>4236 W. Lovers Lane<br>Dallas, Texas 75209<br>mkim@mkimlegal.com<br>erbrown@mkimlegal.com<br>mnarvaez@mkimlegal.com<br>egarza@mkimlegal.com<br><br>**Attorneys for Plaintiff** | James T. Drakeley<br>Laurie N. Patton<br>SPENCER FANE LLP<br>5700 Granite Parkway, Ste. 650<br>Plano, TX 75024<br>jdrakeley@spencerfane.com<br>lpatton@spencerfane.com<br><br>**Attorneys for Defendant John Davis** | A. Boone Almanza<br>Tanya Robinson<br>ALMANZA, BLACKBURN, DICKIE<br>& MITCHELL LLP<br>2301 S. Capital of Texas Hwy., Bldg. H<br>Austin, Texas 78746<br>TRobinson@abdmlaw.com<br>BAlmanza@abdmlaw.com<br><br>**Attorneys For Defendants Go Management LLC, David Osborn, And Smokey Garrett** |
| | | Jay Wallace<br>BELL NUNNALLY & MARTIN LLP<br>23323 Ross Avenue, Suite 1900<br>Dallas, TX 75201<br>Jwallace@bellnunnally.com |

                                                 */s/ Kristin L. Bauer*
                                                 Kristin L. Bauer



EXHIBIT H

No *Shepard's* Signal™
As of: May 16, 2022 6:49 PM Z

# Monk v. Choice Hotels Int'l Servs., Corp.

United States District Court for the Western District of Louisiana, Monroe Division

August 10, 2016, Decided; August 10, 2016, Filed

CIVIL ACTION NO. 15-1699

**Reporter**
2016 U.S. Dist. LEXIS 105806 *

BENIFER MONK VERSUS CHOICE HOTELS INTERNATIONAL SERVICES, CORP. (CLARION INN & SUITES AND CONFERENCE CENTER), ET AL.

## Core Terms

Hotel, summary judgment, vicarious liability, custody, franchise agreement, premises, premises liability, summary judgment motion, reasonable care, contractor, servant, district court, Franchisee, alleges, genuine, license, repair

**Counsel:** [*1] For Benifer Monk, Plaintiff: Tracy W Houck, LEAD ATTORNEY, Ronald L Riggle, Houck & Riggle, Ruston, LA.

For Choice Hotels International Services Corp, incorrectly named as Clarion Inn & Suites & Conference Center, Defendant: Valerie T Schexnayder, LEAD ATTORNEY, Robicheaux & Collins (BR), Baton Rouge, LA; Carl W Robicheaux, Robicheaux & Collins, Lafayette, LA; Terri M Collins, Anderson Stephens et al, Baton Rouge, LA.

For I Q 16 Martin Luther King Dr L L C, Defendant: Valerie T Schexnayder, LEAD ATTORNEY, Robicheaux & Collins (BR), Baton Rouge, LA; Terri M Collins, Anderson Stephens et al, Baton Rouge, LA.

**Judges:** S. MAURICE HICKS, JR., UNITED STATES DISTRICT JUDGE. MAGISTRATE JUDGE HAYES.

**Opinion by:** S. MAURICE HICKS, JR.

## Opinion

### MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment (Record Document 10) filed by Defendant Choice Hotels International Services, Corp. ("CHI-S"). CHI-S, a franchisor, moves for summary judgment on the grounds that it did not own, control, possess, or otherwise have custody over the hotel wherein Plaintiff Benifer Monk ("Monk") suffered injuries. Additionally, CHI-S maintains that vicarious liability is inapplicable to the instant action. Monk has opposed the Motion for Summary [*2] Judgment. See Record Document 17. For the reasons which follow, the Motion for Summary Judgment is **GRANTED** and all of Monk's claims against CHI-S are **DISMISSED**.

### BACKGROUND

This case involves allegations of premises and vicarious liability under Louisiana law. Monk alleges that on July 25, 2013, she fell due to water on the floor at a hotel located at 1051 Martin Luther King Drive in Monroe, Louisiana ("the Hotel"). See Record Document 1-1 at ¶ 3; Record document 17-1 at ¶ 2.[1] The Hotel was not owned by CHI-S. See Record Document 10-2 (Affidavit of Stuart Kreindler) at ¶ 8; Record Document 17-1 at ¶ 3. At all times relevant to this case, the Hotel was owned by IQ16-MARTIN LUTHER KING JR DR LLC ("IQ16"), which operated the Hotel under a franchise agreement, dated February 8, 2013, with Choice Hotels International, Inc. ("CHI"). See Record Documents 10-4 at ¶ 4; Record Document 17-1 at ¶ 4; Record Document 10-2 at ¶ 10; Record Document 10-3 (Franchise Agreement).[2]

---

[1] In opposing the instant motion, Monk argues that the path for visitors exiting the Hotel's pool area had no protective surface in place to prevent water tracked in from the pool area from pooling on the slick surface of the interior [*3] hallway outside the meeting area of the Hotel. See Record Document 17 at 1.

[2] CHI was not named as a defendant. CHI-S and CHI are linked because CHI-S provides management services and employees to CHI. See Record Document 10-2 at ¶ 4.

**APP. 331**

Stuart Kreindler ("Kreindler"), the assistant general counsel for CHI-S, explained in his affidavit that in exchange for certain fees, CHI granted franchisees such as IQ16 a license to use CHI's trademarks with its designated logo perforation of the Hotel and to operate the Hotel under the name "Clarion Inn and Suites." See Record Document 10-2 at ¶ 9. Pertinent provisions of the Franchise Agreement include:

> **6. Your [Franchisee] Duties**. You [Franchisee] will during the Term:
>
> . . .
>
> b. Good Repair. Construct, renovate, operate, furnish, maintain, and advertise the Hotel . . . ; undertake all repairs, cleaning, redecoration, repainting, and replacement of obsolete or outdated Hotel Supplies; and take such other corrective action as is necessary to maintain the Hotel interior and exterior, including any parking areas and food and beverage facilities, in a clean, sound and attractive condition and good repair at all times;
>
> . . .
>
> d. Compliance with Law; Limited Use **[*4]** . Comply with all local, state and federal laws, rules, regulations or agency orders applicable to you and the construction, renovation, operation, maintenance and promotion of the Hotel . . .;
>
> . . .
>
> **19. Acknowledgments**.
>
> . . .
>
> c. Control; No Duty; Independent Contractor. You [franchisee] acknowledge and agree that you are solely responsible for exercising ordinary business control over the Hotel . . . . This Agreement does not create a fiduciary relationship between you and us. You are an independent contractor. Nothing in this Agreement makes, or is intended to make, either party an agent, legal representative, subsidiary joint venturer, partner, employee, or servant of the other . . . .

Record Document 10-3.

CHI-S argues that it did not operate, control, possess, or otherwise have custody of the Hotel. See Record Document 10-4 at ¶ 3, citing Record Document 10-2 (Affidavit of Kreindler) at ¶ 11. CHI-S further contends that under the plain language of the Franchise Agreement, IQ16 was solely responsible for operating and maintaining the Hotel and that neither CHI-S nor CHI were required nor permitted to operate or maintain the Hotel premises. See Record Document 10-4 at ¶ 5, citing Record **[*5]** Document 10-3 (Franchise Agreement).³

Monk filed this action in the Fourth Judicial District Court, Parish of Ouachita, State of Louisiana. See Record Document 1. She alleges that she sustained injuries to her ankle, which required surgery, and alleges that she will continue "to incur pain, suffering, mental anguish, and emotional distress" because of the July 2013 incident. See Record Document 1-1. On May 14, 2015, Defendant CHI-S removed the case based on diversity jurisdiction to the United States District Court for the Western District of Louisiana. See Record Document 1. CHI-S now moves for summary judgment and seeks **[*6]** dismissal of all of Monk's claims against it. See Record Document 10.

**LAW AND ANALYSIS**

**I. Summary Judgment Standard**.

Summary judgment is proper pursuant to *Rule 56 of the Federal Rules of Civil Procedure* when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir.2010)*. "*Rule 56[(a)]* mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir.2004)*.

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and

---

³ Monk contests these facts by stating "denied" or "it is denied that Choice Hotels was not involved with the operation of the hotel." Record Document 17-1 at ¶¶ 3, 5. *Federal Rule of Civil Procedure 56 (c)* requires a party asserting that a fact is genuinely disputed to support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." *F.R.C.P. 56(c)(1)(A)*. Monk has failed to meet this requirement.

**APP. 332**

admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986)*. If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response. See *Tubacex, Inc. v. M/V Risan, 45 F.3d 951, 954 (5th Cir.1995)*.

If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific [*7] facts showing that there is a genuine [dispute] for trial." *Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir.2004)*. Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See *Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir.2005)*. Where the parties dispute the facts, the Court must view the facts and draw reasonable inferences in the light most favorable to the plaintiff. See *Scott v. Harris, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L. Ed. 2d 686 (2007)*. In sum, the motion for summary judgment "should be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in *Rule 56(c)*, is satisfied." *Celotex Corp., 477 U.S. at 323, 106 S.Ct. at 2553*.

**II. Analysis**.

CHI-S has moved for summary judgment, arguing that it did not have ownership, care, control or custody of the Hotel such that it could be held responsible under any premises liability theory. See Record Document 10. In response, Monk stated:

> In its Motion, Choice Hotels generally claims that it is merely a franchisor and had no control or garde over the premises. Although it is true that Choice Hotels was a franchisor and ***did not have actual physical custody of the premises at the time***, Choice Hotels focuses on its liability as an alleged owner rather than its vicarious liability for [*8] the actions of the owner of the hotel.

Record Document 17 at 2 (emphasis added). CHI-S replied, noting that vicarious liability does not apply when there is an independent contractor relationship and no employer/employee relationship. See Record Document 18. Thus, while it appears that Monk has abandoned her premises liability claim against CHI-S in favor of vicarious liability, this Court will nonetheless analyze her claims under both premises and vicarious liability.

**A. Premises Liability**.

Monk alleges that CHI-S was negligent in allowing an unreasonably dangerous condition upon its premises and failing to remediate the unreasonably dangerous condition upon its premises. See Record Document 1-1. Under Louisiana law, a premises liability negligence claim is based on one of the following provisions: *Louisiana Civil Code Articles 2315*, *2317*/*2317.1*, or *2322*. *Article 2315* states that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." *La. C.C. Art. 2315(A)*. *Article 2317* provides that "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody." *La. Civ. Code Ann. art. 2317*. More specifically, *Article 2317.1* states: [*9]

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. . . .

*La. C.C. Art. 2317.1*. Finally, *Article 2322* provides that "[t]he owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice or defect in its original construction. However, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care." *La. C.C. Art. 2322*.

Monk did not specify the codal article that is the basis of her premises liability claim(s). However, present in all of the premises liability theories is the requirement that the defendant have ownership, care, control, or custody of the subject property. In *Carter v. Bd. of Supervisors of La. State University, 459 So. 2d 1263 (La. App. 1 Cir. 1984)*, the court considered premises [*10] liability under *Articles 2315* and *2317* and reasoned that "[t]he owner or person having custody of immovable property

**APP. 333**

has a duty to keep such property in a reasonably safe condition." See *id. at 1265*. Likewise, in *Venezia v. ConocoPhillips Co., No. 12-2168, 2014 U.S. Dist. LEXIS 2584, 2014 WL 107962 (E.D. La. Jan. 9, 2014)*, the court discusses *Articles 2317* and *2317.1* and reasoned that "the threshold requirement for custodial liability . . . is that the defendant must be in custody of the object that is the cause of the plaintiff's injury." *2014 U.S. Dist. LEXIS 2584, [WL] at *10*.

In *Taylor v. Holiday Inn, Inc., 595 So.2d 735 (La. App. 5 Cir. 1992)*, the plaintiff slipped and fell on some liquid as she was entering the hotel lounge. She brought a premises liability action against Holiday Inn, Inc. and Kenner Management, Inc. The two defendants had entered into a license agreement and Kenner Management, Inc. was the owner and operator of the hotel. See id. The trial court granted Holiday Inn's motion for summary judgment on the grounds that it had never owned or managed the hotel and did not owe a duty to plaintiff under the terms of the license agreement. See id. The appellate court affirmed, holding:

> [Holiday Inn, Inc.], through its pleadings and affidavits, established that it did not, nor has it ever, owned or managed the property on which the accident occurred. There is no custody or guardianship resting in **[*11]** [Holiday Inn, Inc.]. Rather, [the plaintiff's] relationship to the premises is through Kenner Management, Inc., by a Licensing Agreement whereby [Holiday Inn, Inc.] permits the use of its trademarks, service marks, logos, sign designs and other distinctive characteristics. In exchange, [Holiday Inn, Inc.] receives monthly royalty fees. The License Agreement expressly denies any agency relationship between its parties.
> . . . [Holiday Inn, Inc.] had no control of the day-to-day management procedures. . . . There is no factual issue as to whether [Holiday Inn, Inc.] had custody or control over the premises in question. The pleadings and supporting affidavits clearly establish it did not.

*Id. at 736*.

In the instant matter, both the affidavit of Kreindler and the four corners of the Franchise Agreement establish that CHI-S did not own, operate, control or otherwise have custody of the subject property. Kreindler attested that IQ16 owned the Hotel and operated it pursuant to the Franchise Agreement. See Record Document 10-2 at ¶ 10. He further stated that no Choice Hotel entity controlled the daily operations of franchised hotels, including the Hotel at issue in this case. See id. at ¶¶ 11, 13. The Franchise **[*12]** Agreement imposed the sole and exclusive responsibility for maintaining the Hotel on IQ16. See Record Document 10-3 at ¶¶ 6(b), 6(c), and 19(c). Monk has come forward with no competent summary judgment evidence to negate these facts. Simply put, CHI-S had no duty to maintain the Hotel at issue; thus, it owed no legal duty to Monk in relation to her premises liability claim. Summary judgment in favor of CHI-S is, therefore, **GRANTED**.

### B. Vicarious Liability.

*Louisiana Civil Code Article 2320* provides:
> Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.
> . . .
> In the above cases, responsibility only attaches, when the masters or employers . . . might have prevented the act which caused the damage, and have not done it.
> The master is answerable for the offenses and quasi-offenses committed by his servants . . . .

*La. C.C. Art. 2320*. Monk argues that Choice Hotels had the right to control IQ16, to control the operation of the Hotel, and to require that unreasonably dangerous conditions be remedied, eliminated, or changed at its direction and under its authority. See Record Document 17 at 2.

Based on the plain language of the Franchise Agreement, **[*13]** Monk's reliance on *Article 2320* is misplaced. In *LeBrane v. Lewis, 292 So. 2d 216 (La. 1974)*, the Louisiana Supreme Court held that "an employer (master) is liable for a tort committed by his employee (servant) if, at the time, the servant is acting within the scope of his employment," that is, "in the exercise of the functions in which employed." *Id. at 217-218* (internal citations omitted). This standard requires an employment relationship and the Franchise Agreement in this case clearly demonstrates no employment relationship between CHI-S and IQ16. See Record Document 10-3 at ¶ 19(c) ("Nothing in this Agreement makes, or is intended to make, either party an agent, legal representative, subsidiary joint venturer, partner, **employee**, or servant of the other") (emphasis added). Moreover, "vicarious liability does not apply

**APP. 334**

when an independent contractor relationship exists." *Loftus v. Kuyper, 46,961 (La. App. 2 Cir. 3/14/12), 87 So. 3d 963, 967*. The Franchise Agreement clearly provides that IQ16, the franchisee, is an independent contractor. See Record Document 10-3 at ¶ 19(c) ("You are an independent contractor").

Even if this Court were to assume that vicarious liability would encompass the relationship between IQ16 and CHI-S in this case, the Fifth Circuit has held that "district courts do not abuse their [*14] discretion when they disregard claims or theories of liability not present in the complaint and raised first in a motion in opposing summary judgment." *De Franceschi v. BAC Home Loans Servicing, L.P., 477 Fed.Appx. 200, 204 (5th Cir. 2012)*. Here, Monk asserted premises liability in her complaint and the catchall "any and all other acts of negligence which mat be shown at the trial hereof." Record Document 1-1 at ¶ 4. She raised vicarious liability for the first time in her opposition to CHI-S's Motion for Summary Judgment. This Court finds that it is within its discretion to disregard Monk's assertion of vicarious liability, as the complaint is silent as to any such theory of liability. Summary judgment in favor of CHI-S is, therefore, **GRANTED**.

**CONCLUSION**

Based on the forgoing analysis, CHI-S's Motion for Summary Judgment is **GRANTED**, as Monk has failed to show a genuine dispute as to any material fact in relation to premises or vicarious liability. CHI-S is entitled to judgment as a matter of law.

An order consistent with the terms of the instant ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 10th day of August, 2016.

/s/ S. Maurice Hicks, Jr.

**S. MAURICE HICKS, JR.**

**UNITED STATES DISTRICT JUDGE**

**ORDER**

Based on the foregoing Memorandum Ruling,

 [*15] **IT IS ORDERED** that the Motion for Summary Judgment (Record Document 10) filed by Defendant Choice Hotels International Services, Corp. be and is hereby **GRANTED**. All of Plaintiff Bennifer Monk's claims are **DISMISSED**.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 10th day of August, 2016.

/s/ S. Maurice Hicks, Jr.

S. MAURICE HICKS, JR.

UNITED STATES DISTRICT JUDGE

**End of Document**

⚠ Caution
As of: May 16, 2022 6:50 PM Z

EXHIBIT
I

# Simmons v. Methodist Hosps. of Dallas

United States District Court for the Northern District of Texas, Dallas Division

April 26, 2012, Decided; April 26, 2012, Filed

CIVIL ACTION NO. 3:11-CV-0017-B

**Reporter**
2012 U.S. Dist. LEXIS 58427 *; 2012 WL 1447970

JASON SIMMONS, Plaintiff, v. METHODIST HOSPITALS OF DALLAS, Defendant.

**Subsequent History:** Related proceeding at *Simmons v. Methodist Hosps. of Dallas, 2015 U.S. Dist. LEXIS 53691 (N.D. Tex., Apr. 22, 2015)*

Related proceeding at *Simmons v. Jackson, 2016 U.S. Dist. LEXIS 61388 (N.D. Tex., May 10, 2016)*

Related proceeding at *Simmons v. Tex. Med. Bd., 2018 U.S. Dist. LEXIS 230165 (W.D. Tex., Jan. 30, 2018)*

## Core Terms

residents, rotation, vacation, alleges, prima facie case, summary judgment, non-movant, disparate impact, graduate, discriminated, terminate, reasons, attend, adverse employment action, disparate treatment, non-discriminatory, scheduled, movant, similarly situated, remediation, genuine, residency program, program director, suspended, rebut

**Counsel:** [*1] For Jason Simmons, Plaintiff: Ray Jackson, LEAD ATTORNEY, The Jackson Law Firm, Dallas, TX.

For Methodist Hospitals of Dallas, Defendant: Simon D Whiting, LEAD ATTORNEY, Burford & Ryburn, Dallas, TX.

For ADR Provider, Mediator: Mary Burdin, Burdin Mediations, Dallas, TX.

**Judges:** JANE J. BOYLE, UNITED STATES DISTRICT JUDGE.

**Opinion by:** JANE J. BOYLE

## Opinion

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant's Motion for Summary Judgment (doc. 12), filed January 27, 2012. In the Motion, Defendant argues that Plaintiff has failed to present a prima facie case of discrimination, and further that he has failed to rebut Defendant's claims that he was fired for legitimate, non-pretextual reasons. For the reasons stated below, Defendant's Motion is hereby **GRANTED**.

I.

**BACKGROUND**

This is an employment discrimination case that arises from Plaintiff's service as a resident physician. Beginning in July 2007, Plaintiff Jason Simmons served as a resident in Defendant Methodist Hospitals of Dallas' ("Methodist") Internal Medicine Residency Program. Def.'s Mot. for Sum. J. ("Def.'s Mot.") 4. The Internal Medicine Program (the "Program") is a three year program that admits nine residents each year. *Id.* at 5. The Program requires [*2] its residents to complete a certain number of elective and mandatory rotations during a residency. *Id.* These rotations are scheduled by two Chief Residents and a Program Director. *Id.*

As a resident, Simmons agreed to comply with a number of policies and guidelines pertaining to his conduct. *Id.* at 4. For example, Simmons was required to sign a Resident Physician Agreement for each of his three years of training at Methodist. *Id.* On June 7, 2009, Simmons signed the Agreement for the 2009-10 training year. *Id.* He also agreed to abide by the terms of the Employee Handbook as set forth by the Graduate Medical Institution and Program manuals, as well as the

Methodist Hospitals of Dallas Internal Medicine Residency Program Policies and Guidelines. *Id.* Simmons received a copy of both of these manuals. App. to Def.'s Mot. 23-24.

During his residency, Simmons' direct supervisor was Dr. Leigh Hunter, the Program Director of the Internal Medicine Residency Program. Def.'s Mot. 4. Dr. Hunter reported to Dr. Manuel Rivera, the Assistant Vice President for Graduate Medical Education at Methodist. *Id.* Methodist's residency programs are governed by the Accreditation Council for Graduate Medical Education [*3] ("ACGME"), an independent accrediting organization that evaluates residency programs in the United States. *Id.* The Graduate Medical Education Committee ("GMEC") is the top Methodist committee that runs all graduate medical education at Methodist and includes approximately twenty members, including two elected residents from each program. *Id.* at 5.

Simmons alleges that in spring of 2010, he began to have conflicts with other doctors in part due to miscommunication and also due to a failure of Dr. Hunter and Dr. Rivera to accommodate his requests. Compl. 2-3. On March 22, 2010, Simmons requested that some of his vacation time, originally scheduled for June 2010, be rescheduled to May. Def.'s Mot. 15. Dr. Hunter responded that Simmons would be unable to take off that requested time because doing so would mean that he would violate Methodist's vacation policy. *Id.* On May 14, Simmons met with Dr. Hunter and Dr. Rivera to discuss which dates he might be able to take a vacation. *Id.* When he attempted to bring up other topics, Dr. Rivera left the meeting. Compl. 3. Simmons also alleges that he was falsely accused of failing to attend his rounds at the hospital as scheduled when he was actually [*4] attending meetings with Dr. Rivera. *Id.* On May 17, Simmons was informed that Dr. Hunter wanted to meet with him, but Simmons refused to meet with her alone and requested that Dr. Rivera attend the meeting. *Id.* Then, on May 19, Simmons was called to a meeting with Dr. Rivera, who questioned him about having failed to attend his rounds or to respond to Dr. Hunter's pages. *Id.* Thereafter, Simmons was asked to take a urine test, which he refused. *Id.* at 3. Consequently, Dr. Rivera formally suspended Simmons. *Id.*

One day later, on May 20, 2010, Simmons met with the Executive Committee of the GMEC ("Executive Committee") concerning the conflicts that had arisen. Def.'s Mot. 22. Simmons denied any issues or concerns that the Executive Committee raised. *Id.* After the meeting was over, the Executive Committee unanimously decided that the suspension should remain intact and that the recommendation should be made to the GMEC to terminate Simmons' employment. *Id.* On May 25, the GMEC met to consider the recommendation, and it decided that Simmons should not be permitted to graduate from the Program. *Id.* at 23. Simmons then appealed the decision to the President and Chief Executive Officer of Methodist [*5] Health System of Dallas, Dr. Stephen Mansfield. *Id.* Dr. Mansfield met with Simmons and reviewed the applicable documentation before deciding to uphold the decision. *Id.*

Simmons alleges that, beginning in 2010, Methodist began to discriminate in several different ways. First, he alleges that Methodist refused to allow him to work a rotation in Rheumatology. Compl. 2. Second, Simmons alleges that Methodist would not permit him to alter his vacation days to the point where he was unable to take any vacation. *Id.* Third, he alleges that Methodist's program directors failed to keep an accurate record of Simmons' conference attendance. *Id.* Fourth, he alleges that Dr. Rivera incorrectly stated that Simmons had signed a remediation agreement, which he claims that he never signed. *Id.* And fifth and finally, Simmons alleges that he was unlawfully suspended from the program and eventually terminated. *Id.* at 4.

Simmons filed this lawsuit on January 4, 2011, claiming that Methodist discriminated against him on the basis of race, in violation of 42 U.S.C. § 2000e and 42 U.S.C. § 1981. Simmons alleges claims of disparate treatment as well as disparate impact. *Id.* at 4-5. On January 27, 2012, Methodist [*6] filed a Motion for Summary Judgment (doc. 12). In the Motion, Methodist argues that Simmons failed to state a *prima facie* case of disparate treatment, and in the alternative, that Simmons' allegations of disparate treatment are unfounded because it had legitimate and non-discriminatory reasons to terminate his employment. Furthermore, Methodist argues that Simmons has failed to offer any evidence of disparate impact, and has in fact failed to establish a *prima facie* case of disparate impact under 42 U.S.C. § 2000e-2(k). On March 2, 2012, Simmons filed a Response that relied heavily on his deposition testimony in reiterating that he had been discriminated against. [1] The Motion now being ripe, the

---

[1] Simmons' Response additionally argues that he was subjected to a hostile work environment because of his race. Resp. 9-11. This claim was not properly pleaded, and

**APP. 337**

Court will address the merits of Methodist's claims below.

## II.

## LEGAL STANDARDS

The purpose of summary judgment is "to enable a party who believes there is no genuine dispute as to a separate fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues." *Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990)*. Accordingly, *Federal Rule of Civil Procedure 56(a)* provides that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." The substantive law governing a matter determines which [*8] facts are material to a case. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

The summary judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Labs, 919 F.2d 301, 303 (5th Cir. 1990)*. However, if the non-movant ultimately bears the burden of proof at trial, the summary judgment movant need not support its motion with evidence negating the non-movant's case. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. Rather, the summary judgment movant may satisfy its burden by pointing to the mere absence of evidence supporting the non-movant's case. *Id.* When the movant bears the burden of proving an affirmative defense at trial, "it must establish beyond dispute all of the defense's essential elements." *Bank of La. v. Aetna U.S. Healthcare Inc., 468 F.3d 237, 241 (5th Cir. 2006)* (citing *Martin v. Alamo Cmty. Coll. Dist., 353 F.3d 409, 412 (5th Cir. 2003))*.

Once the summary judgment movant has met this burden, the non-movant must "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)*(per curiam)(citing *Celotex, 477 U.S. at 325*). [*9] Factual controversies regarding the existence of a genuine issue for trial must be resolved in favor of the non-movant. *Little, 37 F.3d at 1075*. Nevertheless, a non-movant may not simply rely on the Court to sift through the record to find a fact issue, but must instead point to specific evidence in the record and articulate precisely how that evidence supports the challenged claim. *Ragas v. Tenn. Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998)*. Moreover, the evidence the non-movant does provide must raise more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. This evidence must be such that a jury could reasonably base a verdict in the non-movant's favor. *Anderson, 477 U.S. at 248*. If the non-movant is unable to make such a showing, the court must grant summary judgment. *Little, 37 F.3d at 1075*.

## III.

## ANALYSIS

A. *Disparate Treatment*

Simmons alleges that he was the victim of disparate treatment on the basis of his race in violation of Title VII of the Civil Rights Act of 1964. *42 U.S.C. § 2000e-2(a)(1) (2006)*. Title VII provides that "[i]t shall be an unlawful employment practice for an employer—(1) [*10] to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2(a)(1)*. A plaintiff can "prove a claim of intentional discrimination . . . either by direct or circumstantial evidence." *McCoy v. City of Shreveport, 492 F.3d 551, 556 (5th Cir. 2007)*. When the plaintiff presents a case that relies exclusively on circumstantial evidence, the Court will apply the burden-shifting framework as set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d*

---

Simmons failed to seek leave from this Court to amend his Complaint to add a hostile work environment claim. If a party fails to amend properly as a matter of course, it "may amend its pleading only with the opposing party's written consent or the court's leave." *Fed. R. Civ. P. 15(a)(2)*. [*7] Given that Simmons did not obtain Methodist's consent, it must obtain leave from the Court. Simmons has not articulated why he failed to amend his pleading properly, or why doing so in his Response to Defendant's Motion for Summary Judgment would not cause undue prejudice to Methodist. Furthermore, the Court finds that this amendment would be futile. See *Matter of Southmark Corp., 88 F.3d 311, 314-15 (5th Cir. 1996)*. Accordingly, the Court denies Simmons the right to add this claim, and therefore his argument that he was subject to a hostile work environment is hereby **STRICKEN**.

**APP. 338**

668 (1973). McCoy, 492 F.3d at 556.

Under the McDonnell Douglas framework, the plaintiff has the in initial burden to come forward with evidence establishing a prima facie case of discrimination. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). To make out a prima facie case, the plaintiff must show that he or she "(1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than [*11] other similarly situated employees outside the protected group." McCoy, 492 F.3d at 556-57. "If the plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory . . . reason for its employment action." Id. at 557. "The employer's burden is only one of production, not persuasion, and involves no credibility assessment." Id. Finally, "[i]f the employer meets its burden of production, the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory . . . purpose." Id. To carry this burden, the employee must demonstrate that each stated reason articulated by the employer was merely a pretext for discrimination. Id.

i. Adverse Employment Action

Simmons contends that Methodist discriminated against him in several different respects. The alleged discriminatory acts include the following: (1) Methodist refused to allow Simmons to work a rotation in Rheumatology; (2) Methodist would not permit him to alter his vacation days to the point where he was unable to take any vacation; (3) Methodist's program directors failed to keep an accurate record [*12] of Simmons' conference attendance; (4) Dr. Rivera incorrectly stated that Simmons had signed a remediation agreement, which Simmons alleges that he never signed; and (5) Simmons unlawfully suspended from the program and eventually terminated. Id. at 4.

The Court must determine whether these allegations constitute adverse actions that amount to a prima facie case of discrimination under Title VII. The Fifth Circuit has held that adverse actions under Title VII claims include "ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating." Pegram v. Honeywell, Inc., 361 F.3d 272, 282 (5th Cir. 2004) (emphasis omitted) (citation omitted). Other actions — including disciplinary filings, reprimands, and poor performance reviews — do not constitute adverse employment actions, even as they might affect the plaintiff's future employment. Roberson v. Game Stop/Babbage's, 152 Fed. Appx. 356, 360 (5th Cir. 2005).

Simmons' Complaint does not make clear which precise actions constitute unlawful discrimination. However, several of his factual allegations are not adverse employment actions. Claims that Methodist did not calculate his attendance correctly or that [*13] it incorrectly believed he signed a remediation agreement are not adverse employment actions. They may be examples of differential treatment, but they are not actionable under the Fifth Circuit's analysis of Title VII. Furthermore, the fact that Simmons did not perform a Rheumatology rotation is not an "ultimate employment decision" because it did not affect his status within the Program. See McCoy, 492 F.3d at 559. Nevertheless, the Court will consider Methodist's resistance to permitting Simmons to take vacation days, as well as his eventual firing, as adverse employment actions. [2] Therefore, the Court finds that Simmons has carried his burden to show that he experienced an adverse employment action.

ii. Preferential Treatment

To establish the fourth element of a prima facie case for discrimination, Simmons must show that Methodist gave preferential treatment to similarly situated employees [*14] outside the protected class. Until the employee produces evidence that similarly situated employees were treated differently, then there is no inference of discrimination for the employer to rebut. See Anthony v. Donahoe, No. 11-30644, 460 Fed. Appx. 399, 2012 U.S. App. LEXIS 3201, 2012 WL 470193, at *3 (5th Cir. Feb. 13, 2012); see also Lee v. Kan. City S. Ry. Co., 574 F.3d 253, 259-60 (5th Cir. 2009) ("The question whether [the plaintiff] presented a prima facie case of racial discrimination turns here on whether either or both of the white engineers identified by [the plaintiff] as

---

[2] Simmons provides no legal support for the theory that limiting available vacation days may be an adverse employment action, but for purposes of this Order, the Court will assume without deciding that it is. His eventual firing is, of course, an adverse employment action. See Pegram, 361 F.3d at 282.

**APP. 339**

Case 4:21-cv-01209-P   Document 121   Filed 05/16/22   Page 13 of 15   PageID 2683

Page 5 of 7
2012 U.S. Dist. LEXIS 58427, *14

comparators were similarly situated to him."). [3]

Simmons, in both his Complaint and his Response, has offered no facts to suggest differential treatment on the basis of race. Simmons addresses this only by pointing to statements from his from his own Appendix, which includes an affidavit that states plainly that "other non-African Americans were allowed to take their vacation time" and that other residents who made similar mistakes were permitted to graduate. App. to Pl.'s Resp. 22. Apart from Simmons' own testimony, then, within his affidavit and deposition, there is no comparative evidence that would lead to an inference that [*16] Methodist discriminated against Simmons or treated similarly situated plaintiffs more favorably.

Accordingly, the Court finds that Simmons has not established a *prima facie* case of racial discrimination because he has not demonstrated that other employees outside his protected class were treated differently than he was.

### iii. Defendant's Legitimate, Non-Discriminatory Reasons

Assuming, *arguendo*, that Simmons were able to establish a prima facie case of discrimination, he would not prevail because Methodist has offered a litany of examples of Simmons' misconduct, which Simmons has failed entirely to rebut. Methodist indicates, for example, that Simmons' performance in a mandatory, required exam dropped from the 47th percentile in his second year to the 14th percentile in his third year. Def.'s Mot. 11. Pursuant to Methodist policy, all residents scoring below the 30th percentile are placed on a remediation plan. *Id.* In Simmons' year, four residents scored below the 30th percentile, and all were subject to the remediation plan, yet Simmons refused to sign the plan, and later claimed that he believed he may not be subject to it. Def.'s Mot. 12; App. to Def.'s Mot. 34-35. Thus, there is no [*17] evidence that Methodist treated Simmons differently from similarly situated residents, or strayed from its policy in placing Simmons on the remediation plan.

Second, Methodist has offered a non-discriminatory explanation for Simmons' inability to work a Rheumatology rotation. Methodist contends that in March 2010, Simmons wrote to Dr. Hunter and stated that he wanted to work his Rheumatology rotation in April, yet was scheduled to work a rotation in Nephrology that month. Def.'s Mot. 13. Dr. Hunter responded that she had requested information from the program coordinator and attached a copy of his schedule indicating that he was not scheduled to do it in April. *Id.* Despite this, Dr. Hunter contacted Parkland Hospital ("Parkland") to see if it would permit Simmons to complete his Rheumatology rotation there. *Id.*; App. to Def.'s Mot. 91. Because Parkland already had one resident scheduled to perform a Rheumatology rotation in April, it could not accommodate another resident. *Id.* Nevertheless, Dr. Hunter contacted that resident, who willingly gave up her rotation at Parkland so that Simmons could work there. *Id.* However, Dr. Hunter then contacted Dr. Carol Croft, the Program Director of [*18] Internal Medicine at Parkland, who refused to allow Simmons to perform the rotation because he had failed tho attend his previously scheduled rotation at Parkland. *Id.* at 13-14; App. to Def.'s Mot. 91. Finally, Dr. Hunter informed Simmons in an email on March 26, 2010, that he could work a Rheumatology rotation at Methodist during April, but Simmons declined. Def.'s Mot. 14; App. to Def.'s Mot. 112. Though Methodist requires its residents to complete a Rheumtaology rotation in order to graduate, it granted Simmons an exception and waived the requirement. Def.'s Mot. 15; App to Def.'s Mot. 114.

Third, Methodist contends that it applied uniform vacation policies to Simmons' requests for vacation days. Pursuant to the Program's Policy and Guidelines, residents do not receive credit for a rotation unless they are present for at least three weeks. Def.'s Mot. 15; App. to Def.'s Mot. 60. On March 23, 2010, Simmons requested a second week of vacation in May, which

---

[3] Nonetheless, as with other forms of intentional discrimination, providing evidence of "similarly situated employees" or that plaintiff was "replaced by an individual outside the protected group" are not the only methods by which a plaintiff may discharge his burden of establishing a *prima facie* case of intentional discrimination. *See Abdu-Brisson v. Delta Airlines, 239 F.3d 456, 467-68 (2d Cir. 2001)* ("[A] showing of disparate treatment, while a common and especially effective method of establishing the inference of discriminatory intent necessary to complete the *prima facie* case, is only one way to [*15] discharge that burden."). Simmons may also establish the fourth element of his *prima facie* case by showing that he was otherwise discharged because of his race. *See Lawson v. S. Components, Inc., 410 Fed. Appx. 833, 835 (5th Cir. 2011)* (holding that the fourth element of plaintiff's *prima facie* case may be satisfied by showing [he] was "otherwise discharged because of [his] race") (citing *Bryan v. McKinsey & Co., Inc., 375 F.3d 358, 360 (5th Cir. 2004)*). Simmons presents nothing to indicate he is relying upon any theory of liability other than that he was treated differently than similarly situated individuals.

**APP. 340**

would have meant that he may not have been present for at least three weeks of his May rotation. [4] Simmons then asked for an exception to this rule. Def.'s Mot. 15; App. to Def.'s Mot. 114. On April 6, 2010, Dr. Hunter notified Simmons [*19] that the requirement would not be waived, but in an email notified him that she was "willing to work to work with [him] on the vacation to try to get something figured out for this month." Def.'s Mot. 15; App. to Def.'s Mot 114-15. The parties continued to correspond regarding potential vacation dates, until Simmons sent Dr. Hunter an email on May 13 that stated that she was "in a state of denial" regarding the situation. Def.'s Mot. 15; App. to Def.'s Mot. 86. The record indicates, then, that Methodist applied its vacation policy as written and Simmons has failed to offer any evidence that it was applied in a discriminatory manner.

Finally, Methodist has offered several reasons to explain its decision to suspend and terminate Simmons. In December 2009, a supervising physician reviewed Simmons' performance and noted that he exhibited an unprofessional attitude in his elective Ambulatory rotation that he labeled "worrisome." Def.'s Mot. 18; App. to Def.'s Mot. 148. Simmons was also noted to have a "tendency to want to give [*20] patients what they want, even when such is no in patient's best medical interest." App. to Def.'s Mot. 148. In spring 2010, a number of physicians and other residents noted Simmons' continued poor performance and behavior. Def.'s Mot. 18-19. Simmons also frequently failed to respond to urgent pages or emails from his superiors. Def.'s Mot. 20. On May 14, 2010, Dr. Rivera and Dr. Hunter met with Simmons to discuss his performance and behavior, but Simmons became combative by yelling at Dr. Hunter and accused her of being unfair about his vacation schedule. Def.'s Mot 20; App. to Def.'s Mot. 130. At that point, Dr. Rivera terminated the meeting. *Id.* Later, on May 19, 2010, Simmons met with Dr. Rivera and refused to submit to a drug test, in violation of the Methodist Health System Human Resource Policy. Def.'s Mot 22; App. to Def.'s Mot. 175. Under the this policy, refusal to submit to a drug test results in automatic termination. *Id.* It was at that point that Dr. Rivera suspended Simmons, and that both GMEC and its Executive Committee voted not to permit Simmons to graduate from the Program. Def.'s Mot. 22-23.

---

[4] Simmons was scheduled for night float from April 28, 2010, to May 4, 2010, which meant that he would not have attended his rotation for those days. Def.'s Mot. 15.

In his Response, Simmons fails to deal substantively with these explanations. [*21] Rather, he relies entirely on his own testimony that he was discriminated against because other residents were treated more favorably. Such assertions, unsupported by evidence, do not rebut evidence put forth by the employer that its reasons are legitimate and nondiscriminatory. *See Grimes v. Tex. Dept. of Mental Health & Retardation, 102 F.3d 137, 139-40 (5th Cir. 1996)* ("[U]nsubstantiated assertions are not competent summary judgment evidence."); *Forsyth v. Barr, 19 F.3d 1527, 1533 (5th Cir. 1994)* ("'Summary judgment, to be sure, may be appropriate, even in cases where elusive concepts such as motive or intent are at issue . . . if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'") (quoting *Krim v. BancTexas Grp., Inc., 989 F.2d 1435, 1449 (5th Cir. 1993))*. Where an employee fails to offer any evidence apart from his subjective belief that he was discriminated against, the employer fails to raise an issue of fact. *Id.*

Accordingly, Simmons has both failed to state a *prima facie* case of disparate treatment and to rebut Methodist's legitimate, non-discriminatory reasons for both denying him vacation time and for eventually [*22] terminating him. Therefore, Methodist's Motion as to Simmons' claim of disparate treatment under Title VII is hereby **GRANTED**.

B. *Disparate Impact*

To establish a *prima facie* case of disparate impact, the plaintiff must show that a "facially neutral employment" standard or policy operates "more harshly on one group than another." *Carpenter v. Steven F. Austin State Univ., 706 F.2d 608, 621 (5th Cir. 1983)*. To carry this burden, the employee must establish that a specific practice or set of practices results in a significant disparity between groups. *Johnson v. Uncle Ben's, Inc., 965 F.2d 1363, 1367 (5th Cir. 1992)*. Therefore, to state a *prima facie* case of disparate impact, a plaintiff must isolate and identify employment practices that are allegedly responsible for statistical disparities. *Wards Cove Packing, Inc. v. Atonio, 490 U.S. 642, 656, 109 S. Ct. 2115, 104 L. Ed. 2d 733 (1989)*, *superseded by statute on other grounds*, *42 U.S.C. § 2000e-2(k)*.

Simmons has failed to identify any practice or procedure that has a disparate impact on a protected class. The Court cannot recognize any substantive claim for disparate impact in either his pleadings or his Response. Accordingly, Methodist's Motion with regard to Simmons' claim [*23] of disparate impact is hereby

**APP. 341**

2012 U.S. Dist. LEXIS 58427, *23

**GRANTED**.

C. Section 1981

"Claims brought pursuant to Title VII and § 1981 are 'governed by the same evidentiary framework,' such that the analyses under both statutes are substantively the same." *Jackson v. Watkins*, 619 F.3d 463, 466 (5th Cir.2010) (quoting *Pegram*, 361 F.3d at 281 n.7). Because the Court determined that Simmons' claim fails under Title VII, his § 1981 claims are likewise dismissed. Accordingly, Methodist's Motion as to Simmons' claim brought under § 1981 is hereby **GRANTED**.

IV.

**CONCLUSION**

The Court finds that Plaintiff has failed to plead a prima facie case of discrimination under Title VII of the Civil Rights Act or § 1981. Furthermore, Plaintiff has failed to respond to Defendant's legitimate and nondiscriminatory reasons that support the adverse actions taken against him. Consequently, Plaintiff cannot show that there is a genuine issue of material fact, and therefore cannot survive summary judgment. For the foregoing reasons, Defendant's Motion for Summary Judgment is hereby **GRANTED**.

**SO ORDERED.**

**SIGNED April 26, 2012**

/s/ Jane J. Boyle

**JANE J. BOYLE**

**UNITED STATES DISTRICT JUDGE**

End of Document